**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| STEFANIE MARVIN, et al., on behalf of themselves and all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:21-cv-01146-PP |
| KIA AMERICA, INC., et al., | ) ) | Hon. Pamela Pepper |
| | ) | |
| Defendants. | ) ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS KIA AMERICA, INC.**</u>
<u>**AND HYUNDAI MOTOR AMERICA'S MOTION TO DISMISS**</u>

Michael T. Brody
Peter J. Brennan
Vaughn E. Olson
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654-3456
Telephone: (312) 222-9350
Fax: (312) 527-0484
MBrody@jenner.com
PBrennan@jenner.com
VOlson@jenner.com

*Attorneys for Defendants*
*Kia America, Inc. and Hyundai Motor America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 2

        A.     Defendants and the Automotive Industry ............................... 3

        B.     Rising Vehicle-Related Crime in 2021 ................................... 4

        C.     The Putative Class and Class Vehicles ................................... 4

        D.     Procedural History ................................................................ 5

ARGUMENT ........................................................................................................... 5

I.      Legal Standards ...................................................................................... 5

II.     Defendants Are Not Liable for Intervening Criminal Acts by Third
       Parties ..................................................................................................... 6

III.    Plaintiffs' Request for a Wisconsin-only Modification to Federal Auto
       Standards Is Preempted ........................................................................... 7

IV.   Plaintiffs Fail to State Facially Plausible Warranty Claims. ................... 8

        A.     Defendants' Express Warranties Exclude Theft. ..................... 8

        B.     Defendants Did Not Breach an Implied Warranty of
               Merchantability. ................................................................. 11

        C.     Plaintiffs' Magnuson-Moss Warranty Act Claim Necessarily Fails.
               ..................................................................................... 13

V.     Plaintiffs' Unjust Enrichment Claim Fails Because Plaintiffs Received
       Something of Value and Defendants Were Not Unjustly Enriched. ......... 14

VI.   Plaintiffs' Misrepresentation-Based Fraud Claims Fail Because Plaintiffs
       Fail to Sufficiently Allege an Actionable Representation and Fail to
       Plead with Sufficient Particularity. ....................................................... 15

VII.  Plaintiffs' Rescission Claim Does Not Sufficiently Allege an Actionable
       Representation, Is Not Sufficiently Plead, and Is Precluded by the
       Economic Loss Doctrine. ....................................................................... 17

VIII. Plaintiffs' Deceptive Trade Practices Claim Relies on an Inapplicable

Case 2:21-cv-01146-PP   Filed 12/22/21   Page 2 of 35   Document 20

     Statute. ....................................................................................................... 19

IX.    Plaintiffs' Wis. Stat. § 218.0116 Claim Also Relies on an Inapplicable
     Statute. ....................................................................................................... 21

X.    Plaintiffs' Wis. Stat. § 895.047 Claim Is Also Precluded by the Economic
     Loss Doctrine. ........................................................................................... 23

XI.    Plaintiffs' Post-Sale Failure to Warn Claim Also Fails to State a Claim. ............... 25

XII.    This Court Should Deny Plaintiffs' Declaratory Relief Claim as
     Duplicative and Improper. ......................................................................... 26

XIII.    Plaintiffs Only Have Standing to Assert Claims Regarding Their Own
     Vehicles. ..................................................................................................... 27

CONCLUSION .................................................................................................... 28

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alston v. Advanced Brands & Importing Co.*,
    494 F.3d 562 (6th Cir. 2007) ..................................................6

*Am. Cas. Co. of Reading, Pa. v. Mem'l Hosp. Ass'n*,
    223 F. Supp. 539 (E.D. Wis. 1963) .....................................18

*Ash Park, LLC v. Alexander & Bishop, Ltd.*,
    866 N.W.2d 679 (Wis. 2015) ........................................10, 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..............................................................6

*Brame v. Gen. Motors LLC*,
    535 F. Supp. 3d 832 (E.D. Wis. 2021) ......................... *passim*

*Burton v. E.I. du Pont de Nemours & Co., Inc.*,
    994 F.3d 791 (7th Cir. 2021) .........................................10, 25

*Bushmaker v. A. W. Chesterton Co.*,
    2013 WL 11079371 (W.D. Wis. Mar. 1, 2013) .....................25

*CMFG Life Ins. Co. v. RBS Sec. Inc.*,
    2013 WL 4483068 (W.D. Wis. Aug. 19, 2013), *order clarified on*
    *reconsideration*, 2013 WL 12233991 (W.D. Wis. Sept. 19, 2013) ..................17, 18

*Daanen & Janssen v. Cedar Rapids*,
    573 N.W.2d 842 (Wis. 1997) ........................................18, 23

*Eichstedt v. Lakefield Arms Ltd.*,
    849 F. Supp. 1287 (E.D. Wis. 1994) ...................................6, 7

*Forest Home Dodge, Inc. v. Karns*,
    138 N.W.2d 214 (Wis. 1965) ...............................................22

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000) ..............................................................7

*United States ex rel. Hanna v. City of Chicago*,
    834 F.3d 775 (7th Cir. 2016) ......................................6, 16, 17

iii

*Jones v. Bock*,
    549 U.S. 199 (2007) ............................................................................................5

*Kisting v. Gregg Appliances, Inc.*,
    2016 WL 5875007 (E.D. Wis. Oct. 7, 2016) ...............................................16, 27, 28

*Kolupar v. Wilde Pontiac Cadillac, Inc.*,
    735 N.W.2d 93 (Wis. 2007) ..............................................................................23

*La Crosse Cty. v. Trinity Indus., Inc.*,
    2016 WL 1274623 (W.D. Wis. Mar. 31, 2016) .....................................................27

*Lamont v. Winnebago Indus., Inc.*,
    569 F. Supp. 2d 806 (E.D. Wis. 2008) ...........................................................11, 13

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................................27

*Mathews v. REV Recreation Grp., Inc.*,
    931 F.3d 619 (7th Cir. 2019) .............................................................................13

*MDS Enters. v. Mid-State Truck Serv., Inc.*,
    958 N.W.2d 164 (Wis. Ct. App. 2021) ...............................................................10

*Miranda v. Navistar, Inc.*,
    2020 WL 8300521 (S.D. Tex. Dec. 15, 2020) .........................................................7

*Mross v. Gen. Motors Co., LLC*,
    2016 WL 4497300 (E.D. Wis. Aug. 25, 2016) .............................................6, 11, 12

*Reusch v. Roob*,
    610 N.W.2d 168 (Wis. Ct. App. 2000) ...............................................................21

*Rosenberg v. SC Johnson & Son, Inc.*,
    2021 WL 3291687 (E.D. Wis. Aug. 2, 2021) .......................................................16

*T&M Farms v. CNH Indus. Am., LLC*,
    488 F. Supp. 3d 756 (E.D. Wis. 2020) ......................................................13, 14, 15

*Tietsworth v. Harley-Davidson, Inc.*,
    677 N.W.2d 233 (Wis. 2004) ........................................................15, 18, 23, 24

*Weaver v. Champion Petfoods USA Inc.*,
    471 F. Supp. 3d 876 (E.D. Wis. 2020), *aff'd* 3 F.4th 927 (7th Cir. 2021) ....................16, 27

*White v. Fincantieri Bay Shipbuilding*,
    429 F. Supp. 3d 582 (E.D. Wis. 2019) .................................................................5

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995) ........................................................................................27

*Wind Point Restoration, Inc. v. Weikel*,
    953 N.W.2d 98 (Wis. Ct. App. 2020) ...........................................................20

**Statutes**

49 CFR § 543 ...........................................................................................................3, 4

Declaratory Judgment Act .........................................................................................26

Federal Rule of Civil Procedure 9(b) .................................................................*passim*

Federal Rule of Civil Procedure 12(b)(6) ..................................................................5

Magnuson-Moss Warranty Act ...........................................................................8, 13

Motor Vehicle Theft Act ............................................................................................3

Wis. Admin. Code § 120.01 .....................................................................................20

Wis. Admin. Code § 127.01 .........................................................................19, 20, 21

Wis. Admin. Code § 127.60 .....................................................................................19

Wis. Stat. § 100.18 ...................................................................................................15

Wis. Stat. § 100.20 ...................................................................................................19

Wis. Stat. § 218.0101(23)(a)(1) ...............................................................................23

Wis. Stat. § 218.0114 .........................................................................................21, 22

Wis. Stat. § 218.0116 .........................................................................................21, 23

Wis. Stat. § 218.0121 ...............................................................................................22

Wis. Stat. § 218.0163(2) .....................................................................................21, 23

Wis. Stat. § 895.047 .................................................................................................23

Wis. Stat. § 895.446 .........................................................................................15, 16

Wis. Stat. § 943.20(1)(d) ...................................................................................15, 16

Wisconsin Auto Dealership Law ..............................................................................22

Wisconsin Constitution .............................................................................................26

