# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| STEFANIE MARVIN, et al., on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 2:21-cv-01146-PP |
| KIA AMERICA, INC., et al., | ) ) | Hon. Pamela Pepper |
| Defendants. | ) ) ) | |

## <u>OMNIBUS REPLY IN SUPPORT OF DEFENDANTS KIA AMERICA, INC. AND HYUNDAI MOTOR AMERICA'S MOTION TO DISMISS AND DEFENDANT HYUNDAI KIA AMERICA TECHNICAL CENTER, INC.'S MOTION TO DISMISS</u>

set

Michael T. Brody
Peter J. Brennan
Vaughn E. Olson
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654-3456
Telephone: (312) 222-9350
Fax: (312) 527-0484
MBrody@jenner.com
PBrennan@jenner.com
VOlson@jenner.com

*Attorneys for Defendants Kia America, Inc., Hyundai Motor America, and Hyundai Kia America Technical Center, Inc.*

# TABLE OF CONTENTS

ARGUMENT ........................................................................................................ 1

I.      The Intervening Criminal Acts Of Third Parties Preclude Liability. ......................... 1

II.     Plaintiffs' Claims Are Preempted By Federal Law, Including FMVSS 114. ................................................................................................................ 3

III.    Plaintiffs' Warranty Claims Are Defective As A Matter Of Law. ............................ 5

IV.     Plaintiffs' Unjust Enrichment Claim Is Fundamentally Flawed. ............................ 7

V.      Plaintiffs' Misrepresentation-Based Fraud Claims Under Wis. Stat. §§ 100.18, 895.446, and 943.20(1)(d) Are Legally Insufficient. ................................. 8

VI.     The "Face to Face" Solicitation Statute And Implementing Regulations (ATCP 127.01 *et seq.*) Do Not Apply To Walk-In Transactions Initiated By Customers At Dealerships To Which None Of The Defendants Are Parties. ....................................................................................................................... 10

VII.    Plaintiffs Cannot Rewrite Wis. Stat. § 218.0116 To Create A Private Right Of Action For False Advertising Against A Distributor. ............................... 11

VIII.   Plaintiffs' Strict Liability Claim Under Wis. Stat. § 895.047 Fails To State A Claim. ........................................................................................................ 14

IX.     Plaintiffs' Post-Sale Failure To Warn Claim Fails To State A Claim. ..................... 16

X.      Plaintiffs' Rescission Claim Fails To State A Claim. ............................................ 17

XI.     Plaintiffs' Declaratory Relief Claim Should Be Dismissed. .................................... 18

XII.    Plaintiffs Lack Standing to Proceed. .................................................................... 18

XIII.   Plaintiffs' Claims Cannot Reach HATCI. .............................................................. 19

CONCLUSION .................................................................................................... 20

Case 2:21-cv-01146-PP   Filed 03/25/22   Page 2 of 25   Document 32

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ball v. Sony Elecs., Inc.*,
No. 05–C–307–S, 2005 WL 2406145 (W.D. Wis. Sept. 28, 2005)..........................................7

*Baranco v. Ford Motor Co.*,
294 F. Supp. 3d 950 (N.D. Cal. 2018) .................................................................................6

*Bieda v. CNH Indus. Am.*,
518 F. Supp. 3d 863 (W.D. Pa. 2021).................................................................................5

*Burton v. Am. Cyanamid*,
334 F. Supp. 3d 949 (E.D. Wis. 2018)...............................................................................17

*Burton v. E.I. du Pont de Nemours & Co.*,
994 F.3d 791 (7th Cir. 2021) .......................................................................................16, 17

*Carando Gourmet Frozen Foods Corp., Inc. v. Axis Automation, LLC*,
458 F. Supp. 3d 60 (D. Mass. 2020) ...................................................................................7

*Eichstedt v. Lakefield Arms Ltd.*,
849 F. Supp. 1287 (E.D. Wis. 1994)...................................................................................2

*Fenner v. General Motors (In re Duramax Diesel Litig.)*,
No. 17-CV-11661, 2018 WL 3647047 (E.D. Mich. Aug. 1, 2018)...................................9, 10

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000).......................................................................................................3, 4

*Geske v. PNY Techs., Inc.*,
503 F. Supp. 3d 687 (N.D. Ill. 2020) ...............................................................................18

*Knight v. Enbridge Pipelines (FSP) L.L.C.*,
759 F.3d 675 (7th Cir. 2014) .............................................................................................6

*Murillo v. Kohl's Corp.*,
197 F. Supp. 3d 1119 (E.D. Wis. 2016)............................................................................9, 18

*Peters v. Holiday Inns, Inc.*,
278 N.W.2d 208 (Wis. 1979)...........................................................................................3, 17

*R.S.B. by & through Hammar v. Merck & Co.*,
No. 20-C-1402, 2021 WL 1842280 (E.D. Wis. May 7, 2021) .............................................14

*Rodman Indus., Inc. v. G&S Mill, Inc.*,
   145 F. 3d 940 (7th Cir. 1998) ............................................................15

*Ruff v. Burger*,
   145 N.W.2d 73 (Wis. 1966) ................................................................3

*Snyder v. Badgerland Mobile Homes, Inc.*,
   659 N.W.2d 887 (Wis. Ct. App. 2003) ............................................11

*Stuart v. Weisflog's Showroom Gallery, Inc.*,
   746 N.W.2d 762 (Wis. 2008) ..............................................11, 14, 15

*In re Volkswagen Grp. of Am., Inc.*,
   No. 2022-108, 2022 WL 697526 (Fed. Cir. Mar. 9, 2022)................10

*Wascher v. ABC Ins. Co.*,
   No. 2020AP1961, 2022 WL 389480 (Wis. Ct. App. Feb. 9, 2022).......16

*Watts v. Watts*,
   405 N.W.2d 303 (Wis. 1987) ..............................................................7

*Wausau Tile, Inc. v. Cty. Concrete Corp.*,
   593 N.W.2d 445 (Wis. 1999) ......................................................14, 15

*Webber v. Armslist LLC*,
   No. 20-C-1526, 2021 WL 5206580 (E.D. Wis. Nov. 9, 2021)..........2, 3

*Williamson v. Mazda*,
   562 U.S. 323 (2011)........................................................................3, 4

**Statutes**

Home Improvement Practices Act ...............................................................14

Magnuson-Moss Warranty Act .....................................................................7

Wis. Stat. § 100.18...................................................................................8, 10

Wis. Stat. § 218.0116 ....................................................................11, 12, 13