**Other Authorities**

Benjamin Yount, *Milwaukee city council members blame car companies for spike in stolen cars*, THE CENTER SQUARE: WISCONSIN (June 17, 2021) ........................................26

James E. Causey, *Car theft remains a pressing problem in Milwaukee.  Here's what we learned at our recent Listen MKE Live event.*, MILWAUKEE JOURNAL SENTINEL (updated Mar. 12, 2021) ...........................................................................................2

Jeramey Jannene, *Two-Thirds of All Milwaukee Auto Thefts Are Kia and Hyundai Vehicles*, URBAN MILWAUKEE (July 24, 2021) ...............................................................25, 26

vi

Defendants Kia America, Inc. ("Kia") and Hyundai Motor America ("Hyundai") (together, "Defendants") respectfully submit this Memorandum of Law in support of their Motion to Dismiss Plaintiffs Stefanie Marvin, Katherine Wargin, Chaid Przybelski, Chad Just, Amy Flasch, and Lydia Davis's (collectively, "Plaintiffs") Amended Complaint ("Complaint" or "Compl.").[1]

## INTRODUCTION

In late 2020 or early 2021, the Milwaukee metropolitan area suffered an unexpected and unprecedented rise in vehicle thefts. According to the Complaint, the culprits were a "gang of juveniles" who called themselves the "Kia Boyz." Compl. ¶ 1. Their motives were not financial. They—or those affiliated with them—uploaded footage of their exploits, including "reckless joyriding," on various social media platforms, including TikTok and Instagram. *Id.* ¶ 265. Plaintiffs are the former and current owners and lessees of Kia and Hyundai vehicles stolen by these third parties between February 2021 and June 2021. Plaintiffs initiated this action to blame Defendants for the Kia Boyz's crimes.

Plaintiffs' Complaint suffers several major flaws. First, the conduct animating this case is not any action taken by Defendants but by the Kia Boyz, and Plaintiffs cannot hold Defendants accountable for a third party's actions. Second, Defendants are not able to state viable warranty claims against Defendants because their vehicles are fit for their ordinary purpose of providing transportation and because Defendants' express warranties explicitly disclaim responsibility for any damage due to theft. Third, Plaintiffs fail to allege with any particularity a single actionable misrepresentation. And fourth, Plaintiffs' claims are precluded by the economic loss doctrine and by the very statutes they allege Defendants violated.

Defendants respectfully request that this Court dismiss Plaintiffs' Complaint in its entirety, with prejudice, and without granting Plaintiffs leave to amend their Complaint for the second time.

---

[1] As explained in its concurrently filed Motion to Dismiss Plaintiffs' Complaint, for brevity, Defendant Hyundai Kia America Technical Center, Inc. ("HATCI") also joins Defendants' Motion to Dismiss Plaintiffs' Complaint.

# BACKGROUND

In 2021, the theft of Kia and Hyundai vehicles "increased by 2,500% in Milwaukee" and now "represent 66% of all auto thefts in Milwaukee." *Id.* ¶ 2 (emphasis omitted); *see also id.* ¶¶ 165–73. The recent uptick has apparently been so substantial that compared "to the FBI's most-recent, 2019 statistics on auto-theft in Milwaukee, . . . twice as many Kias and Hyundais will be stolen in 2021 (7,149 cars) than the total number of vehicles stolen in 2019 (3,450 cars)—combined." *Id.* ¶ 281 (emphasis and footnote omitted).[2]

According to the Complaint, thieves are not just targeting new vehicles: many of the stolen vehicles have been on the road for as long as a decade. *E.g.*, Compl. ¶¶ 94, 167. And the criminals responsible are not alleged to be professional thieves who intend to profit financially from stealing these vehicles. *E.g.*, *id.* ¶¶ 1, 240, 265, 270, 276. Instead, the Complaint identifies a "gang of juveniles." *Id.* ¶¶ 1–2; *see also, e.g.*, *id.* ¶ 240 ("juveniles with a penchant for joyriding"). The Complaint points to "reckless joyriding" as a possible motive and suggests that the sharing of reckless joyriding videos on social media platforms, including TikTok and Instagram, could be a factor in the rash of thefts. *Id.* ¶¶ 265; *see also id.* ¶¶ 265–71.

Plaintiffs broadly allege that the "Class Vehicles" share a common "combination of design flaws" that they broadly define as the purported "Defect." *Id.* ¶¶ 1, 95. At the core of Plaintiffs' "defect" claim is the Federal Motor Vehicle Safety Standards ("FMVSS"), particularly FMVSS 114, which outlines "minimum theft-protection standards." *Id.* ¶ 24. FMVSS 114, for example, requires a "key locking system" to prevent "[n]ormal activation of the car's engine or other main source of motive power" and prevent "steering or self-mobility of the car, or both," "whenever the key is removed." *Id.* ¶ 33 (citation and quotation omitted). Although they acknowledge that Class

---

[2] As one of the Complaint's cited articles suggests, this recent uptick may be part of a larger nationwide spike in vehicle-related crime. *See* James E. Causey, *Car theft remains a pressing problem in Milwaukee. Here's what we learned at our recent Listen MKE Live event.*, MILWAUKEE JOURNAL SENTINEL (updated Mar. 12, 2021), https://www.jsonline.com/story/news/solutions/2021/03/11/car-thefts-continue-plague-milwaukee-here-some-answers/6904729002/) (cited by Complaint at 37 n.20).

Vehicles satisfy this standard, *see, e.g.*, *id.* ¶¶ 106, 110–13, 117, 125, 127, Plaintiffs argue that Defendants have violated FMVSS 114 because their vehicles' key locking system can be "easily" bypassed, *see id.* ¶ 35.[3]  Plaintiffs assert that Defendants have violated FMVSS 114 because Defendants did not implement at least five alternative designs the regulations do not require, including an "immobilizer" that would restrict the forward mobility of a stolen vehicle. *Id.* ¶¶ 94–95.

A.  Defendants and the Automotive Industry

Defendants are U.S. auto distributors of Hyundai and Kia branded vehicles. *See id.* ¶¶ 42, 45–46, 50–51.  Defendants sell to independent dealers who in turn directly sell or lease vehicles to consumers. *See id.* ¶ 55–57.  Defendants provide consumers certain limited express warranties that accompany the vehicles including to (typically, but not always) secondary owners. *See id.* ¶ 62; *see also generally* Compl. Exs. D & F.

The claims in this case arise in a regulatory context that the Complaint references but does not fully describe.  The federal auto regulator, the National Highway Traffic Safety Administration ("NHTSA"), declined to require the measures Plaintiffs ask this Court to order.  In particular, NHTSA denied a petition to "require manufacturers to install immobilizers as standard technology in all new vehicle lines." *Id.* ¶ 111.

NHTSA imposed a "parts marking requirement," referred to as a "PMR," which it published at 49 CFR part 543, pursuant "to its authority under the Motor Vehicle Theft Act of 1984." *Id.* ¶ 36.  The PMR requires "auto manufacturers to mark major parts of passenger vehicles with non-removable labels that make these parts identifiable, if stolen." *Id.* ¶¶ 36–37.  The PMR "is another regulatory scheme to combat auto theft; not only do marked auto parts facilitate their

---

[3] "Although Plaintiffs repeatedly call it "easy," the process of theft involves multiple steps and tools.  And all the while, Plaintiffs downplay the fact that it apparently took years, even decades, for this so-called relative "ease with which the Class Vehicles can be stolen" to become known among criminals. *Id.* ¶¶ 165, 236.  After all, it took until late 2020 or 2021, a global pandemic, and a related rise in crime, for this alleged "explo[sion]" of vehicle thefts in the Milwaukee area to happen. *Id.* ¶ 455.

tracing and recovery, but they also serve as evidence used to prosecute, thieves, dealers, and chop shops connected with vehicle theft." *Id.* ¶ 38 (citing 69 Fed. Reg. 17,960 at 961). Auto manufacturers may petition for an exemption from the PMR standard and NHTSA may approve an alternative "antitheft device if the agency concludes that the device is likely to be as effective in reducing and deterring motor vehicle theft as compliance with the parts-marking requirements." 49 CFR § 543.2; *see also* Compl. ¶ 112. Contrary to Plaintiffs' suggestions otherwise, NHTSA does not *require* any such alternative anti-theft devices; NHTSA merely *accepts* them as substitutes for its actual requirement, the PMR.

Plaintiffs insist that their preferred alternative designs—including an immobilizer that would restrict forward mobility and a push-button feature to start the vehicle (as opposed to a traditional key ignition)—should substitute for the regulator's judgment, which was in place when all of the Class Vehicles were manufactured. In making these allegations, the Complaint frames these optional features as "safety" features rather than "security" features. *See id.* ¶¶ 94, 625.