Wis. Stat. § 895.047................................................................14, 15, 16

Wis. Stat. § 895.446................................................................................8, 10

Wis. Stat. § 943.20 ................................................................................8, 10

Wisconsin Deceptive Trade Practices Act ...............................................9, 14

**Other Authorities**

62 Fed. Reg. No. 200 ...................................................................................................................3, 4

Clifford Atiyeh, *Hyundai, Kia Take Action after Cars Become Theft Targets in*
    *Milwaukee*, CAR AND DRIVER (Dec. 11, 2021),
    https://www.caranddriver.com/news/a38491394/hyundai-kia-thefts-
    milwaukee-action/.................................................................................................................18

Federal Rule of Civil Procedure 9(b).....................................................................................8, 18

iv

Plaintiffs Marvin, Wargin, Przybelski, Just, Flasch, and Davis (collectively, "Plaintiffs") address the Memoranda of Law in Support of Defendants' Motions to Dismiss ("Defendants' Mem.") the 12-count First Amended Complaint ("Complaint") with a barrage of arguments that fail to address critical deficiencies in their claims. Plaintiffs fail to allege any affirmative misrepresentations, because every statement identified in the Complaint is either true or is not subject to verification (e.g., inactionable puffery). Likewise, Plaintiffs rely upon many statutory provisions but most do not even apply to Defendants Kia America, Inc. ("Kia"), Hyundai Motor America ("Hyundai"), and Hyundai Kia America Technical Center, Inc. ("HATCI") (collectively, "Defendants"). To the extent those statutes do apply, they explicitly bar, rather than support, this action. All 12 counts are defective as a matter of law and should be dismissed.

## ARGUMENT

### I. The Intervening Criminal Acts Of Third Parties Preclude Liability.

Plaintiffs recognize the perpetrators of the auto theft crimes alleged in the Complaint are not Defendants; Defendants are not stealing vehicles in Milwaukee and crashing them. *See, e.g.*, Plaintiffs' Omnibus Opposition ("Opp'n") 1. Instead, "[t]he perpetrators are teenagers"; "[k]ids, with a penchant for reckless joyriding." *Id.* Kia and Hyundai, joined by HATCI, demonstrated that these independent criminal acts broke any chain of causation and preclude liability.

In response, Plaintiffs contend that Defendants are liable because "Defendants knowingly disregarded the very risk they created" and they realized or should have realized the likelihood that a criminal might commit this auto theft crime. *Id.* at 10–11. Plaintiffs point to their allegations that, among other things, the European Union and other countries (though not the United States) require Plaintiffs' preferred security measures. *See id.* at 5–6 ("the EU and other countries . . . mandated them decades ago," "[b]ut NHTSA rejected the petition" to "require immobilizers as standard equipment"). Plaintiffs further claim that although NHTSA rejected a petition to require immobilizers on American vehicles, NHTSA advised the automotive industry "to make immobilizers standard" anyway. *Id.* at 6. Plaintiffs argue Defendants thus "created" the risk of auto theft crime and "knowingly disregarded" it. *Id.* at 6, 11.

Plaintiffs' argument does not hold together. As a factual matter, according to Plaintiffs' own cited reports, the National Insurance Crime Bureau ("NICB") does not include any Kia or Hyundai models in its most recent national Top 10 "most stolen vehicles" report. *See* Defendants' Mem. 24; *see also, e.g.*, Compl. ¶¶ 214–15, 218–33 (discussing and referencing NICB reports). Further, during the time period when the vehicles at issue in the Complaint (2011–2021), were designed and manufactured, there was no so-called "epidemic" of thefts in any locale. Opp'n 8.

Moreover, Plaintiffs' argument does not refute Defendants' legal argument that the intervention of a criminal act defeats causation. Plaintiffs artfully quote from *Webber v. Armslist LLC*, No. 20-C-1526, 2021 WL 5206580 (E.D. Wis. Nov. 9, 2021) to argue "nothing changes the rule that 'intentional criminal acts are not a superseding cause *per se*.'" Opp'n 10 (citing *Webber*, 2021 WL 5206580, at *10). Yet the *Webber* court said more. In context, it stated "[a]lthough intentional criminal acts 'are not a superseding cause per se,' 'acts that are either criminal or intentionally tortious . . . are more likely to be adjudged superseding causes than merely negligent acts.'" *Webber*, 2021 WL 5206580, at *10 (citation omitted). In *Webber*, as in *Eichstedt v. Lakefield Arms Ltd.*, 849 F. Supp. 1287 (E.D. Wis. 1994), this Court held intervening criminal acts were a superseding causes. In *Eichstedt*, this Court held that "[e]ven if it is conceded for purposes of the present motion that the rifle in question was defective and unreasonably dangerous and was one cause-in-fact of the plaintiff's injuries, as a matter of law the intentional, reckless actions of Daniel Simons (actions that are crimes in Wisconsin) constituted a superseding cause." *Eichstedt*, 849 F. Supp. at 1292.

In *Webber*, this Court expressly put aside "[w]hatever role Defendants may have played" by owning and operating a website that allowed a criminal to obtain a firearm for use in a crime and concluded that "the conscious, pre-meditated decisions and actions of [the criminal] served as a superseding cause of Plaintiff's injury." *Webber*, 2021 WL 5206580, at *10. The defendants' conduct was "simply too far removed from and out of proportion to the criminal act committed," for "[s]imply *enabling* consumers to use a legal service is far removed from *encouraging* them to commit an illegal act." *Id.* (second emphasis added) (citation omitted). Moreover, the *Webber*

court further determined that "[i]mposing civil liability" would be "also out of proportion to the lawful conduct in which they engaged and would likely destroy their business," making "litigation … a way of circumventing the legislative process." *Id.*; *see also id.* (stating that, "[i]n a government such as ours," "determining public policy based on one tragic set of circumstances is not the proper function of courts or juries"). Here, too, as a matter of law, the intentional, reckless actions by the Kia Boyz, or other criminal perpetrators, constitute a superseding cause.[1]

## II. Plaintiffs' Claims Are Preempted By Federal Law, Including FMVSS 114.

Plaintiffs do not deny that they seek to apply a unique standard to one State's consumers. Instead, they argue their claims are not preempted by attempting to distinguish *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000), the case on which Defendants rely. Instead, they point to *Williamson v. Mazda*, 562 U.S. 323 (2011). Opp'n 12–13. Plaintiffs' argument is flawed.