B.    Rising Vehicle-Related Crime in 2021

The National Insurance Crime Bureau ("NICB") is a not-for-profit organization "dedicated exclusively to fighting insurance fraud and crime" that publicly publishes "an annual 'Hot Wheels' Report that identifies: (i) the most stolen vehicles in the country; [and] (ii) the most stolen vehicles in each state." *Id.* ¶¶ 212–14. According to the Complaint, some Kia and Hyundai models have shown up on some of the NICB's lists for some states over the years leading up to and including 2020. A comprehensive overview of the cited data shows that in years leading up to and including 2020, Hyundai and Kia branded vehicles showed up less often than many of their competitors.

According to the Complaint, suddenly, in late 2020 or 2021, the Milwaukee area experienced a "surge" in vehicle-related crime, and vehicles made by Honda, Kia, and Hyundai were the most impacted. *Id.* ¶ 165; *id.* at 36 n.16.

C.    The Putative Class and Class Vehicles

Plaintiffs are residents of Wisconsin. Two purchased their vehicles used: Plaintiff Marvin purchased a 2012 Kia Optima in 2021 from a family member who purchased it at some unknown

time from some unknown seller, and Plaintiff Wargin bought a 2013 Hyundai Sonata in 2016 from an independent dealership. *Id.* ¶¶ 6–7. Three others—Plaintiffs Przybelski, Just, and Davis—leased vehicles from independent dealerships, Plaintiff Przybelski a 2019 Hyundai Elantra, Plaintiff Just a 2019 Kia Forte, and Plaintiff Davis a 2021 Kia Sportage. *Id.* ¶¶ 8–9, 11. Finally, Plaintiff Flasch purchased a 2021 Kia Sportage; she is the only Plaintiff who still has her vehicle. *Id.* ¶ 10.

Plaintiffs define the class they seek to represent broadly: "All persons or entities residing in Wisconsin who are current or former owners and/or lessees of a Class Vehicle." *Id.* ¶ 468. They define the putative Class Vehicles even more broadly: rather than identify any specific Kia or Hyundai vehicles by make or model, they sweep in all Kia and Hyundai vehicles manufactured after 2011 that have, in whole or in part, the so-called Defect. *Id.* ¶ 94.

      D.    <u>Procedural History</u>

Plaintiffs Marvin and Wargin initiated this action in the Circuit Court of Milwaukee County, Wisconsin, with a 3-count complaint spanning 47 pages. After removal to the United States District Court for the Eastern District of Wisconsin, Plaintiffs amended their complaint, added four additional plaintiffs, increased the claims to 12 counts, and tripled its length to 168 pages.[4]

## **ARGUMENT**

### I.    **Legal Standards**

Under Federal Rule of Civil Procedure 12(b)(6), a "complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief," *Jones v. Bock*, 549 U.S. 199, 215 (2007), or the allegations, taken as true, otherwise fail "to state a claim to relief that is plausible on its face," *White v. Fincantieri Bay Shipbuilding*, 429 F. Supp. 3d 582, 585 (E.D. Wis. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has

---

[4] Plaintiffs have filed a Motion to Restrict a Court Document (Dkt. 11) to redact certain information about the Class Vehicles. The parties have since reached an agreement regarding the scope of the redactions and anticipate filing a stipulation and related motion in January 2022.

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Mross v. Gen. Motors Co., LLC*, 2016 WL 4497300, at \*2 (E.D. Wis. Aug. 25, 2016) (quoting *Iqbal*, 556 U.S. at 678). The complaint's "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Conclusory allegations do not suffice. *See Iqbal*, 556 U.S. at 678.

Federal Rule of Civil Procedure 9(b) imposes "heightened pleading requirements" for fraud claims. *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 778 (7th Cir. 2016) (citation and quotation omitted). This includes alleging "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Id.* (citation and quotation omitted).

## II. Defendants Are Not Liable for Intervening Criminal Acts by Third Parties.

As the Complaint makes clear, Defendants are not responsible for the Milwaukee area's "shocking auto-theft spree." Compl. ¶ 2. In the very first paragraph of their lengthy Complaint, Plaintiffs admit that the purported Class Vehicles were stolen not by Defendants but by "[a] gang of juveniles, self-dubbed the 'Kia Boyz.'" *Id.* ¶ 1; *see also id.* ¶ 4 ("The Milwaukee metropolitan area has—quite literally—been transformed into a game of *Grand Theft Auto* wherein *the Kia Boyz* are preying on the owners of these Class Vehicles to steal their cars in droves . . . ." (emphasis added)). And the ultimate injury animating Plaintiffs' Complaint is not the design, manufacture, or advertising of Defendants' vehicles but the theft of those vehicles by these so-called Kia Boyz. *See id.* ¶¶ 1–5.

A third party's crime is an independent, intervening action that disrupts causation. Even if Defendants were somehow liable for any harm alleged here (and they are not), the crimes committed by the third parties relieve Defendants of any such liability as a matter of law. *See Eichstedt v. Lakefield Arms Ltd.*, 849 F. Supp. 1287, 1292 (E.D. Wis. 1994) ("In ordinary circumstances, a criminal act breaks the chain of legal causation."); *cf. Alston v. Advanced Brands & Importing Co.*, 494 F.3d 562, 565 (6th Cir. 2007) (stating that "the causal connection between

the defendants' advertising and the plaintiffs' alleged injuries [wa]s broken by the intervening criminal acts of the third-party sellers and the third-party[] underage purchasers").

The *Eichstedt* court considered a tragic accident in which a third party, believing his firearm was not loaded, pointed it at the plaintiff and shot him. *See Eichstedt*, 849 F. Supp. at 1289. The plaintiff later sued the firearm manufacturer, claiming that the firearm "was defective and unreasonably dangerous and that its defective condition caused him to be shot by his friend." *Id.* at 1289–90. The court rejected these claims, stating that the third party's "reckless action of knowingly pointing the weapon at Eichstedt and then pulling the trigger was a superseding cause of Eichstedt's injuries" and the manufacturer, "if it did anything wrong (and it didn't), is off the hook." *Id.* at 1291. In considering causation, the court noted, "Courts are properly reluctant to find that an intervening criminal act should have been foreseen by the original tortfeasor," as "under ordinary circumstances it is reasonable to assume that no one will commit an act that will violate the criminal law." *Id.* at 1292.

Here, too, even if Defendants did any wrong (and they did not), the Kia Boyz's criminal acts have broken the chain of legal causation. *See id.* Accordingly, Plaintiffs cannot state their claims against Defendants.

## III. Plaintiffs' Request for a Wisconsin-only Modification to Federal Auto Standards Is Preempted.

Plaintiffs ask this Court to force Defendants to redesign their vehicles according to Plaintiffs' personal preferences, and to penalize Defendants for not designing their vehicles that way in the first place. Directing a Wisconsin-only modification to NHTSA's federal auto standards—a modification that would not be required in any other state—would upend uniformity across the states and interfere with NHTSA's important federal objectives and interstate commerce. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 874–75, 883 (2000); *see also Miranda v. Navistar, Inc.*, 2020 WL 8300521, at *3 (S.D. Tex. Dec. 15, 2020).

NHTSA has already regulated in this area, "to deliberately provide[] . . . a range of choices." *Geier*, 529 U.S. at 875. In doing so, NHTSA rejected Plaintiffs' proposed alternative

required design. *See* Compl. ¶¶ 36–37, 111. Plaintiffs now seek to circumvent this federal regulatory determination through state tort law. This Court should decline Plaintiffs' request to create a Wisconsin-specific regulation that would be inconsistent with and even interfere with the federal regulatory scheme.

**IV.    Plaintiffs Fail to State Facially Plausible Warranty Claims.**

In Counts I, II, and III, Plaintiffs allege breach of express warranty, breach of implied warranty of merchantability, and Magnuson-Moss Warranty Act claims, all premised on the purported Defect. As shown in this section, these counts are defective because Defendants' limited express warranties explicitly exclude coverage for the alleged Defect, Plaintiffs' vehicles were fit for their ordinary purpose, and Plaintiffs lack the required privity for an implied warranty claim.

A.    <u>Defendants' Express Warranties Exclude Theft.</u>

In Count I, Plaintiffs allege that Defendants breached their limited express warranties to Plaintiffs, and further allege that any warranty disclaimers and/or limitations are inapplicable, conflicting, nullified, and/or unconscionable. Kia's limited express warranty covers repairs or replacements due to a vehicle's failure to function properly during normal use; Hyundai's limited express warranty covers repairs or replacements of certain components that are found to be defective in material or workmanship under normal use and maintenance. *See* Compl. Ex. D, at 5; *see also* Compl. Ex. F, at 18. In other words, these express warranties cover repairs or replacements needed due to an inherent defect in material or workmanship.