The history of federal anti-theft standards relied on by Plaintiffs reveals that NHTSA considered and declined to adopt the standard Plaintiffs advocate. In 1997, the Department of Transportation and the Department of Justice were "assessing the existing theft prevention program to determine what, if any, changes are needed to further deter motor vehicle theft," including the proposal to require immobilizers. 62 Fed. Reg. No. 200 at 54153 col. 1. NHTSA concluded that "it would be premature to promulgate additional requirements before this comprehensive assessment is completed." *Id.* NHTSA concluded "there is already a standard

---

[1] Plaintiffs' other legal authority is inapposite. For example, in *Ruff v. Burger*, 145 N.W.2d 73 (Wis. 1966), the jury specifically found that "no person other than Burger was negligent," so "the question of intervening cause [wa]s moot." *Id.* at 77. Even if the question were not moot, the *Ruff* court concluded that the actions at issue—an electric company energized a cable that later electrocuted certain cows—could not constitute an *intervening* cause because the defendant had specifically constructed that cable in order to energize it. *Id.* at 77–78. For another, the *Peters v. Holiday Inns, Inc.*, 278 N.W.2d 208 (Wis. 1979) court dealt with a motel that was allegedly "negligent in permitting two intruders access to [the plaintiff's] room that resulted in his being beaten and robbed" and considered an innkeeper's "duty to exercise ordinary care to provide adequate protection for its guests and their property from assaultive and other types of criminal activity." *Id.* at 209, 212. This is a duty tort law imposes on innkeepers in particular; indeed, in some jurisdictions, tort law imposes a heightened duty. The facts and duties of innkeepers discussed in *Peters* are simply irrelevant to this case.

3

(FMVSS 114) covering theft protection" and it declined to modify that standard. *Id.* Yet that is precisely what Plaintiffs seek to do in this lawsuit: amend a theft protection standard in an area that was occupied by federal law in 1997, and still is today.

Plaintiffs thus seek to displace FMVSS 114 with a standard NHTSA itself indicated was incompatible with its standard. *Id.* at 54153 col. 2. Indeed, the agency was clear that a proposal to require additional theft prevention devices, such as immobilizers, was inconsistent with the judgment it had made. It noted FMVSS 114 struck a balance "aimed at alleviating theft in a cost-effective manner." *Id.* It concluded: "The agency believes that the Theft Prevention Standard (49 CFR part 541) in conjunction with FMVSS No. 114 and Part 543, provides a comprehensive scheme for deterring motor vehicle theft." *Id.* at 54154 col. 1. It refused to require more.

Plaintiffs seek to deviate from that comprehensive regulation, which presents a classic situation of conflict preemption. *See Geier*, 529 U.S. at 874–75, 883. In *Geier*, where NHTSA chose one possible regulatory option over other available options, the Supreme Court held that civil litigation seeking to impose liability for not implementing the option NHTSA rejected was preempted. *Id.* Plaintiffs instead analogize to *Williamson*, but in *Williamson* the federal government did not, as here, have a sufficiently "comprehensive scheme" designed to achieve a "significant regulatory objective" that it considered but refused to change. *Williamson*, 562 U.S. at 332. Instead, it gave manufacturers multiple options to meet a desired objective. Here, the Theft Act itself and the subsequent implementation of the standard and rejection of alternate standards make clear that the scheme is comprehensive and intended to complete a "significant regulatory objective," as in *Geier*. By contrast, the *Williamson* Court concluded that providing manufacturers a seatbelt choice was not a significant objective of the federal regulation for reasons refuted here. *Id.* at 335 ("we are satisfied that the rulemaking record at issue here discloses no such pre-emptive intent"). Finally, in *Williamson*, the government took the position "that DOT's regulation does not pre-empt this tort suit," whereas in *Geier*, it took the oppositie view. As the Court stated, "the agency's own views should make a difference." *Id.* (quoting *Geier*, 529 U.S. at 883). Plaintiffs' claims are preempted by the Theft Act and the implementing regulations.

4

**III. Plaintiffs' Warranty Claims Are Defective As A Matter Of Law.**

Defendants showed the vehicles are fit for their intended purpose and the warranty claims alleged in Counts I, II, and III fail to state a claim. Defendants' Mem. 8–13. Plaintiffs fail to refute that showing.

Express Warranty. Plaintiffs ignore the dispositive language of the express warranties, which disclaim liability for damage due to theft. *See, e.g.*, Compl. ¶¶ 249, 257; Compl. Ex. D, at 9; Compl. Ex. F, at 18. Instead, they argue the express warranties do not say what they plainly say about theft. Opp'n 34–35. Here, that language explicitly excludes damage due to theft. Likewise, the warranties limit coverage to defects in material and workmanship rather than providing coverage for choices made in designing the vehicle. Compl. Ex. D, at 10; Compl. Ex. F, at 16–17.

Plaintiffs then engage in a lengthy argument that the express warranties are "unconscionable." Opp'n 35. This argument fares no better. They fail to cite a single case from any jurisdiction in which the court rewrote a written warranty to provide coverage against theft of anything, much less a moving vehicle. Nor are they able to provide any evidence of any warranty from any manufacturer of a vehicle that has provided coverage against theft. Their citation to a case from the Western District of Pennsylvania concerning the performance of a hydraulic system on a mechanical product underscores why the warranties here are conscionable—these warranties would cover the failure of performance of such a system whereas in the cited case there was no warranty coverage of any kind—limited or not. Opp'n 35–36 (citing *Bieda v. CNH Indus. Am.*, 518 F. Supp. 3d 863 (W.D. Pa. 2021)). In *Bieda*, the defendant knew the product was defective and not merchantable over two years prior to the plaintiff's purchase, and the defendant had already developed a kit to remedy the defect, yet the defendant did not incorporate or supply this required kit with its product, nor did it advise dealers or purchasers of the defect or the existence of the kit. *Bieda*, 518 F. Supp. 3d at 865–66. Despite all this, the defendant's sales contract explicitly stated, "NO WARRANTY. THE EQUIPMENT IS SOLD AS IS AND WITH ALL FAULTS . . . ." *Id.* at 869. This is not that case or that warranty. Moreover, the Seventh Circuit has cautioned against looking for opportunities to expand state law. As that court put it, "tak[ing] state law as it is rather

5

than predicting novel developments" is the proper role for federal courts.  *Knight v. Enbridge Pipelines (FSP) L.L.C.*, 759 F.3d 675, 678 (7th Cir. 2014).