Critically, the Complaint recognizes Kia and Hyundai's warranties specifically disclaim responsibility for any actual damage due to theft. Compl. ¶¶ 249, 257; Compl. Ex. D, at 10; Compl. Ex. F, at 20. The 2019 Kia warranty reads: "The following items are not covered: Damage due to Factors Beyond the Manufacturer's Control," including "Accidents and incidents that damage your Kia vehicle including but not limited to collision, fire, theft, riot" and "Misuse of your Kia Vehicle such as . . . racing." Compl. Ex. D, at 10 (formatting omitted). Similarly, the 2019 Hyundai warranty reads, under "What is not covered": "Damage or failure resulting directly or indirectly from any of the following: . . . Misuse, abuse, accident, theft, water/flooding or fire." Compl. Ex.

8

F, at 19–20 (formatting omitted).  In addition, the warranties do not cover situations in which a vehicle owner or lessee simply prefers an alternative material or an alternative design, as a different preference is not a defect.  For example, under "Manufacturer Design Choices," the Kia warranty states: "A material is not defective or underperforming under your warranty because a better, stronger, more durable or more suitable material could have been used."  Compl. Ex. D, at 11 (formatting omitted).  It also states that "Kia and its Authorized Kia Dealers reserve the right to make changes in vehicles built and/or sold by Kia and its Authorized Kia Dealers at any time without incurring any obligation to make the same or similar changes on vehicles previously built and/or sold."  Compl. Ex. D, at 12.  The so-called Defect at issue here—the possibility of theft— is simply not covered by either Kia or Hyundai's express warranty.[5]

To circumvent this clear language, Plaintiffs invent "conflicting language in [the] express warranty."  *Id.*  ¶ 250.  According to Plaintiffs, NHTSA once "expressed concern about car thieves who could bypass the ignition lock," and NHTSA therefore "decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed."  *Id.* ¶ 251 (emphasis omitted) (quoting Compl. Ex. B, at 2).   Plaintiffs reason that the fact that NHTSA once had this concern means NHTSA considered anti-theft security measures part of the normal functioning of a vehicle.  Plaintiffs assert Kia's and Hyundai's warranties cover failures to function properly during normal vehicle use and activation.  *See id.*  ¶¶ 244–48, 255–59.  Extending Plaintiffs' tortured reasoning, despite Defendants' express theft disclaimers, Plaintiffs assert the warranties cover theft because the possibility of theft is a failure to function properly during normal use and the possibility that a criminal can bypass a vehicle's ignition lock is an abnormal activation of the vehicle.  Plaintiffs allege that Defendants also made certain contradictory statements

_____

[5] Moreover, for Plaintiffs Marvin and Wargin, their respective warranty periods may have already expired: Kia's warranty generally lasts for 60 months or 60,000 miles, whichever comes first, *see* Compl. Ex. D, at 4, 6, and Hyundai's warranty generally lasts for 5 years or 60,000 miles, whichever comes first, Compl. Ex. F, at 15, 18.  Recognizing this, Plaintiffs allege in conclusory fashion and without substantive explanation that these "time limitations . . . are . . . unconscionable and inadequate to protect" Plaintiffs.  Compl. ¶ 499.

regarding safety and design features in "various marketing materials" and that these statements "were woven into the fabric of the parties' agreement." *Id.* ¶ 486–87. Consequently, Plaintiffs ask this Court to conclude that Defendants' express disclaimers are inapplicable, conflicting, nullified, and/or unconscionable. *See id.* ¶¶ 249–63, 493, 495.

Plaintiffs' argument ignores both law and common sense. "Under Wisconsin law, '[w]hen the terms of a contract are clear and unambiguous, [this Court] construe[s] the contract's language according to its literal meaning.'" *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 830 (7th Cir. 2021) (first alteration in original) (quoting *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 866 N.W.2d 679, 685 (Wis. 2015)). "It is not the function of the court to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated." *Ash Park*, 866 N.W.2d at 686 (citation and quotation omitted). Here, the very warranties Plaintiffs cite to for their claim clearly and unambiguously exclude from coverage damage due to theft. Wisconsin law respects and enforces that disclaimer. *See MDS Enters. v. Mid-State Truck Serv., Inc.*, 958 N.W.2d 164, at *3, *7 (Wis. Ct. App. 2021) (unpublished table decision) (recognizing that Wisconsin law allows sellers to "disclaim or limit express warranties" and concluding plaintiff had "accepted the terms of the limited warranty," including its disclaimers).

Even if Defendants' warranties are somehow ambiguous (and they are not), courts construe contract language "according to its plain or ordinary meaning" and interpret such language to "give reasonable meaning to each provision in the contract." *Ash Park*, 866 N.W.2d at 685. Plaintiffs' alternative construction of the clear and unambiguous terms of the warranties controverts these principles. And even if this Court could credit Plaintiffs' argument, the argument ignores the context surrounding NHTSA's purported "concern." NHTSA "proposed to amend the override provisions . . . to allow manufacturers greater flexibility in designing their override devices and to allow manufacturers the choice to use electronic theft prevention devices, such as immobilizers, instead of using steering locks, if they desire." Compl. Ex. B, at 2. In other words, NHTSA was committed to giving auto manufacturers "*greater flexibility*" in designing their anti-theft security

measures, so long as they met certain specified standards. *Id.* (emphasis added). NHTSA did not require an immobilizer and did not suggest that the presence or absence of an immobilizer affected a vehicle's normal functioning or normal activation.

For all these reasons, Plaintiffs fail to state an express warranty claim. *See Lamont v. Winnebago Indus., Inc.*, 569 F. Supp. 2d 806, 818–19 (E.D. Wis. 2008) ("Winnebago's obligation under its Limited Warranty was to repair or replace covered parts that were defective in material or workmanship. . . . Winnebago has no obligation to provide a remedy for breach of a warranty it never gave.").

      B.    <u>Defendants Did Not Breach an Implied Warranty of Merchantability.</u>

In Count II, Plaintiffs allege Defendants breached their implied warranties of merchantability because the Class Vehicles "are not 'merchantable' because they are not reasonably fit for the ordinary purpose for which they are sold, which is to provide *safe*, *reliable* transportation." Compl. ¶ 509, 511. Plaintiffs' implied warranty claim fails for two reasons. First, Plaintiffs conflate safety in transportation with security to assert that merchantability means a vehicle that is theft-proof. This is not supported by the law. Second, Plaintiffs lack the privity required under Wisconsin law to state an implied warranty claim.

On the first point, vehicles are fit for their ordinary purpose when they are "able to provide safe, reliable transportation." *Mross*, 2016 WL 4497300, at *6. Plaintiffs do not and cannot allege that their vehicles failed to provide transportation.

Plaintiffs assert the Class Vehicles' alleged lack of certain preferred security measures means that the Class Vehicles are not able to provide "safe" transportation. But in the context of auto manufacturing, safety and security are not synonymous. A vehicle's safety systems typically include features such as airbags and stability control systems that pertain to the ability to protect occupants during an impact or avoid one all together. Exhibit G to the Complaint, which quotes vehicle brochures, is instructive: the 2012 Kia Optima brochure addresses its "Advanced Safety Systems" and states that this model has "a long list of standard safety features, including six airbags, Electronic Stability Control and Vehicle Stability Management"; the 2014 Kia Sedona

brochure addresses its "Advanced Safety Systems to Help Handle Unexpected Conditions" and states that "[s]afe driving begins with the ability to avoid accidents," so this model has "active safety systems that help you avoid mishaps in the first place" and has "safety features . . . designed to help you maintain control, even in certain harsh road conditions and some other unexpected situations"; and the 2015 Kia Cadenza brochure states that this model "incorporates the latest advanced safety systems including Vehicle Stability Management, Electronic Stability Control and a Brake Assist System." Compl. Ex. G, at 1, 3, 4. The Kia Forte brochure details its restraint and safety systems, including, among many other features, dual front advanced airbags, full-length curtain airbags, three-point seatbelts for all seating positions, an anti-locking braking system, a brake assist system, electronic brake-force distribution, hill-start assist control, a traction control system, electronic stability control, side-impact door beams, front and rear crumple zones, and lower anchors and tethers for children. Compl. Ex. G, at 7. Notably absent from the restraint and safety systems discussion is anything dealing with security or deterring theft or other crime. Instead, the brochure places discussion of immobilizer and "push button start w/ Smart Key" options in entirely separate sections on premium packages and premium technology packages. *See id.* So, while the Class Vehicles may not be as *secure* as Plaintiffs would like, there are no real allegations that the Class Vehicles are not *safe*.

Moreover, Plaintiffs' preferred additional security measures are available on many of Defendants' product lines as optional trim and/or package upgrades, for an additional cost. In fact, several Plaintiffs, at the time of purchase or leasing, were offered these optional upgrades, including additional security measures such as an immobilizer and a push-button feature. *E.g.*, *id.* ¶ 323. These Plaintiffs declined this offer. Their Complaint now faults Defendants for not specifically or not sufficiently informing them that if they obtained these optional upgrades, these upgrades could "provide an immense safety benefit by dramatically reducing the risk [their] car would be stolen." *Id.* According to data cited in the Complaint, this "dramatic[]" reduction of risk is actually approximately 0.158%. *See id.* at 24 n.11, 70 n.65.