    <u>Implied Warranty</u>.  Plaintiffs do not allege Defendants' vehicles do not operate as intended. Instead, they conflate safety in transportation with security, and they suggest that a vehicle is not merchantable unless it is theft-proof.  *See* Opp'n 27–28; *see also* Defendants' Mem. 11–12. Plaintiffs again fail to cite a single case from any jurisdiction in which a court held that the law implied a warranty that protects against the possible theft of a vehicle.  Their cited case, *Baranco v. Ford Motor Co*., 294 F. Supp. 3d 950 (N.D. Cal. 2018), involved unrepaired contamination of a door latch signal assembly that could "falsely signal that a door is open when it is in fact closed," resulting potentially in: (1) "false and distracting visual and/or audible signals that the doors are ajar"; (2) the inability of the occupants to lock the vehicle while driving; and (3) an "interior dome light remaining on even while the vehicle is in motion."  *Id.* at 975, 965.  Defects that allegedly interfere with the owner's operation of the vehicle are not comparable with the theft of an unoccupied parked vehicle.  Plaintiffs note correctly that this Court should determine how the state's highest court would rule on the issue, which "the Wisconsin Supreme Court has never done."  Opp'n 34 (citations omitted).  Given that neither the Wisconsin Supreme Court nor any other state's supreme court has ever implied a warranty for such a purpose, this is an easy outcome to predict—there is no such warranty.  *See Knight*, 759 F.3d at 678.

    Plaintiffs' argument also does not admit of a limiting principle.  That is, what amount of theft is enough to imply a warranty against theft?  Would the top five most stolen vehicles nationwide be deemed to breach the implied warranty of merchantability?  Top 10?  And would that change as the year-by-year statistics changed?  Or perhaps it would turn on some unknown percentage of vehicles stolen, or if any car were stolen.  Plaintiffs ask this Court to create a standard and hold that Defendants' vehicles are too easy to steal, even though not a single one of them makes the Top 10 "most stolen vehicles" report using the NICB data relied upon in the Complaint. *See* Defendants' Mem. 24.  Nor do Plaintiffs answer whether they want to use a national scale or break down the 10 most stolen vehicles slots in each jurisdiction.  Plaintiffs fare no better using

the jurisdiction-by-jurisdiction approach with Kia and Hyundai cracking the top five slots in only two jurisdictions in the most recent publicly available survey, taking up just two out of 260 possible top five slots. *Id*. Would the competitors' vehicles that take up the other 258 top five slots by jurisdiction also be unmerchantable? And would they be unmerchantable just in those jurisdictions or elsewhere? Plaintiffs provide no answers at all, which explains why no court has ever countenanced such a theory.

<u>Magnuson-Moss Warranty Act</u>. Because Plaintiffs have no legally cognizable express or implied warranty claims, their Magnuson-Moss Warranty Act claim should also be dismissed.

## IV. Plaintiffs' Unjust Enrichment Claim Is Fundamentally Flawed.

Plaintiffs' unjust enrichment claim requires an allegation that Defendants got something for nothing, not just that Plaintiffs are disappointed with the deal. Defendants' Mem. 14–15. In response, Plaintiffs argue that they were forced to make payments to Defendants' *affiliates* under their "purchase/lease contracts," despite their vehicles being temporarily unavailable (i.e., of no benefit) to them due to a need for repairs. Opp'n 37.

Plaintiffs' response concedes their claim is really about their "purchase/lease contracts." *Id.* Under Wisconsin law, however, "[t]he doctrine of unjust enrichment does not apply where the parties have entered into a contract." *Watts v. Watts*, 405 N.W.2d 303, 313 (Wis. 1987)). In the instances in which Wisconsin courts have allowed plaintiffs to file an alternative to a contract-based claim, those courts have required dismissal of the unjust enrichment claim "if the unjust enrichment claim incorporates by reference allegations of the existence of a contract between the parties." *Carando Gourmet Frozen Foods Corp., Inc. v. Axis Automation, LLC*, 458 F. Supp. 3d 60, 74 (D. Mass. 2020) (quoting *NC Holdings v. United Rehabilitation Servs., Inc.*, No. 06-cv-01085, 2007 WL 542140, at *7 (E.D. Wis. Feb. 16, 2007)).

In addition, even if Plaintiffs' benefit could support a claim beyond third-party affiliates and reach all the way to Defendants, Plaintiffs did receive something in exchange for that benefit: their vehicles and their contract remedies. Defendants' Mem. 14–15. Plaintiffs cannot now use their unjust enrichment claim to unilaterally alter the terms of their valid contracts. *See, e.g.*, *Ball*

*v. Sony Elecs., Inc.*, No. 05–C–307–S, 2005 WL 2406145, at \*6 (W.D. Wis. Sept. 28, 2005) ("Plaintiffs believe that they paid more than the camcorders were worth because they were defective. However, . . . [u]njust enrichment is not a mechanism for supplementing that which a purchaser perceives as inadequate contractual remedies.").

## V. Plaintiffs' Misrepresentation-Based Fraud Claims Under Wis. Stat. §§ 100.18, 895.446, and 943.20(1)(d) Are Legally Insufficient.

Plaintiffs fail to state actionable misrepresentation-based fraud claims in Count VI and VII. Plaintiffs do not meet the requirements of Sections 100.18, 895.446, and 943.20(1)(d). They do not allege any untrue statements of fact with the requisite intent, that caused reliance and resulted in pecuniary harm. Defendants' Mem. 15–16. Further and critically, Plaintiffs have not sufficiently alleged a duty to disclose. *Id.* at 16–17. Plaintiffs' claims are also subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements, and Plaintiffs' allegations do not come close to meeting this heightened standard. *Id.* at 15–17.

In response, Plaintiffs broadly assert that they alleged misstatements. Opp'n 19–22. Yet, in the more than three pages they devote to this issue, Plaintiffs fail to quote a single statement. Instead, they insert two red herrings, the GM ignition switch and the Takata airbag cases, when neither is remotely relevant. Plaintiffs also refer this Court to the more than seven pages of so-called "Facts" in their brief. *Id.* at 22. None of those "Facts" identify a single statement that Plaintiffs identify as a misrepresentation. There is a reason for that failure: Plaintiffs do not want the Court to examine the language of any statement because it would become readily apparent that the statement is true or, at most, inactionable puffery.