On the second point regarding privity, under Wisconsin law, an implied warranty "can only

arise . . . where there is a contract between the parties." *Lamont*, 569 F. Supp. 2d at 815; *see also id.* at 815–16 (collecting cases "recogniz[ing] and affirm[ing] the State's law on the issue"). But here, the relevant sales contract rests between Plaintiffs and the dealerships (or other sellers) who sold or leased vehicles to Plaintiffs, not between Plaintiffs and Defendants. *See T&M Farms v. CNH Indus. Am., LLC*, 488 F. Supp. 3d 756, 764 (E.D. Wis. 2020) (noting that "manufacturers ordinarily are not parties to sales contracts that arise when dealers sell the manufacturers' products to consumers"). And "since there was no contract or sale between [Plaintiffs] and [Defendants], no implied warranties could have arisen as between those parties." *Lamont*, 569 F. Supp. 2d at 816.

Still, Plaintiffs assert that "[s]ufficient privity of contract exists to assert this implied warranty claim" simply because Defendants "market and advertise the sale of their vehicles" . . . across the United States and because Defendants have a "relationship with their respective dealers." Compl. ¶¶ 512–16. On this basis, Plaintiffs broadly assert that there was an "understanding that these dealers were acting on behalf of Kia and Hyundai," and this understanding, mistaken or not, "satisfies the privity requirement." *Id.* ¶¶ 517–20. These conclusory allegations are not sufficient to give "rise to a reasonable inference that [Defendants] and [their] dealers were involved in an unusual relationship in which either [Defendants] sold [their] products directly to consumers or [Defendants] and [their] dealers were joint sellers of the [vehicles]." *T&M Farms*, 488 F. Supp. 3d at 764. That Defendants may be party to contracts to wholesale to local, independent dealerships does not make Defendants party to the dealerships' contracts to sell directly to retail consumers. *Id.* at 766.

    C. <u>Plaintiffs' Magnuson-Moss Warranty Act Claim Necessarily Fails.</u>

Because Plaintiffs' express and implied warranty claims should be dismissed, Count III, Plaintiffs' Magnuson-Moss Warranty Act claim, which depends on those claims, can and should be dismissed as well. *See, e.g.*, *Mathews v. REV Recreation Grp., Inc.*, 931 F.3d 619, 623 (7th Cir. 2019).

**V.     Plaintiffs' Unjust Enrichment Claim Fails Because Plaintiffs Received Something of Value and Defendants Were Not Unjustly Enriched.**

In Count V, "in the alternative to any contract-based claims," Plaintiffs attempt to state an unjust enrichment claim: they allege that Defendants "make millions of dollars in revenue selling and leasing new vehicles through their respective dealer networks across the United States"; that Defendants "have represented . . . that the Class Vehicles are safe, reliable, and durable"; and that, at the same time, Defendants have failed "to equip the Class Vehicles with basic anti-theft measures" and did not comply with FMVSS 114. Compl. ¶¶ 585, 587, 592, 601. According to Plaintiffs, then, it would be "unjust" to let Defendants keep these benefits. *Id.* ¶ 605.

Under Wisconsin law, an unjust enrichment claim requires: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the fact of such benefit; and (3) acceptance and retention by the defendant of the benefit under circumstances that would make it inequitable to retain the benefit without payment. *See, e.g.*, *Brame v. Gen. Motors LLC*, 535 F. Supp. 3d 832, 842 (E.D. Wis. 2021). "As other judges in this district have noted, '[u]njust enrichment involves getting something for nothing, not providing a product for a price.'" *T&M Farms*, 488 F. Supp. 3d at 769 (alteration in original) (citation omitted). Here, as an initial matter, any benefit Plaintiffs conferred by purchasing or leasing vehicles from independent dealerships or other sellers was conferred to these dealerships or other sellers, not Defendants. *See id.*; *see also Brame*, 535 F. Supp. 3d at 843. And even if Plaintiffs conferred a benefit on Defendants, Defendants were not unjustly enriched because Plaintiffs received something of value in return for this supposed benefit. Plaintiffs received their vehicles. *See T&M Farms*, 488 F. Supp. 3d at 769; *see also Brame*, 535 F. Supp. 3d at 843 (stating that "the plaintiffs received something of value in return, namely the vehicles GM manufactured").

And if these vehicles "did not meet their expectations," as Plaintiffs allege, Plaintiffs are "entitled to pursue their contract remedies against their dealers" and against Defendants under the express warranties. *Id.* "So, even if the products did not meet expectations," Plaintiffs still "received something in exchange for the benefit they conferred—the products plus the remedies

available to them under the contracts they agreed to." *T&M Farms*, 488 F. Supp. 3d at 769. "It is not unjust to limit disappointed product purchasers to their legal remedies." *Brame*, 535 F. Supp. 3d at 843. Accordingly, Plaintiffs' unjust enrichment claim should be dismissed.

## VI. Plaintiffs' Misrepresentation-Based Fraud Claims Fail Because Plaintiffs Fail to Sufficiently Allege an Actionable Representation and Fail to Plead with Sufficient Particularity.

In Counts VI and VII, Plaintiffs assert claims for false advertising under Wis. Stat. § 100.18 and statutory fraud under Wis. Stat. §§ 895.446 and 943.20(1)(d). But these claims are not facially plausible, as Defendants did not make any untrue representations of fact, with any required specified intent, that caused reliance by and/or pecuniary loss to Plaintiffs.

Wis. Stat. § 100.18 "generally prohibits false, deceptive, or misleading representations or statements of fact in public advertisements or sales announcements," made with the specified intent, that cause a plaintiff to sustain a pecuniary loss. *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 244–45 (Wis. 2004). Here, Plaintiffs' case is premised on the allegations that Defendants failed to disclose the so-called Defect. But a "nondisclosure is not an 'assertion, representation or statement of fact' under Wis. Stat. § 100.18(1)," and "[s]ilence—an omission to speak—is insufficient to support a claim under Wis. Stat. § 100.18(1)." *Id.* at 245.

To the extent the Complaint alleges any affirmative assertions, such assertions, at most, "are mere commercial 'puffery' and hence legally insufficient to support a claim under the statute." *Id.* The Wisconsin Supreme Court in *Tietsworth*, for example, called statements that certain motorcycles were of "premium quality," "a masterpiece," "filled to the brim with torque and ready to take you thundering down the road," "fairly obvious examples of puffery." *Id.* at 246. Similarly, any statements Defendants may have made with respect to their vehicles' quality were also "classic advertising puffery, non-actionable at common law and under the statute." *Id.* at 237; *see also T&M Farms*, 488 F. Supp. 3d at 760 (stating that "classic puffing statements" about quality or performance "are not actionable").

In addition, claims made under Wis. Stat. § 100.18 are subject to Federal Rule of Civil

Procedure 9(b)'s heightened pleading requirements. *See Kisting v. Gregg Appliances, Inc.*, 2016 WL 5875007, at *5 (E.D. Wis. Oct. 7, 2016). But Plaintiffs have not met this standard. Plaintiffs broadly allege that "Kia and Hyundai engaged in a multi-year, multi-faceted, advertising campaign—through their websites, social media outlets, television commercials, and vehicle brochures, to name a few"—in which they "touted the safety and design of the Class Vehicles." Compl. ¶ 652. Plaintiffs include snippets from Defendants' alleged advertising campaign. *See id.* ¶ 657. Plaintiffs then broadly allege that some of the Plaintiffs were "exposed" to this campaign. *Id.* ¶ 661. Plaintiffs do not, however, allege with particularity which Plaintiff saw which statement through which medium at what time at what location. *See Hanna*, 834 F.3d at 779 (requiring that plaintiff "allege the who, what, when, where, and how," including "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated" (citations and quotations omitted)); *see also Rosenberg v. SC Johnson & Son, Inc.*, 2021 WL 3291687, at *4 (E.D. Wis. Aug. 2, 2021) (asking, inter alia, "Which plaintiff purchased which product? When? Where? How much did they pay? How much more expensive were the 'non-toxic' products compared to those without such a label?" and concluding plaintiffs' claim was not pled with particularity). And, as a practical matter, Plaintiffs allege that this recent spike in vehicle theft began in late 2020 or 2021. *E.g.*, Compl. ¶¶ 165, 168–70. Plaintiffs do not explain how Defendants could be held liable for an alleged safety or design representation that *later* became untrue.