Plaintiffs also suggest Defendants had a duty to make certain disclosures. Through this lens, Plaintiffs attempt to repackage alleged omissions as affirmative misrepresentations. *See* Opp'n 19 (arguing that "concealment . . . amounts to knowingly false representations"). But, as Plaintiffs must and do concede, Wisconsin law does not permit claims based on an omission. *Id.* (recognizing that "[o]missions are not actionable"). Plaintiffs invite the Court to require Defendants to have made certain unspecified disclosures about the security systems available on

their vehicles, and on other manufacturers' vehicles, and provide comparisons to theft rates at different points in time.  Plaintiffs also appear to want the law to require disclosures concerning the difficulty involved in defeating each vehicle's respective security system.  In Wisconsin, courts do not engage in this inquiry of what could have or should have been disclosed, and certainly not with the advantage of hindsight.  Instead, the law requires specific false representations.

The thorough analysis of the Wisconsin Deceptive Trade Practices Act ("WDTPA") in *Fenner v. General Motors (In re Duramax Diesel Litig.)*, No. 17-CV-11661, 2018 WL 3647047 (E.D. Mich. Aug. 1, 2018), underscores the distinction between misrepresentations and omissions.  *See id.* at *6–7.  As in this case, the plaintiffs there tried to disguise an omission case as a misrepresentation case relying upon cases like *Murillo v. Kohl's Corp.*, 197 F. Supp. 3d 1119 (E.D. Wis. 2016).  The plaintiffs identified "approximately ten pages of GM advertising, press releases, and publications related to the emissions production and fuel economy of its diesel engines" such as "the Duramax engine 'run[s] clean,' delivers 'low emissions,' and is 'friendlier to the environment.'"  *Id.* at *4 (alteration in original).  The plaintiffs alleged that the Duramax engine achieved those "feat[s] by employing 'defeat devices,'" which they defined as "an auxiliary emissions control device that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use."  *Id.* at *2.  The Duramax engine allegedly contained three such devices.  *See id.*  The court noted that "not one of the advertisements or publications which Plaintiffs reproduce . . . references EPA standards or represents that the vehicle in question has been certified by the EPA."  *Id.* at *4.  Still, the plaintiffs argued "Wisconsin courts have approved WDTPA claims based on a 'mixed' theory of affirmative misrepresentation and omission."  *Id.* at *6.  They further argued "GM owed Plaintiffs a duty to disclose the defeat devices in the Affected Vehicles in part because it made false and incomplete representations about the cleanliness and power of the vehicles."  *Id.* at *7.

The court pointed out that none of the cases relied upon there by the plaintiffs predicated liability based upon omissions.  Rather, the omissions were relevant only because they "*may show that the* <u>*affirmative representation*</u> *is untrue, deceptive, or misleading*."  *Id.* at *6 (emphasis added)

(citation and quotations omitted). Thus, the "cases make abundantly clear that fraudulent omissions, by themselves, cannot state a claim." *Id.* at *7. Rather, "proof of fraudulent omissions may help a plaintiff to state a WDPTA claim because those omissions will often *identify* a fraudulent representation." *Id.* Joining the Wisconsin courts that "have rejected similar arguments," the *Duramax* court held that "nonactionable representations, viewed in context of the alleged fraudulent omissions," are not "sufficient to constitute actionable representations," and "individually nonactionable statements" do not "become actionable together." *Id.*

Thus, no matter how many omissions Plaintiffs point to, individually or collectively, they are insufficient to state a claim under Sections 100.18, 895.446, and 943.20(1)(d).

**VI.   The "Face to Face" Solicitation Statute And Implementing Regulations (ATCP 127.01 *et seq.*) Do Not Apply To Walk-In Transactions Initiated By Customers At Dealerships To Which None Of The Defendants Are Parties.**

In Count VIII, Plaintiffs rely on a "direct marketing scheme" statute that does not apply. Defendants' Mem. 19. Plaintiffs fail to address a critical and dispositive point: the Complaint does not allege sales were "initiated" by any person other than Plaintiffs themselves. *See* Opp'n 23–24. There is not one word in the Complaint or the Opposition or its supporting declaration to show that these transactions were initiated in any way other than by the consumers walking into a dealer's showroom. Moreover, as the very recent and detailed opinion of the Federal Circuit made clear, with respect to any sales activity (and lots of other issues), dealers are not considered agents of distributors or manufacturers in any event. *See In re Volkswagen Grp. of Am., Inc.*, No. 2022-108, 2022 WL 697526, at *3 (Fed. Cir. Mar. 9, 2022) (granting mandamus petitions to transfer cases out of Western District of Texas in part because plaintiff "failed to carry its burden to show that the dealerships are agents of Volkswagen or Hyundai"). Without overcoming those threshold issues, the statutes do not apply and any other argument is beside the point.

Plaintiffs' other arguments do not work in any event. The statute defines a seller as a "person who accepts payment for a purported sale of consumer goods or services to a consumer" under ATCP § 127.01(21). The Complaint alleges dealers—not Defendants—accepted payment.

10

*See, e.g.*, Compl. ¶ 8 ("Przybelski . . . leased from an authorized Hyundai dealership"); ¶ 9 ("Just . . . leased from an authorized Kia dealership"); ¶ 10 ("Flasch . . . purchased from an authorized Kia dealership"); ¶ 11 ("Davis . . . leased from an authorized Kia dealership"). Indeed, it could not be otherwise under the law of Wisconsin where only dealers—not distributors, not finance companies—may sell vehicles to the public.

While Plaintiffs claim the statute is "expansive," that claim has no support in the statutory language. Opp'n 23. Instead, the statute is drafted broadly only so a "person who accepts payment" cannot escape liability by asserting it was his "employee or agent" that failed to comply with the statute or by hiring "a telemarketing firm" who is acting on behalf of the "seller." Defendants' Mem. 20 (quoting ATCP § 127.01(21)). But the statute does not make a manufacturer or distributor of any product liable to a consumer—it applies only to entities that operate at the retail level who "accept payment" for the sale of "consumer goods." ATCP § 127.01(21). No Wisconsin authority supports Plaintiffs' statutory rewrite. Indeed, the two authorities that Plaintiffs cite reinforce that Wisconsin courts reject interpretations of the plain language of a statute that do not comport with the obvious protection that the statute was trying to afford. *See Snyder v. Badgerland Mobile Homes, Inc.*, 659 N.W.2d 887, 893 (Wis. Ct. App. 2003) (rejecting attempt to engraft additional requirements against statute's "unambiguous language," where purpose of statutory protection already well served); *Stuart v. Weisflog's Showroom Gallery, Inc.*, 746 N.W.2d 762, 767 (Wis. 2008) ("We must give effect to statutory enactments by determining the statute's meaning, especially through its language, which we presume expresses the intent of the legislature. We favor a construction that will fulfill the intent of a statute or a regulation, over a construction that defeats its manifest object." (citation omitted)).