Plaintiffs' Wis. Stat. §§ 895.446 and 943.20(1)(d) claim fails for similar reasons. To state a claim, Plaintiffs must plead, with particularity under Federal Rule of Civil Procedure 9(b), that (1) Defendants made a representation of fact; (2) the representation was untrue; (3) Defendants made the representation either knowing that it was untrue or recklessly not caring whether it was untrue; (4) with intent to deceive Plaintiffs in order to induce them to act on it, to their pecuniary damage; and (5) Plaintiffs believed the representation was true and relied on it. *Kisting*, 2016 WL 5875007, at *6. As outlined above, Plaintiffs have not identified any actionable representations, and Plaintiffs have not established a duty to disclose. *See Weaver v. Champion Petfoods USA Inc.*,

471 F. Supp. 3d 876, 885 (E.D. Wis. 2020), *aff'd* 3 F.4th 927 (7th Cir. 2021) (concluding no duty to disclose potential for "extremely low levels of BPA" in dog food that "may unintentionally be present in the final product," in part because defendants did "not state that the product is BPA free"). And Plaintiffs have not sufficiently alleged "the who, what, when, where, and how" regarding any alleged representation. *Hanna*, 834 F.3d at 779 (citation and quotation omitted). Moreover, Plaintiffs offer only general, conclusory allegations that certain of them "would not have purchased" their vehicle or "would have . . . upgraded" their vehicle if they had realized that the additional security measures they were declining "would reduce the risk of theft." *E.g.*, Compl. ¶¶ 291–92, 363, 396–97, 429. For claims subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements, this is not enough. *See, e.g.*, *Hanna*, 834 F.3d at 779.

## VII.    Plaintiffs' Rescission Claim Does Not Sufficiently Allege an Actionable Representation, Is Not Sufficiently Plead, and Is Precluded by the Economic Loss Doctrine.

Styled as a cause of action, rather than the equitable remedy it is, Count IV is Plaintiffs' attempt to "seek 'other legal and equitable' relief as needed to do substantial justice"—rescission of Plaintiff Flasch's contract with an independent dealership to purchase a 2021 Kia Sportage, but directed at both Defendants. Compl. ¶¶ 557–58, 562–64. Even assuming Plaintiffs can bring a claim to rescind a contract against Defendants with whom they did not contract, this claim fails because it is not plead with sufficient particularity, as required by Federal Rule of Civil Procedure 9(b), and because it is precluded by Wisconsin's economic loss doctrine. *See CMFG Life Ins. Co. v. RBS Sec. Inc.*, 2013 WL 4483068, at *3 n.4 (W.D. Wis. Aug. 19, 2013), *order clarified on reconsideration*, 2013 WL 12233991 (W.D. Wis. Sept. 19, 2013).

"Under Wisconsin principles of equity, a party induced to enter into a contract by the other party's misrepresentation may unilaterally rescind the contract if" the party can show "three essential elements": "(1) a misrepresentation of fact; (2) that was material or fraudulent; (3) upon which the recipient justifiably relied." *Id.* at *4. This equitable remedy "rests in the sound discretion of the court, to be exercised in the case of executed contracts with great circumspection."

17

*Am. Cas. Co. of Reading, Pa. v. Mem'l Hosp. Ass'n*, 223 F. Supp. 539, 542 (E.D. Wis. 1963).

As explained above, Plaintiffs have failed to identify any actionable misrepresentations, let alone misrepresentations that were material or fraudulent. Plaintiffs have further failed to show that they justifiably relied on any such misrepresentations. This means that Plaintiffs have failed to meet the heightened pleading standards imposed by Federal Rule of Civil Procedure 9(b), for allegations of fraud or mistake. *See CMFG Life Ins. Co.*, 2013 WL 12233991, at *3 n.4.

In addition, under Wisconsin law, the economic loss doctrine precludes this claim. *See, e.g.*, *Daanen & Janssen v. Cedar Rapids*, 573 N.W.2d 842, 844–45 (Wis. 1997); *Tietsworth*, 677 N.W.2d at 251. The economic loss doctrine "generally requires transacting parties to pursue only their contractual remedies when asserting an economic loss claim." *Brame*, 535 F. Supp. 3d at 841. This is particularly so when, as here, a plaintiff brings "common-law fraud claims alleging that the seller of a product made misrepresentations pertaining to the character and quality of the goods that are the subject matter of the contract." *Id.* at 841–42 (citation, quotation, and footnote omitted).

Moreover, although the economic loss doctrine allows a "narrow" fraud in the inducement exception, Plaintiffs cannot avail themselves of it. *Id.* This exception applies only when (1) a defendant engaged in an intentional misrepresentation, (2) the misrepresentation was made prior to the contract's formation, and (3) the misrepresentation was "extraneous to the contract"—i.e., it "concern[ed] matters whose risk and responsibility do not relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involve performance of the contract." *Id.* Even if Plaintiffs could sufficiently allege an intentional misrepresentation made by Defendants before the contract was formed (and they cannot), the alleged fraud relates to the Class Vehicles' "quality or . . . characteristics," as well as to Defendants' alleged statements regarding the quality and performance of the Class Vehicles, and is therefore not "extraneous to the contract." *Id.* Accordingly, the economic loss doctrine precludes recovery, and Plaintiffs may only pursue warranty remedies and/or contract remedies at law and in equity for any alleged defects.

**VIII. Plaintiffs' Deceptive Trade Practices Claim Relies on an Inapplicable Statute.**

In Count VIII, Plaintiffs attempt to apply to Defendants a statute and regulations that cover "face-to-face solicitations with customers." Compl. ¶ 670; *see also id.* ¶¶ 667–70 (citing Wis. Stat. § 100.20 and Wis. Admin. Code §§ 127.01 *et seq.* ("ATCP")). That attempt fails. None of the transactions were face-to-face solicitations that took place away from the seller's business, as the statute requires. Equally importantly, neither Defendant was involved in these transactions. Indeed, save the intra-family purchase of Plaintiff Marvin, there are no allegations that the transactions were anything other than ordinary transactions carried out by local, independent dealers selling or leasing vehicles at their dealerships. These were two-party transactions and Kia and Hyundai were neither of those two parties. None of the protections of the relied-upon regulatory scheme apply to these transactions.

This statute requires Plaintiffs to show: (1) initiation by the seller of the transaction or "solicitation"; (2) "at a place other than seller's regular place of business"; (3) representations targeted at a particular consumer; (4) not involving a "mass advertisement." ATCP § 127.01(22)(a)(b)(c) (defining "solicitation"). Plaintiffs take it one step further and want these transactions to qualify as a "face-to-face" solicitation under ATCP § 127.60, which is defined simply as a "solicitation" that "a seller makes in a face-to-face encounter with a consumer." ATCP § 127.60. In a note, the regulations give as an "example, a door-to-door seller is engaged in 'face-to-face' solicitations." *Id*. Plaintiffs cannot meet a single one, let alone all five, of those criteria.

In their attempt to fit within the confines of the statute, Plaintiffs utilize the following flawed logic: (1) distributors like Defendants must, under Wisconsin law, sell their vehicles to dealers; (2) only Wisconsin dealers may sell Kia and Hyundai branded vehicles to the public; (3) Defendants have their principal places of businesses in California; (4) Wisconsin is located "away from" California; and (5) because the sales of the vehicles in Wisconsin occur "away from" the principal places of business of Defendants in California,[6] all sales of those vehicles are

---

[6] Indeed, the independent dealerships are not Defendants' places of business at all.

considered "solicitations" and, indeed, "face-to-face" solicitations under the regulatory scheme. *See* Compl. ¶¶ 679-683. Put another way, according to Plaintiffs, all sales of vehicles at auto dealerships in Wisconsin are covered by Wisconsin's "face-to-face" solicitation statute so long as the plaintiff is clever enough to make the distributor a defendant.

Count VIII employs reasoning that is completely at odds with the language of the statute and its regulations. First, the regulations Plaintiffs cite in Count VIII, *see id.* ¶ 670, define a "solicitation" as "mean[ing] a communication received by a consumer at a place other than the seller's regular place of business," ATCP § 120.01(22), and a "face-to-face solicitation" as a solicitation a seller makes in a face-to-face encounter with a consumer, ATCP § 127.01(22). Without quoting any language, the Complaint claims that ATCP § 127 "defines 'seller' expansively," but there is zero indication in the statute or the regulations that the statute was intended to apply to any entity other than the actual seller of the product who was involved in the solicitation regulated by the statute and its accompanying regulations. Compl. ¶ 671. ATCP § 127.01(21)'s definition of "seller" includes "(a) a person who accepts payment for a purported sale of consumer goods or services to a consumer; (b) an employee or agent of a seller; [and] (c) a person who makes solicitations under arrangement with a seller" in order to avoid any attempts to end run the statute by using, for example, "a telemarketing firm that makes telephone solicitations on behalf of a 'seller.'" ATCP § 127.01(21), note. The Complaint does not allege that Defendants' employees were involved in solicitations, nor are there any allegations that countermand the entire statutory scheme in Wisconsin that makes dealers the sellers of the vehicles.