## VII. Plaintiffs Cannot Rewrite Wis. Stat. § 218.0116 To Create A Private Right Of Action For False Advertising Against A Distributor.

With respect to Count IX, Defendants showed that the portions of the statute that apply to the conduct alleged in the Complaint do not impose duties on entities like Defendants. Plaintiffs argue against that result, suggesting the statute could have been written differently or more clearly,

11

but the reality is the plain language of the statute is already clear. There is no cause of action here.

Wis. Stat. § 218.0116(1) has 53 different subparagraphs that regulate practices of entities that must obtain "licenses." As Plaintiffs concede, those subparagraphs sometimes regulate only conduct of dealers, other times they regulate only conduct of distributors or manufacturers, and still other times they regulate practices of all entities that receive licenses. *See* Opp'n 16. ("some apply to manufacturers and distributors . . . some apply to dealers . . . and some apply to all licensees"); *compare, e.g.*, Wis. Stat. § 218.0116(1) subparagraphs (x), (xm), (y), (ym), (ys) (all of which permit adverse action for "being a manufacturer, importer, or distributor who . . ."), *with* (n) ("the selling of new motor vehicles for which the dealer is not franchised"), *with* (tm) ("being a licensee who willfully refuses or fails to . . .").

Plaintiffs rely on Section 218.0163, which provides "any retail buyer" with the opportunity to "recover damages for loss" from "licensees" with respect to only 10 of the 53 different subparagraphs of Section 218.0116(1). Opp'n 16. Plaintiffs assert Section 218.0163 not only provides a private right of action for violations of those 10 subparagraphs, but also redefines what those 10 subparagraphs prohibit. *Id.* at 16–17. More specifically, Plaintiffs assert that by creating a claim against "licensees," Section 218.0163 expands the prohibition in the specific substantive provision from a specific type of licensee to all licensees in all instances. *Id.* Plaintiffs reason that because Defendants are licensees subject to some substantive provisions and Section 218.0163 creates a civil remedy or private right of action against licensees for certain provisions, that civil remedy makes Defendants subject to substantive provisions that do not apply to manufacturers or distributors. *Id.* at 15-16. Yet the word "licensees" in Section 218.0163 merely parrots the opening words of Section 218.0116—"A license may be denied, suspended or revoked on the following grounds"—to encompass whatever is described in the 10 subparagraphs for which it provides a private cause of action. There is no indication that the civil remedy provision was intended to expand the substantive duties of the entities affected by those 10 subparagraphs.

Plaintiffs' suggestion that Section 218.0163 should have used additional restrictive language—dealers instead of licensees—misses the point: the entity subject to the duty is found in

the 10 identified subparagraphs themselves. *Id.* at 16. By way of example, Section 218.0116(1)(im) only applies to a dealer licensee. Wis. Stat. § 218.0116(1)(im). It prohibits "bushing," "the practice of increasing the selling price of a motor vehicle above that originally quoted the purchaser as evidenced by a purchase order or contract which has been signed by both the purchaser and dealer licensee." *Id.* Yet while distributors can only wholesale vehicles to dealers which have exclusive jurisdiction over setting prices to the public, under Plaintiffs' interpretation, when Section 218.0163(2) creates a private cause of action for a "retail buyer" for violations of Section 218.0116(1)(im), a distributor could become a legitimate target of such an action, even though Section 218.0116(1)(im) clearly addresses an interaction between a dealer and its customer. In short, Plaintiffs misread the statutory language.

Plaintiffs' attempt to use Section 218.0163(2) to expand the parameters of Section 218.0116(c), (dm), and (e) also overlooks the fact that the legislature prohibited private rights of action for 43 subparagraphs of Section 218.0116. For example, the statute does not create a civil remedy for violations of Section 218.0116(j), which prohibits "any statement or representation with regard to the sale, lease or financing of motors vehicles which is false, deceptive or misleading" that was "advertised, printed, displayed, published, distributed, broadcast or televised." Section 218.0116(j) covers precisely the type of statements that Plaintiffs allege were made. Plaintiffs seek to circumvent the legislature's decision to make "false, deceptive or misleading . . . advertis[ing]" *not* actionable under Section 218.0163(2). Compl. ¶ 699 (attacking alleged "fraudulent conduct" "through various affirmative misrepresentations and omissions"). Thus, even if Plaintiffs could end run the substantive provisions of the statute to make sections that apply only to dealers also apply to distributors, that end run is prohibited by the explicit provisions of Section 218.0116(j), which is not given a private cause of action under Section 218.0163(2). The bottom line is that Count IX should be dismissed for the additional reason that Plaintiffs want to use an inapplicable and improper section to recover for conduct governed by a different section (Section 218.0116(j)).

**VIII.   Plaintiffs' Strict Liability Claim Under Wis. Stat. § 895.047 Fails To State A Claim.**

Wisconsin's economic loss doctrine (the "ELD") bars Count X  under Section 895.047 for "a manufactured product based on a claim of strict liability."  Wis. Stat. § 895.047; *see also* Compl. ¶ 708.  The scope of the ELD is broad, extending to all theories of strict liability.  *See Wausau Tile, Inc. v. Cty. Concrete Corp.*, 593 N.W.2d 445, 451 (Wis. 1999) ("The economic loss doctrine precludes a purchaser of a product from employing negligence or strict liability theories to recover from the product's manufacturer loss which is solely economic.").

Plaintiffs assert that Wisconsin statutory actions do not fall within the ELD.  But, as Plaintiffs' cases recognize, the Wisconsin Supreme Court has held that whether the ELD will apply can turn on the legislature's intention in enacting the statute.  The result depends on whether the statutory history gives an "indication that the legislature merely intended to add a remedy to common-law breach of contract or misrepresentation claims."  *Stuart*, 746 N.W.2d at 774.  For example, the Wisconsin Supreme Court determined that the ELD did not apply to the Home Improvement Practices Act (the "HIPA"), explaining that if it "were to apply the ELD to bar the HIPA claims, [it] would be ignoring the public policies that are the basis for the HIPA."  *Id.* at 772.  That holding is hardly surprising because the legislature there intended to promote public policies by adding a remedy beyond those existing at common law to create additional protections for consumers.  *Id*.  Defendants do not contend otherwise and do not argue the ELD bars a claim, for example, under the WDTPA.  But the strict product liability statute is different.