Second, the Complaint does not allege that any of the sales or leases were in any sense "initiated" by the sellers at all. In *Wind Point Restoration, Inc. v. Weikel*, 953 N.W.2d 98 (Wis. Ct. App. 2020) (unpublished table decision), the court reasoned that "[t]he language of [ATCP § 127.01(22)] excludes from the definition of 'solicitation' '[a] telephone, mail, or electronic communication initiated by the consumer." *Id.* at *3 (third alteration in original). Because the consumer had "initiated the communication regarding services when she called," the court concluded that ATCP § 127.01(22) did not apply. *Id.* The same is true here.

Third, the Complaint does not allege that any solicitations or statements were directed "to a consumer," as the statute requires. Indeed, every statement cited in the Complaint was exactly the opposite, thereby falling into the specific exclusion from the term "solicitation" for all "mass advertising." ATCP § 127.01(22)(a); *see also* ATCP § 127.01(13) (defining "mass advertisement" as including anything "published in a newspaper, magazine, radio broadcast, television broadcast, or internet home page"). The statute makes clear that face-to-face solicitations are something "other than general advertising." Here, all that the Complaint relies upon is general advertising.

Finally, the statutory scheme is designed to regulate in-home solicitations or other solicitations away from a regular place of business, because of possible undue pressure consumers may feel with door-to-door solicitors and the like. *See Reusch v. Roob*, 610 N.W.2d 168, 174–75 (Wis. Ct. App. 2000). The circumstances here are different. This claim should be dismissed.

## IX. Plaintiffs' Wis. Stat. § 218.0116 Claim Also Relies on an Inapplicable Statute.

In Count IX, Plaintiffs assert that Defendants' alleged "pattern of fraudulent conduct is independently actionable under Wis. Stat. § 218.0163(2)" because Defendants are licensed distributors, as defined by Wis. Stat. § 218.0114, and their conduct violates various subsections of Wis. Stat. § 218.0116. Like Count VIII, Count IX suffers from a twisted logic to reach a result that is inconsistent with the language and purpose of the statute. Plaintiffs' logic starts with the correct premise that both distributors and, separately, auto dealers must be licensed to do business in Wisconsin. The logic continues that "any retail buyer [or] lessee" has a cause of action under Wis. Stat. § 218.0163(2) "because of a violation by a licensee of § 218.0116." Compl. ¶ 696 (emphasis omitted) (quoting Wis. Stat. § 218.0163(2)). Section 218.0116 prohibits "willfully defraud[ing] any retail buyer" (subsection c), "mak[ing] a fraudulent misrepresentation" (subsection e), and the like. Wis. Stat. § 218.0116. What Count IX glides over is that the Wisconsin statutory provisions create two different sets of entities: (1) manufacturers and distributors on the one hand; and (2) auto dealers on the other. The scheme divides responsibilities between the two categories and makes crystal clear that the former may not own dealers, which must be independent. The law also provides many protections for dealers such as prohibiting

21

manufacturers or distributors from engaging in various practices, and it requires them to provide dealers with specific types of information as well as justifications for certain actions or practices.

In 1965, the Wisconsin Supreme Court, interpreting a prior version of the current statute, explained the origins of the relevant statutory language: then-Section 218.01(3) "[wa]s a part of the Wisconsin Auto Dealership Law," and "[i]mplicit in this law is the recognition of the gross disparity of bargaining power between the manufacturer of automobiles and the local retailer." *Forest Home Dodge, Inc. v. Karns*, 138 N.W.2d 214, 217 (Wis. 1965). As the Wisconsin Supreme Court explained, "[t]hese laws deal with the relationship between auto manufacturers and auto dealers." *Id.* at 218. "The purpose of the law is to furnish the dealer with some protection against unfair treatment by the manufacturer." *Id.*

What the law does not do, however, is regulate interactions between manufacturers or distributors and retail customers. Indeed, any interactions with retail customers are required by law to be carried out by dealers, not manufacturers or distributors. Notably, while Wis. Stat. § 218.0114(1) appears to cover dealers and salespeople, it does not cover manufacturers or distributors. Rather, manufacturers and distributors are regulated in subsection (3), where it states that "No manufacturer, importer or distributor may engage in business as a manufacturer, importer or distributor in this state without a license therefor." Wis. Stat. § 218.0114(3). The remainder of Wis. Stat. § 218.0114 deals with the requirements to become licensed, and as in subsection (11), the division of responsibilities. Wis. Stat. § 218.0114(11) ("A manufacturer, distributor or importer shall designate in writing the area of sales responsibility assigned to a motor vehicle dealer."). Manufacturers and distributors are prohibited from engaging in those activities that are specifically reserved to dealers. *See* Wis. Stat. § 218.0121(2m) ("A factory shall not, directly or indirectly, hold an ownership interest in or operate or control a motor vehicle dealership in this state."); Wis. Stat. § 218.0121(1m)(e) ("'Factory' means a manufacturer, distributor or importer, or an agent of a manufacturer, distributor or importer."). So it is dealers, not manufacturers or distributors, that engage with consumers, and all of those enumerated practices in the statute are designed to regulate and limit the interaction between dealers and consumers or, depending upon

the provision, interactions between dealers and manufacturers or distributors. *See Kolupar v. Wilde Pontiac Cadillac, Inc.*, 735 N.W.2d 93, 101, 104 (Wis. 2007) (calling Wis. Stat. § 218.0116 "a consumer protection statute regulating motor vehicle dealers, salespersons and sales finance companies" and "offering retail buyers protection against certain unfair practices of auto dealers, salespersons and finance companies"). The statute does not regulate the interaction of manufacturers or distributors with consumers, as the statute makes clear that there is to be no such interaction.[7]

According to the Complaint, Defendants are licensed distributors, *see* Compl. ¶ 694, and therefore cannot directly sell or lease a vehicle to a consumer, *see* Wis. Stat. § 218.0101(23)(a)(1). Consequently, if there was an interaction with Plaintiffs as consumers that violated this statute (and there was not), it was the relevant dealer who violated the statute, not Defendants, and Plaintiffs can only sue the dealer, not Defendants.

## X. Plaintiffs' Wis. Stat. § 895.047 Claim Is Also Precluded by the Economic Loss Doctrine.

In Count X, Plaintiffs attempt to state a claim, essentially for strict products liability, under Wis. Stat. § 895.047. But the economic loss doctrine bars this claim: the purchaser of a product cannot recover from a manufacturer, under tort theories of negligence or strict products liability, damages that are purely "economic" in nature. *See, e.g.*, *Daanen & Janssen*, 573 N.W.2d at 844–45; *Tietsworth*, 677 N.W.2d at 251. Indeed, the economic loss doctrine "precludes recovery in tort for economic losses resulting from the failure of a product to live up to a contracting party's expectations." *Brame*, 535 F. Supp. 3d at 841 (citation and quotation omitted).

As outlined above, the allegations here "plainly pertain[] to the character and quality of the goods that are the subject matter of [a] contract." *Tietsworth*, 677 N.W.2d at 251. Plaintiffs assert that the Class Vehicles suffer an alleged Defect that allows criminals to steal them more easily

---

[7] Perhaps unsurprisingly, there do not appear to be cases in which a consumer has tried, as here, to use Wis. Stat. §§ 218.0116 and 218.0163(2) to bring an action against a manufacturer or distributor.

than other vehicles. As an initial matter, there is no such Defect, by design or otherwise. It is worth repeating that there are no allegations that these allegedly defective vehicles have actually malfunctioned. The only relevant allegations are that Plaintiffs believe criminal third parties, through the use of physical brute force, smashed their windows and broke into their vehicles. Of course, as explained above, intervening criminal acts of others do not constitute a "design defect" (and such criminal acts relieve any liability Defendants might otherwise face). And the absence of any specific allegations of actual malfunction further supports dismissal. *See Tietsworth*, 677 N.W.2d at 240–41 (collecting cases). In addition, the Complaint cites data suggesting that, at least in the years leading up to the recent vehicle thefts, these criminal third parties did not disproportionately target Defendants' vehicles. Notably, the NICB, whose data the Complaint prominently references, has not included any Kia or Hyundai models in its most recent national Top 10 "most stolen vehicles" report, nor does it identify what percentage of its Kia or Hyundai-related theft statistics account for vehicles with the alleged Defect (as opposed to vehicles with Plaintiffs' preferred alternative designs). Take, for example, the most recent publicly available survey covering the 50 states, plus the District of Columbia and Puerto Rico. *See* Compl. ¶ 232. Simple analysis shows that of the 520 Top 10 slots shown on the report—10 slots for each state (plus ties), plus D.C. and Puerto Rico—Hyundai and Kia occupied only a small fraction of those slots. In order, the number of slots occupied by brand are: Chevrolet, with 110 slots; Honda, with 104; Ford, with 88; Toyota, with 83; Nissan, with 41; Jeep, with 36; GMC, with 29; Hyundai, with 20; Subaru, with 15; and finally, Kia, with 5. Moreover, when looking at the rankings within the Top 10 slots occupied by brands, 19 of the 25 total slots occupied by Kia or Hyundai fall to ranking number 7 or below, with the highest 5 slots cracked only in New Mexico and Puerto Rico. So Plaintiffs' allegations of a Defect are disproven by their own cited data.