Unlike the HIPA and the WDTPA, Section 895.047 actually narrows rather than expands strict liability at common law.  Indeed, the very case that Plaintiffs cite makes exactly that point.  *See* Opp'n 24 (citing *R.S.B. by & through Hammar v. Merck & Co.*, No. 20-C-1402, 2021 WL 1842280, at *3 (E.D. Wis. May 7, 2021)); *see also R.S.B.*, 2021 WL 1842280, at *3 ("Section 895.047(1)(a) thus imposes new burdens on a plaintiff by requiring that she prove foreseeability and that a reasonable alternative design exists and should have been adopted by the manufacturer.  Where there are no safer alternatives, it deprives her of her right to recover, even though the product is unreasonably dangerous." (citation omitted)).  In addition, Section 895.047

14

introduces comparative negligence principles into Wisconsin's strict liability regime, stating damages "shall be reduced by the percentage of causal responsibility for the claimant's harm attributable to the claimant's misuse, alteration, or modification of the product." Wis. Stat. § 895.047(3)(c). Various other provisions put significant limits on strict liability actions (for examples, statute of repose in subsection (5) and introducing subsequent remedial measures in subsection (4)). *See id.*

So, far from expanding strict liability law, the statute contracts potential liability, and there is no indication that, as the Wisconsin Supreme Court put it in *Stuart*, the legislature "intended to add" anything. *Stuart*, 746 N.W.2d at 774. Because the Wisconsin Supreme Court has held statutory claims "merely intend[ing] to add a remedy" would not be enough to eliminate the ELD, subtracting rather than adding is, for sure, not enough to justify this elimination. *Id.* Put another way, there is no indication the statute was intended to legislatively reverse the rule that the ELD "precludes a purchaser of a product from employing negligence or strict liability theories" for economic loss. *Wausau Tile*, 593 N.W.2d at 451. The ELD bars Plaintiffs' Section 895.047 claim.

And Plaintiffs cannot avail themselves of any ELD exceptions. As Plaintiffs recognize, the public safety exception is an exceedingly narrow one, meant to address only "special" concerns involving "contamination by *inherently hazardous substances* like asbestos." Opp'n 26 (emphasis added) (quoting *Wausau Tile*, 593 N.W.2d at 458); *see also Wausau Tile*, 593 N.W.2d at 457 ("Courts generally view asbestos cases as unique in the law."); *cf. id.* (declining to apply public safety exception to allegations that "damaged pavers present a risk of injury to pedestrians on the walkways in which they have been installed"). In addition, the *Wausau Tile* court made clear that ELD exception did not apply when, as here, the allegation is merely that there is economic loss because the product was inferior in quality, poorly designed, or failed to work for its intended purpose. *Id.* at 457, 459. Plus, for the "other property" exception any damage needs to be "*physical* harm," done to Plaintiffs' "other property" by the allegedly defective vehicle, not any damage done to Plaintiffs' "other property" by third-party criminals. *Id*. 457 (emphasis added); *see also Rodman Indus., Inc. v. G&S Mill, Inc.*, 145 F. 3d 940, 945 (7th Cir. 1998).

And even if their Section 895.047 claim could skirt the ELD, any allegations that their vehicles' security systems failed to live up to their expectations is not sufficient to allege a defect, as is needed to state a Section 895.047 claim. The Wisconsin Court of Appeals' recent decision in *Wascher v. ABC Ins. Co.*, No. 2020AP1961, 2022 WL 389480 (Wis. Ct. App. Feb. 9, 2022) highlights this point. There, the plaintiffs claimed that mortar a defendant had "'selected and sold' was 'inappropriate' for use in adhering the stone cladding to the [plaintiffs'] residence because the mortar was 'grossly under strength' and therefore 'accommodated only a small fraction of the weight of the stones.'" *Id.* at *12. The court held such allegations insufficient to state a claim, noting that the plaintiffs had not alleged that the mortar had a manufacturing defect, a design defect, or was otherwise "defective due to inadequate instructions or warnings." *Id.* at *13. Instead, the plaintiffs simply asserted that the mortar was "inappropriate for the setting in which it was used." *Id.* Here, too, although Plaintiffs pay lip service to the word "defect," their complaint, at base, is simply that they would have preferred an alternative security system for their vehicles, given to them for free, without having to purchase it as an optional upgrade.

All of the above is underscored by the Seventh Circuit's recent decision in *Burton v. E.I. du Pont de Nemours & Co.*, 994 F.3d 791 (7th Cir. 2021), in which it conducted an extensive analysis of the history of strict product liability jurisprudence in Wisconsin since the 1960s and how the 2011 codification narrowed the potential bases for liability. The Seventh Circuit reiterated an important principle: "It is boilerplate law that, merely because a product or an operation is not as safe as possible, because there are better methods of manufacture or performing an operation does not lead to the conclusion that the method employed was undertaken with a lack of ordinary care or the product was defective." *Id.* at 818 (quotation omitted). The fact that Plaintiffs have identified alternative security methods hardly shows that Kia and Hyundai's methods rendered their vehicles defective products. This is all the Complaint offers, and it is not enough.

## IX.    Plaintiffs' Post-Sale Failure To Warn Claim Fails To State A Claim.

Defendants explained that the so-called risk at issue here—the possibility of auto theft— was not "discovered" post-sale and was never "hidden." Defendants' Mem. 25–26. Plaintiffs

continue to insist otherwise, arguing Defendants knew or should have known of the risk of harm, that auto theft is actual harm (because "[e]asy-to-steal cars subject their owners to greater risk of falling victim to criminal activity"), and that "when" Defendants knew of the risk is a fact question. Opp'n 38. These arguments are nonsense.

There is generally no "duty to warn about dangers that are obvious to or readily known by potential users, or so commonly known that it can reasonably be assumed that users will be familiar with them." *Burton v. Am. Cyanamid*, 334 F. Supp. 3d 949, 958 (E.D. Wis. 2018). That a criminal can use brute physical force to smash a vehicle's window and break into that vehicle is a danger obvious to or readily known by potential users, or at least so commonly known it can be reasonably assumed that potential users will be familiar with it. *See* Opp'n 25 (Plaintiffs conceding that "a 'reasonable consumer' can foresee the possibility that his or her car could get broken into—maybe even stolen"). It does not give rise to a duty to warn. And it is not a danger that "may result from a particular use" of the vehicle, nor is the vehicle "likely dangerous for the use for which it is supplied" because of any such danger. *Burton*, 334 F. Supp. 3d at 961–62 (citations omitted).[2]

In addition, Plaintiffs' own Complaint alleges that, "Defendants have been aware of this problem for *approximately one year*" and that "Defendants have . . . known for *months* if not years." Compl. ¶¶ 747, 750 (emphasis added). Plaintiffs cannot abandon this concession and call their allegations a question of fact.