Plaintiffs cannot recover in tort for any economic loss that might result from the Class Vehicles' "failure . . . to live up to [Plaintiffs'] expectations." *Brame*, 535 F. Supp. 3d at 841 (citation and quotation omitted). This Court should dismiss this claim.

## XI.    Plaintiffs' Post-Sale Failure to Warn Claim Also Fails to State a Claim.

Plaintiffs allege in Count XI that "Wisconsin law imposes an obligation on automotive companies to design reasonably safe and secure vehicles," and that this obligation "extends to require these companies to warn the owners of their vehicles," post-sale, of risks "that can pose substantial harm to persons or property."  Compl. ¶¶ 739–40.  Here, Plaintiffs allege Defendants were aware of "an outlandish spike" in vehicle thefts in the Milwaukee area and thus were obligated to warn vehicle owners of this spike and of their vehicle's susceptibility to it.  *Id.* ¶ 744. This post-sale failure to warn claim fails because the risk at issue here—the possibility of vehicle theft—was not "discovered" post-sale and was never "hidden."

Under Wisconsin law and under certain circumstances, an auto manufacturer may be obligated to warn vehicle owners of certain risks it discovers after the vehicles' sale.  *See Bushmaker v. A. W. Chesterton Co.*, 2013 WL 11079371, at *4 (W.D. Wis. Mar. 1, 2013).  Vehicle theft is not one such risk.  Vehicle theft has long been a risk, and that risk does not affect an occupant's personal safety as a result of driving the vehicle, which is what the post-sale failure to warn doctrine targets.  Neither Defendants nor Plaintiffs somehow "discovered" this risk for the first time after the vehicles' sale.  It would not be reasonable to assume that Plaintiffs were and/or remain somehow unaware of this risk, such that Defendants have an obligation to warn them.  *Cf. Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 822 (7th Cir. 2021) ("Importantly, warnings are necessary only when a product's dangers are hidden.").

Moreover, the Complaint emphasizes that the alleged spike in vehicle theft began in late 2020 or 2021.  *E.g.*, Compl. ¶¶ 165, 168–69; *id.* ¶ 170 ("local news outlets began referring to Milwaukee's spike in car thefts as an 'epidemic'" on or around April 30, 2021).  Indeed, prior to this recent spike, "[v]ehicle thefts had been on a downward trend since 2015."  Jeramey Jannene, *Two-Thirds of All Milwaukee Auto Thefts Are Kia and Hyundai Vehicles*, URBAN MILWAUKEE (July 24, 2021), https://urbanmilwaukee.com/2021/07/24/two-thirds-of-all-milwaukee-auto-thefts-are-kia-and-hyundai-vehicles/ (cited by Complaint at 44 n.41).

According to the Complaint and the articles it cites, the Milwaukee Police Department

reached out to Defendants in or around May 2021, *id.* ¶ 186, 189; *id.* at 44 n.41 (citing Jeramey Jannene, *Two-Thirds of All Milwaukee Auto Thefts Are Kia and Hyundai Vehicles*, URBAN MILWAUKEE (July 24, 2021), https://urbanmilwaukee.com/2021/07/24/two-thirds-of-all-milwaukee-auto-thefts-are-kia-and-hyundai-vehicles/); two Milwaukee city council members wrote to Defendants regarding this alleged Defect in or around mid-June 2021, *id.* ¶ 187; *id.* at 44 n.39 (citing Benjamin Yount, *Milwaukee city council members blame car companies for spike in stolen cars*, THE CENTER SQUARE: WISCONSIN (June 17, 2021), https://www.thecentersquare.com/milwaukee/milwaukee-city-council-members-blame-car-companies-for-spike-in-stolen-cars/article_8a91118a-cf86-11eb-acc0-a377db7bb33a.html). Defendants subsequently released statements that it was investigating the recent issue. *See id.* ¶ 187. And in or around July 2021, Defendants began providing the Milwaukee Police Department with free steering wheel locks. *Id.* ¶ 189; *id.* at 44 n.41.

Plaintiffs, whose vehicles were stolen by third parties between February 2021 and June 2021, do not allege how Defendants could have warned them of possible vehicle theft prior to February 2021, when Defendants were only made aware of possible vehicle theft in May and June 2021 and were still investigating the issue in June and July 2021. Plaintiffs further do not allege how Defendants could be obligated to warn them of risks Defendants were not yet aware of. Accordingly, Plaintiffs fail to state a viable claim based on any alleged post-sale failure to warn.

## XII. This Court Should Deny Plaintiffs' Declaratory Relief Claim as Duplicative and Improper.

In Count XII, Plaintiffs' claim for declaratory relief, Plaintiffs allege that "Milwaukee is under siege and people have already died." *Id.* ¶ 782. On this basis, Plaintiffs states that this Court "must invoke its authority under the Declaratory Judgment[] Act and the Wisconsin Constitution to craft a suitable remedy": this Court must "declare the Class Vehicles defective." *Id.* ¶¶ 767, 783. The Complaint all but admits that Plaintiffs need this declaratory relief claim in order to evade Wisconsin's economic loss doctrine and its privity requirement for implied warranty claims. *See id.* ¶¶ 774–75 (alleging that "Plaintiffs anticipate that . . . Defendants will seek to weaponize

the economic loss doctrine" against them and that Plaintiffs "are foreclosed from asserting an otherwise cognizable claim for breach of the implied warranty of merchantability" unless this Court "abrogat[es] the privity requirement altogether").

In other words, Plaintiffs recognize that the law provides them no avenue to proceed against Defendants (and rightfully so), and Plaintiffs ask this Court to help them find a way, through a claim for declaratory relief.  This is improper, and this Court should decline to hear this claim.  *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995).  This claim is duplicative of Plaintiffs' other claims, suffers from the same infirmities, and is generally "a poor candidate for such sweeping declaratory relief."  *La Crosse Cty. v. Trinity Indus., Inc.*, 2016 WL 1274623, at *5 (W.D. Wis. Mar. 31, 2016).  And because it is duplicative of other claims, alternative remedies exist and there is no "practical difference between declaratory relief and a judgment in [their] favor on the substantive claims."  *Id.*  In such cases, in Wisconsin, courts have routinely declined to award declaratory relief.  *See id.*[8]

## XIII. Plaintiffs Only Have Standing to Assert Claims Regarding Their Own Vehicles.

It is axiomatic that a plaintiff must have standing to bring a claim.  *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 n.1 (1992).  Even a plaintiff who brings claims on behalf of a class must establish his or her own standing for each claim he or she seeks to bring.  *See, e.g.*, *Lujan*, 504 U.S. at 561 n.1 ("injury must affect the plaintiff in a personal and individual way").  Accordingly, a plaintiff, even in a putative class action, cannot bring claims against products that he has not personally purchased, leased, owned, and/or used.  *See, e.g.*, *Weaver*, 471 F. Supp. 3d at 883 (concluding plaintiff lacked "standing to sue for a risk of harm he never experienced"); *Kisting*, 2016 WL 5875007, at *4 ("an individual does not have standing to bring claims for products he did not purchase").

In *Kisting*, for example, the named plaintiff sought to bring claims relating to "seventy

---

[8] In addition, to the extent that Plaintiffs assert a claim for injunctive relief, injunctive relief is not an independent cause of action.  *See* Compl. ¶ 769.

different models of Samsung televisions, sixty-nine of which [he] did not purchase." *Id.* at *5. The *Kisting* court concluded that the plaintiff lacked "standing to bring claims for products he did not purchase." *Id.* Here, Plaintiffs are the former and current owners and lessees of the 2012 Kia Optima, 2013 Hyundai Sonata, 2019 Hyundai Elantra, 2019 Kia Forte, and 2021 Kia Sportage. But they seek to bring claims on behalf of all former and current owners and lessees of all Kia and Hyundai vehicles manufactured after 2011 that have, in whole or in part, the so-called Defect. The Class Vehicles potentially at issue here span an incredible range, across two different brands, 10 model years, and an unspecified number of models and trims. Moreover, Plaintiffs allege Defendants made certain representations as to their vehicles' quality and/or performance. But the Complaint does not clarify whether these alleged representations were uniformly used across these different vehicle makes, models, and years. Accordingly, although Plaintiffs may have standing to bring claims with respect to their own vehicle makes, models, and years, their claims with respect to all other vehicles should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter an Order dismissing the Complaint in its entirety with prejudice and without leave to amend.

Dated: December 22, 2021

Respectfully submitted,

*/s/ Michael T. Brody*
Michael T. Brody
Peter J. Brennan
Vaughn E. Olson
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654-3456
Telephone: (312) 222-9350
Fax: (312) 527-0484
MBrody@jenner.com
PBrennan@jenner.com
VOlson@jenner.com

*Attorneys for Defendants Kia America, Inc. and Hyundai Motor America*