## X.    Plaintiffs' Rescission Claim Fails To State A Claim.

Even assuming Plaintiffs can bring a rescission claim against Defendants that are not parties to the relevant contracts, Plaintiffs do not allege this claim with sufficient particularity. *See* Defendants' Mem. 17–18. With no legal analysis, Plaintiffs assert that they can bring this claim

---

[2] Plaintiffs attempt to bolster their argument with another citation to *Peters*. As explained above, the *Peters* court considered whether a motel was negligent in allowing two intruders—one of whom was a former employee of the motel and was able to steal and put on an employee uniform—access to the plaintiff's room, resulting in the intruders assaulting and robbing the plaintiff. *Peters*, 278 N.W.2d at 209–10. That is a completely different situation from the theft of unoccupied parked vehicles.

in law and in equity, that they "alleged fraudulent concealment pursuant to Rule 9(b)," and that the economic loss doctrine "does not apply if the remedy sought is recission." Opp'n 36–37. Because Plaintiffs have failed to identify any actionable material or fraudulent misrepresentation and have failed to show justifiable reliance on any such misrepresentation, this claim fails to meet Federal Rule of Civil Procedure 9(b)'s heightened pleading standard and should be dismissed.

## XI.     Plaintiffs' Declaratory Relief Claim Should Be Dismissed.

Plaintiffs cannot plead a valid cause of action under their other 11 counts, and they cannot use a declaratory relief claim to sidestep those legal infirmities. Defendants' Mem. 26–27. They assert their declaratory relief claim is proper because the allegedly wrongful conduct is continuing. Opp'n 39. Yet, despite this blanket assertion, Plaintiffs' claim concerns only past conduct. *Id.* at 39–40 (calling the "scheme to sell" vehicles "ongoing" but identifying the underlying problem as auto thefts of vehicles already sold—indeed, sold so long ago that their warranties have expired). After all, with respect to future new vehicle sales, Plaintiffs do not allege any Kia or Hyundai vehicles fail to include the technology they claim is required.[3] So their reliance on case law in which allegedly wrongful conduct was "ongoing/future" is unavailing. *Murillo*, 197 F. Supp. 3d at 1137 (cited at Opp'n 39). And their argument that this Court "is obligated to craft a remedy" for individuals whose remedies have already expired and/or whose claims are not legally cognizable is misguided. Opp'n 39–40. This is not an appropriate request for declaratory relief.

## XII.    Plaintiffs Lack Standing to Proceed.

Plaintiffs admit that their expansive class vehicle definition spans "different years and models," and they acknowledge that a crucial standing inquiry "assesses the similarities between the products and advertisements to see if the Plaintiffs' 'injury is sufficiently similar to that suffered by class members who purchased other accused products.'" Opp'n 14–15 (quoting *Gisairo v. Lenovo (United States) Inc.*, 516 F. Supp. 3d 880, 887 (D. Minn. 2021)); *see also Geske*

---

[3] Nor can they. *See* Clifford Atiyeh, *Hyundai, Kia Take Action after Cars Become Theft Targets in Milwaukee*, CAR AND DRIVER (Dec. 11, 2021), https://www.caranddriver.com/news/a38491394/hyundai-kia-thefts-milwaukee-action/.

*v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 693, 700 (N.D. Ill. 2020) (noting a plaintiff may have "standing to sue on behalf of others who suffered a substantially similar harm from similar products with similar misrepresentations" and identifying the alleged misrepresentations the plaintiff "read and relied on": the name and label of her purchased power bank, the PowerPack 5200, which said it "could actually deliver 5200 mAH to her devices"). Only once this inquiry is answered can the issue be "deferred until class certification." Opp'n 14.

Plaintiffs argue that all of Kia and Hyundai's implicated vehicles over ten years (2011 to 2021), *see* Compl. ¶ 94, "are covered by the *same warranties* and were marketed in the *same way*," Opp'n 15. But their Complaint only refers to a random assortment of "exemplar" brochures, warranties, and statements over the years. *See, e.g.*, Compl. ¶¶ 74–86, 320–22, 356–59, 379–82, 421, 423. The Complaint does not sufficiently confirm whether these alleged representations and warranties were uniformly used across the different vehicle makes, models, years, and trims. *See* Defendants' Mem. 28. Because Plaintiffs' alleged injury is not sufficiently similar across the two brands, 10 model years, and unspecified number of models and trims, they lack standing to sue on behalf of class members who purchased and/or leased other vehicles.

## XIII. Plaintiffs' Claims Cannot Reach HATCI.

HATCI is not a manufacturer, a distributor, or a seller. *See* Memorandum of Law in Support of HATCI's Motion to Dismiss 1–4. It sits in a position markedly different from that of Kia and Hyundai, which are distributors. Under Wisconsin law, it is not clear how HATCI could owe Plaintiffs, for example, any post-sale duty to warn. *See id.* at 1, 4. In response, Plaintiffs simply argue that HATCI has an "agency relationship" with Kia, Hyundai, and Kia and Hyundai's parent companies in South Korea, and because of this alleged relationship, Plaintiffs assert in conclusory fashion that "an agent is liable for its own torts." Opp'n 38. Plaintiffs cite no case law—indeed, HATCI has found none—that contemplates, let alone requires, a so-called agent to adopt a manufacturer's post-sale duty to warn. *See id.*

Elsewhere, in similar fashion, Plaintiffs insist that HATCI is an agent and "authorized representative," with a relationship akin to "that of an attorney and its clients," of Kia, Hyundai,

and Kia and Hyundai's parent companies in South Korea, so HATCI "stands in their shoes" and is liable for their alleged violations of law. *Id.* at 27. But, even if such descriptions and analogies were true and correct, Plaintiffs present no case law or other legal authority indicating that an attorney can be held liable for his or her client's violations of law.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter an Order dismissing the First Amended Complaint in its entirety with prejudice and without leave to amend.

Dated: March 25, 2022

Respectfully submitted,

*/s/ Michael T. Brody*
Michael T. Brody
Peter J. Brennan
Vaughn E. Olson
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654-3456
Telephone: (312) 222-9350
Fax: (312) 527-0484
MBrody@jenner.com
PBrennan@jenner.com
VOlson@jenner.com

*Attorneys for Defendants Kia America, Inc., Hyundai Motor America, and Hyundai Kia America Technical Center, Inc.*