STEFANIE MARVIN

KATHERINE WARGIN

CHAID PRZYBELSKI                                    Case No.: 2:21–cv–01146–PP

CHAD JUST

AMY FLASCH

    –and–

LYDIA DAVIS

*On Behalf Of Themselves And*
*All Others Similarly Situated*,

              Plaintiffs,

v.

KIA AMERICA, INC.

HYUNDAI MOTOR AMERICA

HYUNDAI KIA AMERICA TECHNICAL CENTER, INC.

FICTITIOUS KIA DEFENDANTS A–C

    –and–

FICTITIOUS HYUNDAI DEFENDANTS A–C

          Defendants.

---

## AMENDED COMPLAINT

NOW COME Plaintiffs, Ms. Stefanie Marvin ("Stefanie"), Ms. Katherine Wargin ("Katie"), Mr. Chaid Przybelski ("Chaid"), Mr. Chad Just ("Chad"), Ms. Amy Flasch ("Amy"), and Ms. Lydia Davis ("Lydia") (collectively, "Plaintiffs"), by their attorneys, Barton Legal S.C., on behalf of themselves and all others similarly situated, and for their Amended Class Action Complaint against Defendants, Kia America, Inc. ("Kia"), Hyundai Motor America ("Hyundai"), Hyundai Kia America Technical Center, Inc. ("HATCI"), Fictitious Kia Defendants A–C, and Fictitious Hyundai Defendants A–C (collectively, "Defendants"), allege and state as follows:

1. A gang of juveniles, self-dubbed the "Kia Boyz," figured out what an entire team of Defendants' engineers and design professionals seemingly missed (at least initially): the vast majority of Kia and Hyundai vehicles (the "Class Vehicles," defined *infra*) are designed and manufactured with subpar security measures, thereby making them incredibly easy to steal.

2. Indeed, as WISN Channel 12 reported months ago, thefts of Kia and Hyundai vehicles have ***increased by 2,500%*** in Milwaukee since last year, precisely why the Milwaukee Police Department ("MPD") labeled this shocking auto-theft spree an "epidemic." These two auto brands alone—which, through their respective parent and/or affiliated companies, share common ownership—now represent ***66% of all auto thefts in Milwaukee***.

3. Although Defendants have recently acknowledged this crisis, claiming they "were investigating the situation and working with police" to ostensibly uncover the root of the problem, the truth is that Kia and Hyundai—who share similar design features based on their joint relationship with HATCI—are acutely aware of the design defect (or combination of design flaws, more aptly), which is plaguing the Class Vehicles.

4. So, as Defendants sit on their corporate hands and feign ignorance about how their defectively designed vehicles are causing this epidemic, Wisconsinites are put in harm's way. The Milwaukee metropolitan area has—quite literally—been transformed into a game of *Grand Theft Auto* wherein the Kia Boyz are preying on the owners of these Class Vehicles to steal their cars in droves; consumers who never imagined when they purchased their respective Class Vehicles, that they could be stolen so quickly and so easily that even middle-schoolers are doing it (in under a minute).

2

5.      Apart from the obvious financial harm that thousands of auto–theft victims have suffered, the ease with which the Class Vehicles can be stolen has created a marked public safety threat. County residents have been exposed to increased crime and unsafe roadways all while an overtaxed MPD struggles to cope. Accordingly, this action seeks to hold Defendants to their self–professed commitment to their customers and swiftly fix the problem that these defective Kia and Hyundai vehicles have created.

## THE PARTIES

6.      Plaintiff, Stefanie Marvin, is an adult citizen of Wisconsin. She is the former owner of a 2012 Kia Optima that she purchased from a family member in January 2021. Her Optima was subsequently stolen in May 2021 and deemed a total loss.

7.      Plaintiff, Katherine Wargin, is an adult citizen of Wisconsin. She is the former owner of a 2013 Hyundai Sonata that she purchased from an authorized Hyundai dealership in December 2016. Her Sonata was subsequently stolen in May 2021 and deemed a total loss.

8.      Plaintiff, Chaid Przybelski, is an adult citizen of Wisconsin. He is the former lessee of a 2019 Hyundai Elantra that he leased from an authorized Hyundai dealership in June 2019. His Elantra was subsequently stolen twice on May 3, 2021 and June 12, 2021; it was declared a total loss following its recovery after the second theft.

9.      Plaintiff, Chad Just, is an adult citizen of Wisconsin. He is the former lessee of a 2019 Kia Forte that he leased from an authorized Kia dealership in February 2019. His Forte was subsequently stolen in April 2021 and deemed a total loss.

10.      Plaintiff, Amy Flasch, is an adult citizen of Wisconsin. She is the current owner of a 2021 Kia Sportage, which she purchased from an authorized Kia dealership in January 2021. Her

Sportage was subsequently stolen in June 2021 and, although repaired, it was fixed with the same defective parts, which make it a prime target to get stolen again.

11.    Plaintiff, Lydia Davis, is an adult citizen of Wisconsin. She is the former lessee of a 2021 Kia Sportage that she leased from an authorized Kia dealership in September 2020. Her Sportage was subsequently stolen twice on February 19, 2021 and March 21, 2021; not wanting to tempt fate again, she broke her lease and traded in her Sportage for a Nissan.

12.    On information and belief, Defendant, Kia America, Inc., is a California corporation that maintains its principal place of business at 111 Peters Canyon Road, Irvine, California, 92606.

13.    On information and belief, Defendant, Hyundai Motor America, is a California corporation that maintains its principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708.

14.    On information and belief, Defendant, Hyundai Kia America Technical Center, Inc., is a Michigan corporation that maintains its principal place of business at 6800 Geddes Road, Superior Township, Michigan 48198.

15.    On information and belief, Fictitious Kia Defendants A, B, & C are unknown parent, subsidiary, or affiliate entities and/or corporate predecessors of Kia that, in addition to HATCI, participated in the design, development, manufacture, distribution, marketing, leasing, warranty, sale, service, and repair of the Class Vehicles that are the subject of this action, including the design and manufacture of the Defect (defined *infra*) equipped on each Class Vehicle. The pleadings of this action will be amended once the true identities of these entities are revealed.

16.    On information and belief, Fictitious Hyundai Defendants A, B, & C are unknown parent, subsidiary, or affiliate entities and/or corporate predecessors of Hyundai that, in addition to

4

HATCI, participated in the design, development, manufacture, distribution, marketing, leasing, warranty, sale, service, and repair of the Class Vehicles that are the subject of this action, including the design and manufacture of the Defect equipped on each Class Vehicle. The pleadings of this action will be amended once the true identities of these entities are revealed.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), because the aggregate claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this matter is a class action in which individual members of the class are citizens of a state different than Kia, Hyundai, and HATCI.

18. The naming of Fictitious Kia Defendants A–C and Fictitious Hyundai Defendants A–C in this action does not affect this Court's subject-matter jurisdiction under CAFA's jurisdictional exceptions, *see* 28 U.S.C. §§ 1332(d)(3) & (4), because no entity that would be substituted in for these fictitious parties would be considered a "primary" or a "significant" defendant in the action that would also be a citizen of Wisconsin.

19. This Court may exercise personal jurisdiction over Kia, Hyundai, and HATCI because they conduct substantial business in this state, receive substantial compensation and profits from the design, marketing, sales, and servicing of motor vehicles that they directly and/or indirectly distributed in this state, and have engaged in various unlawful practices described below, all of which occurred in this state; given each Defendant's contacts with this forum, they are subject to this Court's personal jurisdiction.

5

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because it is the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial part of the property that is the subject of the action is situated.

<u>FACTUAL ALLEGATIONS COMMON TO ALL CLASS MEMBERS</u>

*Auto Theft Presents A Profound Safety Risk*

21.     In 1966, Congress enacted the National Traffic and Motor Vehicle Safety Act (the "Safety Act") to empower the federal government to set and administer new safety standards for motor vehicles and road traffic safety.

22.     To oversee the promulgation of federal motor vehicle safety standards ("FMVSS" or "Safety Standards") and combat the increasing number of motor vehicle fatalities given the "motorization" of America, the Safety Act created a new federal agency, the U.S. Department of Transportation ("DOT"), and various subsidiary administrative agencies, including the National Highway Traffic Safety Administration ("NHTSA"); an organization whose mission is "to save lives, prevent injuries, and reduce economic costs due to road traffic crashes, through education research, safety standards, and enforcement."

23.     Pursuant to its authority under the Safety Act, NHTSA has promulgated numerous FMVSS, *see* C.F.R. §§ 571.101 *et seq.*, which the Safety Act defines as the "minimum standard for motor vehicle or motor vehicle equipment performance." 49 U.S.C. § 30102(a)(10).

24.     One of the Safety Standards that NHTSA enacted is FMVSS 114, which decreed minimum theft-protection standards to which virtually all passenger vehicles in the United States are required to follow. *See* 49 C.F.R. § 571.114 ("Theft Protection and rollaway prevention").

25.    FMVSS 114 was promulgated in April 1968. The Administrator's comments supporting the need for this Safety Standard explain that "stolen cars constitute a major hazard to life and limb on the highways." *See* 33 Fed. Reg. 6,471, (Apr. 27, 1968), which is attached hereto as *Exhibit A*.

26.    In reaching this conclusion, the Administrator summarized a body of evidence, which demonstrated that "cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals." *Id.*

27.    Indeed, after further explaining the findings of a Department of Justice of study (the 1968 DOJ Study") about the increased safety risk posed by stolen vehicles involved in auto accidents, the Administrator explained that "the approximate [accident] rate for stolen cars would be some *200 times the normal accident rate* for other vehicles." *Id.* (emphasis added).

28.    Given the increased safety risk posed by the unauthorized use of motor vehicles, the Administrator "reject[ed] those comments on the proposed standard which questioned its validity on the ground that [FMVSS 114 was] not related to improving motor vehicle safety." *Id.*

29.    FMVSS 114 thus sought to curb the ease with which vehicles could be stolen by promulgating minimum standards that required "each car [ ] be equipped with a device to remind drivers to remove the key when leaving the car." *Id.*

30.    Certain comments rejected the utility of this proposed Safety Standard, contending that "since any locking system, no matter how it is constructed, can be defeated by persons possessing sufficient skill, equipment, and tenacity, provisions for ensuring removal of ignition keys would be futile because a thief need not make use of a key." *Id.*

7

31.     The Administrator rejected these contentions, however, by again relying on the 1968 DOJ Study, which concluded that "*the large majority of car thieves are amateurs, almost half of whom are engaged in so–called 'joy–riding.'*" *Id.* (emphasis added). This evidence, the Administrator explained, "*shows that a high proportion of these thieves, most of whom are juveniles, start the cars' engines simply by using the key which has been left in the ignition lock.*" *Id.* (emphasis added).

32.     Apart from the ease with which a vehicle can be stolen when its keys are left in the ignition, the Administrator identified other instances of auto theft that also posed an unreasonable risk of harm, which FMVSS 114 was promulgated to redress; namely, ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

33.     Thus, FMVSS 114 also required manufacturers to use "[a] large number of locking–system combinations" for the keys on each vehicle's model line as well as "a steering or self–mobility lock." *Id.* All told, the first iteration of FMVSS 114 read in pertinent part as follows:

**S.4** *Requirements.*

**S4.1** Each passenger car shall have a key locking system that, whenever the key is removed, will prevent–

    (a)  Normal activation of the car's engine or other main source of motive power; and

    (b)  Either steering or self–mobility of the car, or both.

**S4.2** The prime means for de-activating the car's engine or other main source of motive power shall not activate the deterrent required by S.4.1(b).

**S4.3** The number of different combinations of the key locking systems required by S4.1 of each manufacturer shall be at least 1,000, or a number equal to the number of passenger cars manufactured by such manufacturer, whichever is less.

**S4.4** A warning to the driver shall be activated when the key required by S4.1 has been left in the locking system and the driver's door is opened.

*Id.* at 6,472.

8

34.     Although FMVSS 114 has been updated to "better correlate[ ] to modern theft protection technology and reflect[ ] the agency's interpretation of existing requirements[,]" it has not substantively changed the minimum performance requirements for antitheft equipment; specifically, "the standard [seeks] to ensure that [a] *vehicle could not be easily operated without the key,* and that the vehicle operator would not forget to remove the key from the ignition system upon exiting the vehicle." *See* 71 Fed. Reg. 17,752, 17,753 (Apr. 7, 2006) (emphasis added), which is attached hereto as ***Exhibit B***.

35.     In other words, FMVSS 114 was promulgated to prevent easy cases of auto-theft, whereby unsophisticated car thieves—many of whom are juveniles with a penchant for reckless joy-riding—can easily steal vehicles because either: (i) the keys are left in the vehicle's ignition; or ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

36.     Apart from its promulgation of FMVSS 114, NHTSA oversees other regulatory schemes to identify and combat vehicle theft in the United States, including the motor vehicle theft prevention standard, *see* 49 C.F.R. §§ 541.1 *et seq.*, as promulgated pursuant to its authority under the Motor Vehicle Theft Act of 1984 (the "Theft Act"), which was engrafted onto the Safety Act. *See* 69 Fed. Reg. 17,960 (Apr. 6, 2004), which is attached hereto as ***Exhibit C***.

37.     Pursuant to the theft prevention standard, NHTSA ensures that auto manufacturers comply with the "parts-marking requirement" ("PMR"): a process by which auto manufacturers mark major parts of passenger vehicles with non-removable labels that make these parts identifiable

9

if stolen. *Id.* The PMR is another regulatory scheme to combat auto theft; not only do marked auto parts facilitate their tracing and recovery, but they also serve as evidence used to prosecute, thieves, dealers, and chop shops connected with vehicle theft. *Id.* at 17,961.

38.     The Theft Act further authorizes NHTSA to exempt auto manufacturers from complying with the PMR if a manufacturer installs an antitheft device as standard equipment on a given vehicle line, which NHTSA determines to be at least as effective as the PMR. *Id.*; *see also* 49 C.F.R. §§ 543.1 *et seq.* (discussed further, *infra*).

39.     Historically, NHTSA has also published annual compilations concerning rates and trends of auto theft; in connection with compiling this data, NHTSA regularly sought comment from auto manufacturers and other interested parties regarding these data theft trends. *See, e.g.*, 75 Fed. Reg. 11,005, 11,006 (Mar. 10, 2010). NHTSA's annual reports are based on information it receives from the National Crime Information Center ("NCIC"), a division of the Federal Bureau of Investigation. *Id.* at 11,006.

40.     In connection with fulfilling its administrative mandate under both the Safety Act and the Theft Act, NHTSA regularly interacts with, seeks comment from, and shares information with, automotive manufacturers and their authorized representatives, including Defendants.

### *Kia and Hyundai: A Brief History*

41.     On information and belief, Hyundai was incorporated in 1986 by its Korean parent entity, Hyundai Motor Company ("HMC"), as the latter's first venture into the American market. When it first arrived on American soil, Hyundai sold a single model car to its new consumers: the Hyundai Excel.

10

42.     On information and belief, Kia was incorporated in 1992 as the American sales, marketing, and distribution arm of its parent corporation, Kia Motor Corporation ("KMC"), a Korean-based auto manufacturer.

43.     On information and belief, KMC filed for bankruptcy during the 1997 Asian financial crisis, and the following year it reached an agreement with HMC for the latter to acquire a 51% ownership interest in the company.

44.     On information and belief, HMC remains the majority shareholder of KMC, with its ownership stake now standing at approximately one-third of the company.

45.     On information and belief, Hyundai began manufacturing vehicles in the United States in 2002, when it opened a manufacturing plant located in Montgomery, Alabama, where the company assembles a number of models, such as the Hyundai Sonata, Elantra, and Santa Fe.

46.     On information and belief, Kia began manufacturing vehicles in the United States in 2010 at a manufacturing facility in West Point, Georgia, where it manufactures several of the company's most popular models, including the Kia Optima, Sorento, and Telluride.

47.     On information and belief, HATCI is the design, engineering, and development center for all Kia and Hyundai vehicles sold in the North American market.

48.     On information and belief, because HATCI serves as the technological arm of Kia and Hyundai's Korean-based parent corporations, virtually all Kia and Hyundai vehicles sold in the United States, including the Class Vehicles, feature the same or similar design elements throughout their respective product lines.

49.     On information and belief, HATCI also serves as an "authorized representative" of both HMC and KMC in North America to ensure these manufacturers' compliance with the Safety

11

Act; in this capacity, HATCI regularly interacts with NHTSA to ensure compliance with the administration's regulatory mandates.

50.     On information and belief, Hyundai, in conjunction with HATCI and one or more Fictitious Hyundai Defendants, is responsible for the manufacture, design, distribution, service, and repair of the company's vehicles that are sold to its American consumers.

51.     On information and belief, Kia, in conjunction with HATCI and one or more Fictitious Kia Defendants, is responsible for the manufacture, design, distribution, service, and repair of the company's vehicles that are sold to its American consumers.

### Kia And Hyundai Employ Authorized Dealers To Sell Their Cars Throughout The State

52.     Kia and Hyundai each maintain interactive, consumer-facing websites, which allow prospective buyers and lessees to research the various model lines they offer for sale and lease.

53.     On Kia's website, for example, prospective consumers may avail themselves of the company's many "Shopping Tools," to: (i) calculate their monthly payment if they wish to finance or lease a vehicle; (ii) arrange and estimate the value of a trade-in; (iii) obtain a quote for a new vehicle; (iv) build a customized vehicle; (v) schedule a test-drive; (vi) opt to receive updates on new vehicles; and (vi) acquire a brochure for the vehicles in which they are interested.

54.     Likewise, Hyundai's website offers many of the same features as Kia's website listed above, which can be accessed through the website's drop-down menu.

55.     On information and belief, however, no consumer can purchase or lease a vehicle directly from Kia or Hyundai.

12

56. Rather, on information and belief, Defendants have created a distribution scheme whereby they sell, lease, and service their respective vehicles sold in the United States through a network of authorized dealerships.

57. As such, these Kia and Hyundai dealerships act as conduits through which the Class Vehicles are sold or leased to American consumers.

58. On information and belief, Kia and Hyundai—in furtherance of their relationship with their respective dealers—each control certain details regarding their dealers' operations through various written agreements, including by: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing material to assist in the sale of their vehicles; (iii) authorizing and approving any dealer-specific marketing material; (iv) providing training to dealership personnel to assist in their sales activities; and (v) prohibiting their dealers from engaging certain practices that otherwise detract from their respective brands or undermine the sales of their respective vehicles, including the Class Vehicles.

59. Thus, these dealerships disseminate Kia and Hyundai's brochures and other advertising materials—which originate from the companies' respective headquarters in California and are available on their websites—to consumers and solicit the purchase or lease of Class Vehicles on Kia and Hyundai's behalf.

60. In addition to the advertising materials tendered to their authorized dealers, Defendants' marketing campaign includes a plethora of information offered on their respective websites, social media accounts, news releases and through televised commercials through which Defendants make representations lauding the Class Vehicles' safety, security, and warranties.

61. Additionally, Kia and Hyundai's authorized dealers are responsible for furnishing to each consumer their respective warranties accompanying the sale or lease of each vehicle. As Kia and Hyundai's warranties each make clear: the beneficiary of the express warranties furnished with the vehicles are the consumers themselves—not the dealerships, which serve as the intermediary through which consumers acquire Kia and Hyundai's vehicles.

62. Indeed, Kia and Hyundai's authorized dealers expressly disclaim providing any warranty whatsoever on the sale or lease of new vehicles; they are sold "as is," because the warranty accompanying each vehicle is furnished through Kia or Hyundai, respectively.

63. Of course, an authorized dealer has no need for a warranty to address and receive remuneration for any defects in the vehicles they receive from Kia and Hyundai. The Safety Act makes this point clear because it obligates manufacturers and distributors like Kia and Hyundai to repurchase or repair any defective vehicle before its dealers sell the vehicle to a consumer:

> **(a) Actions Required of Manufacturers and Distributors.** If, after a manufacturer or distributor sells a motor vehicle or motor vehicle equipment to a distributor or dealer and before the distributor or dealer sells the vehicle or equipment, it is decided that the vehicle or equipment contains a defect related to motor vehicle safety or does not comply with applicable motor vehicle safety standards prescribed under this chapter—
>
> (1) the *manufacturer or distributor immediately shall repurchase the vehicle or equipment at the price paid by the distributor or dealer*, plus transportation charges and reasonable reimbursement of at least one percent a month of the price paid prorated from the date of notice of noncompliance or defect to the date of repurchase; *or*
>
> (2) *if a vehicle, the manufacturer or distributor immediately shall give to the distributor or dealer* at the manufacturer's or distributor's own expense, *the part or equipment needed to make the vehicle comply with the standards or correct the defect.*

49 U.S.C. § 30116 (emphasis added).

Case 2:21-cv-01146-PP   Filed 07/08/22   Page 14 of 168   Document 35

64.     The Wisconsin Motor Vehicle Dealership Law ("MVDL"), *see* Wis. Stat. §§ 218.0101 *et seq.*, which licenses these authorized dealerships as well as Kia and Hyundai themselves, further supports this point. Consistent with each dealer's role as a mere conduit through which Kia and Hyundai sell and lease their respective new vehicles to consumers throughout the state, the MVDL requires Defendants to indemnify their dealers in connection with any disputes "caused by [the] alleged defective or negligent manufacture, assembly, or design or a motor vehicle, part, or accessory by the manufacturer, importer, or distributor." Wis. Stat. § 218.0128

65.     Yet while Kia and Hyundai's authorized dealers claim to "sell" or "lease" these new vehicles to their customers, on information and belief, they do not even own title to this inventory.

66.     Rather, on information and belief, authorized dealers obtain their inventory of new cars from Kia and Hyundai pursuant to a financing arrangement with Defendants' corporate affiliate, Hyundai Capital America ("HCA"), which does business as "Kia Motor Finance" and "Hyundai Motor Finance," amongst others.

67.     As HCA's website explains, it "provide[s] financial products tailored to meet the needs of Hyundai, Genesis, and Kia dealerships nationwide, including dealer inventory and facility financing." Further, HCA explains that "through these dealerships, [it] provide[s] indirect vehicle financing and leasing solutions to over 1.7 million retail customers."[1]

68.     On information and belief, this dealer–financing arrangement, known as "floorplan pricing," works as follows: each authorized dealer obtains from HCA a short–term loan for each new vehicle in its inventory–typically 30 to 90 days–which loosely corelates to the time it takes to sell a car. The loan is secured by the new vehicle (or lot of vehicles) to which it correlates, and the dealer

---

[1] "Our Company," HYUNDAI CAPITAL AMERICA, http://www.hyundaicapitalamerica.com/OurCompany.html (last visited Oct. 31, 2021).

15

pays interest (approximately $5 to $10 per day) over the period that the vehicle sits as inventory on the dealer's lot.

69.     When the vehicle is "sold" or "leased" by an authorized Kia or Hyundai dealer to a given consumer, the loan (or that portion of the loan) is repaid. In many situations, the consumer leases or finances the vehicle directly through HCA, whether through Kia Motor Finance or Hyundai Motor Finance, depending on the make of the vehicle.

70.     Further, to cover the interest payments that the dealer was making while the vehicle sat in its inventory, Kia and Hyundai also pay a "dealer holdback" that, on information and belief, is approximately 3% of the purchase price of the vehicle. The upshot is that the dealer makes little to no money on the sale or lease of a new vehicle and is typically reimbursed by Kia and Hyundai for the interest–only payments it made while the vehicle sat in the dealer's inventory.

71.     The upshot is that—complex web of relationships aside—Kia and Hyundai sell and lease their new vehicles (vis-à-vis their respective dealers) for the primary benefit of a lone class of persons: their customers who are equally led to, and in fact do, believe that these dealers are acting as Kia and Hyundai's respective agents.

### Kia And Hyundai Tout Themselves As Innovative Car Companies Committed To Keeping Their Customers Safe

72.     Kia and Hyundai have become a growing force in the U.S. auto market by positioning themselves as providing an incredible value proposition to U.S. consumers. They offer various lines of vehicles at cheaper prices than their competitors, but which they claim are nonetheless loaded with standard features, innovative design, and backed by industry–leading warranties.

73.     The brands have also staked their reputation to a critical consideration that virtually every automotive consumer holds dear: vehicle safety.

16

74.     According to its website, for example, Kia works "tirelessly to ensure [its] vehicle safety features are designed to help [its] drivers handle or avoid the unexpected."[2]

75.     Similarly, in a March 2021 interview, Kia's CEO stated that "[w]hile [Kia] continue[s] to raise the bar in terms of design, value, and technology, safety is always at the forefront."[3]

76.     Kia's various brochures for its 2020 lineup, (*see* Ex. E, discussed *infra*), echo its CEO's sentiments, claiming that "[a]t Kia, the priority is always on improving all aspects of safety . . . we never stop working to increase your protection." (*Id.*, ¶ 10.) Part of this protection plan is Kia's "[i]ndustry-leading warranty program," which accompanies the sale or lease of every Kia vehicle. (*Id.*)

77.     Indeed, for each member of the Class (defined *infra*) who owns a Kia, the company's Warranty and Consumer Information Manual (the "Kia Warranty") accompanying the sale of all its vehicles in the United States, including the Class Vehicles, has touted its commitment to cutting-edge engineering, which Kia backs up with a stellar warranty.

78.     For instance, the very first sentence in Kia's Warranty—furnished to every purchaser and lessee of its vehicles in the United States, including each Kia Plaintiff named herein—makes the following representation of fact: "*The latest engineering techniques have been incorporated into the design and production of your Kia Vehicle.*" (Ex. D at 4, discussed *infra*.) A true and correct copy of the first few sections of an exemplar Kia Warranty from 2019, which includes Kia's New Vehicle Limited Warranty for that year, is attached hereto as ***Exhibit D***.

---

[2] "Why Kia," KIA AMERICA, INC., https://www.kia.com/us/en/why-kia (last visited Oct. 31, 2021).

[3] "Kia Among Brands With Most 2021 IIHS Top Safety Pick Plus And Top Safety Pick Vehicles With Eight Awards," CISION PR NEWSWIRE, https://www.prnewswire.com/news-releases/kia-among-brands-with-most-2021-iihs-top-safety-pick-plus-and-top-safety-pick-vehicles-with-eight-awards-301238259.html (Mar. 2, 2021).

79.     As one of its authorized dealers put it: Kia built "a substantial reputation on safety and security through all its vehicle lines."[4] Indeed, the company credits the success of its brand to its "design innovation, quality, value, advanced safety features, and new technologies."[5]

80.     In short, for more than a decade, Kia's marketing and advertising materials—that it disseminates through various media to consumers in connection with promoting the sales of its vehicles—have consistently reiterated its ostensible commitment to innovative design, customer safety, and its stellar warranty program. Attached hereto as ***Exhibit E*** is a selection of screenshots from various advertising media that Kia has marketed to promote the sale of its vehicles to consumers throughout the country, including Plaintiffs and the Class.

81.     Similar to its corporate cousin, Hyundai claims that its customers are always at the forefront of the company's thoughts. According to Hyundai, its customers are "at the heart of everything" the company does.[6]

82.     This is why Hyundai's vehicle brochures profess that "[s]afety is a mindset," which according to the company "starts with a car's core engineering." (*See* Ex. G, ¶ 2, discussed *infra*.) As such, Hyundai maintains that it has "made huge investments into making [its] vehicles among the safest on the road." (*Id.*, ¶ 4.)

83.     These investments ostensibly include Hyundai's safety and vehicle maintenance services like its "Assurance Connected Care" program, which it claims includes more features than

---

[4] Product Expert, "Four Kia vehicles named IIHS Top Safety Picks," TEAM GUNTHER KIA OFFICIAL BLOG, https://www.teamguntherkia.com/blog/four-kia-vehicles-named-iihs-top-safety-picks/ (Aug. 16, 2016, 10:30 AM).

[5] James Hope, "2012 Kia Optima and Kia Soul Ranked Highest In Class In J.D. Power And Associates Appeal Study," KIA MEDIA, https://www.kiamedia.com/us/en/media/pressreleases/3924/2012-kia-optima-and-kia-soul-ranked-highest-in-class-in-jd-power-and-associates-apeal-study (July 25, 2012).

[6] James Hope, "Hyundai Motor America and Kia Motors America Resolve Engine Litigation," KIA MEDIA, https://www.kiamedia.com/us/en/media/pressreleases/15457/hyundai-motor-america-and-kia-motors-america-resolve-engine-litigation (Oct. 10, 2019).

18

similar programs offered by the company's competitors.[7] For example, Hyundai extols its warranty program, which it claims is "America's Best Warranty."

84.    An exemplar Hyundai warranty (the "Hyundai Warranty") furnished to its customers throughout the United States, including Chaid and other members of the Class, reiterates the level of service and care these consumers can expect when they buy or lease a Hyundai. Attached hereto as ***Exhibit F*** is a true and correct copy of the 2019 Hyundai Warranty.

85.    For instance, "America's Best Warranty" comes with Hyundai's "Roadside Assistance Program," which "reflects Hyundai's commitment to [its customers'] complete satisfaction with the Hyundai ownership experience." (*See* Ex. F, § 2 at 6.)

86.    Various brochures and pronouncements on Hyundai's website, which it distributes and displays to its consumers throughout the United States, likewise reflect the company's ostensible commitment to safety, engineering, and customer satisfaction; corporate virtues to which Hyundai credits its success. Attached hereto as ***Exhibit G*** is a selection of screenshots from various advertising media that Hyundai has marketed to promote the sale of its vehicles to consumers throughout the country, including Plaintiffs and the Class.

87.    Offerings such as this are why Hyundai has represented to the public that regardless of the vehicle a consumer buys, there is a common thread across all its vehicle lines: "value for money and low cost to own are truly characteristic of the Hyundai experience."[8]

---

[7] Jim Trainor, "Hyundai Launches Assurance Connected Care Powered By Blue Link," HYUNDAI MEDIA CENTER, https://www.hyundainews.com/en-us/releases/1632 (Mar. 27, 2013).

[8] Jim Trainor, "Three Hyundai Models Awarded 5-Year Cost To Own Accolade By Kelley Blue Book's KBB.com," HYUNDAI MOTOR COMPANY, https://www.hyundai.com/worldwide/en/company/newsroom/three-hyundai-models-awarded-5-year-cost-to-own-accolade-by-kelley-blue-book%27s-kbb.com-0000001568 (Feb. 5, 2013).

88.     Despite their representations to the contrary, however, Defendants have knowingly flooded the market with defective vehicles equipped with an anti–theft system that violates both the letter and spirit of FMVSS 114; conduct that—feigned care for its customers aside—has been catastrophic to the welfare of thousands of residents across the greater Milwaukee area and which Defendants have no intention to fix.

### The Class Vehicles: A Comedy Of Design Errors

89.     As noted above, FMVSS 114 was promulgated as a minimum performance standard that sought to redress easy cases of auto theft whereby thieves could, ███████████████████ ██████████████████████████████████

90.     ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

91.     In its current form, FMVSS 114 requires manufacturers, including Kia and Hyundai, to outfit their vehicle lines according to the following specifications:

**S4. Definitions**

**Key** means a physical device or an electronic code which, when inserted into the starting system (by physical or electronic means), enables the vehicle operator to activate the engine or motor.

**Starting system** means the vehicle system used in conjunction with the key to activate the engine or motor.

*** 

**S5.1 Theft Protection**

**S5.1.1** Each vehicle must have a **starting system** which, whenever the **key** is removed from the **starting system** prevents:

(a) The normal activation of the vehicle's engine or motor; and

(b) Either steering, or forward self–mobility, of the vehicle, or both.

49 C.F.R. §§ S4, S5.1.1

20

92.     Although Defendants claim that their respective vehicles "meet or exceed Federal Motor Vehicle Safety Standards,"[9] including FMVSS 114, approximately 5,700 stolen vehicles (and counting) tell a different story.

93.     As detailed herein, local car thieves have figured out ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████

94.     Specifically, on information and belief, the Kias and Hyundais at the heart of this action were ████████████████████ and share the following design flaws that have created this epidemic (hereinafter, the "Class Vehicles"):[10]

      a.  ███████████████████████████████████ ████████████████████████████████████ ███████████████████████████████;

      b.  The Class Vehicles are not equipped with an "immobilizer" that prevents a given vehicle from starting without a code transmitted from the vehicle's specific key, so as to restrict "forward mobility" as contemplated under FMVSS 114;

      c.  ███████████████████████████████████ ████████████████████████████████████ ████;

      d.  ███████████████████████████████████ ████████████████████████████████████ ████████████████████

---

[9] *See* Winnie Dortch, "Milwaukee aldermen urge Kia and Hyundai to ramp up security features on their cars," CBS58 WDJT-MILWAUKEE, https://www.cbs58.com/news/milwaukee-aldermen-urge-kia-and-hyundai-to-ramp-on-security-features-on-their-cars (Jun. 17, 2021, 3:58 PM) (Kia); *see also* Jenna Sachs, "Kia, Hyundai thefts expensive for victims, FOX6 NEWS MILWAUKEE, https://www.fox6now.com/news/kia-hyundai-thefts-expensive-milwaukee (Nov. 1, 2021 , 9:12 PM) (Hyundai).

[10] The Kia and Hyundai vehicles identified in paragraph 97, *infra* are hereby excluded from this definition.

e. ███████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████

95.     All told, this combination of design flaws (collectively, the "Defect"), has made many Kias and Hyundais the preferred choice for Milwaukee's auto thieves, including the Kia Boyz.

96.     On information and belief, this Defect is common among Kia and Hyundai models

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████.

97.     On information and belief, the only Kia and Hyundai models categorically excluded from this definition of Class Vehicles are: (i) the Kia Niro and Stinger; and (ii) the Hyundai Azera, Equus, G80, Genesis, and Ioniq vehicles, given different design features, as discussed further below.

███████████████████████████████
███████████████████████████████

98.     ██████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████.

99.     ██████████████████████████████████████
███████████████████████████████████████.

100.    ██████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

22

██████████████████████████████████████████████████████

███████████████████████.

101. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████

102. ████████████████████████████████████████████████

████████████████████████████████████████.

103. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████.

104. ████████████████████████████████████████████████

█████████████████████.

105. ████████████████████████████████████████████████

██████████████████████████████████████.

106. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████.

*Kia & Hyundai Failed To Equip The Class Vehicles With Immobilizers*

107. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████.

23

108.    Immobilizers are a proven commodity to deter auto theft, as a 2016 study shows that immobilizers lowered the overall rate of car thefts by 40% from 1998 to 2008.[11]

109.    Recognizing the utility of this anti-theft device, many countries began mandating that immobilizers be installed as standard technology in newly manufactured vehicles. For example, immobilizers have been required as a standard feature for all vehicles manufactured in the European Union since 1998, Australia since 2001, and Canada since 2007.[12]

110.    In 1997, NHTSA entertained a petition to amend FMVSS 114 to follow suit and require manufacturers to install immobilizers as standard technology in all new vehicle lines in an effort to harmonize this Safety Standard with the design specifications mandated by the EU. *See* 62 Fed. Reg. 54,152, 54,153 (Oct. 17, 1997), which is attached hereto as ***Exhibit H***.

111.    NHTSA ultimately denied the petition, explaining that the Safety Act's definition of "motor vehicle safety standard" limited its discretion to impose design criteria (as opposed to performance criteria) on the manufacturers it oversees:

> Although NHTSA is interested in actions that would reduce motor vehicle theft and provide for a safer and more effective means of deterring theft than that presently offered by steering lock systems, the definition of "motor vehicle safety standard" in the vehicle safety law, 49 U.S.C. 30102(9),[13] provides that a safety standard is "a minimum standard for motor vehicle or motor vehicle equipment performance." This definition limits the agency's discretion with respect to petitions that seek to specify the design of vehicles or equipment rather than their performance. This prohibits the agency from mandating specific technologies that motor vehicle manufacturers are to use to deter theft, as the CARS petition requests.

*Id.* at 54,153.

---

[11] Jan C. van Ours & Ben Vollaard, *The Engine Immobilizer: A Non-Starter For Car Thieves*, THE ECONOMIC JOURNAL, Vol. 126, No. 593, 1264, 1283 (June 2016).

[12] *Id.* at 1265.

[13] Although this definition has remained unchanged, it is now codified at 49 U.S.C. § 30102(a)(10).

112.    Although it denied this petition, NHTSA explained that pursuant to its authority under the Theft Act: (i) manufacturers "may petition the agency for an exemption from the [PMR] if an antitheft system is installed as standard equipment on the entire vehicle line[;]" (ii) "[s]ome manufacturers have already developed and installed antitheft devices which utilize specific ignition keys and sophisticated electronic control modules similar to that required by the European Union [i.e., an immobilizer];" and (iii) NHTSA had already "granted exemptions from parts marking under 49 CFR part 543 for models equipped with PASS-KEY [discussed *infra*] and other antitheft devices with computer chips imbedded in the ignition key." *Id.*

113.    Thus, for more than twenty-five years, NHTSA has incentivized manufacturers to outfit their vehicles with immobilizers; technology it has repeatedly found to exceed the "minimum standard" for antitheft performance specified under FMVSS 114. *Id.*

114.    Under the current regulatory scheme,[14] all "passenger vehicles" and "multipurpose passenger vehicles" with a gross vehicle weight rating of 6,000 or less (*i.e.*, SUVs), amongst others, must either comply with the PMR or seek an exemption by establishing that it will install as a standard feature across a given model line: (i) an immobilizer that also meets the performance requirements under Canadian or EU law; or (ii) some other antitheft device that is at least as effective as the PMR in deterring theft. *See* 49 C.F.R. §§ 543.6–543.7.

115.    In fact, immobilizers have become so commonplace that NHTSA began summarily granting petitions under 49 C.F.R. § 543.7 for vehicle lines equipped with this technology because

---

[14] At the time of the 1997 CARS Petition, the PMR only extended to certain "high theft" vehicle lines. (*See* Ex. H at 54,153 ("The exemption provisions of the Theft Act have already resulted in manufacturers installing antitheft systems, including the systems that incorporate the technology advocated by CARS, in many high-theft models.").) In 2004, however, the PMR was extended to more vehicle lines, including all of Defendants' vehicles. (*See generally* Ex. C (extending the PMR to all passenger vehicles and SUVs above a certain weight); *see also* 49 C.F.R. § 541.3 (identifying the vehicles currently subject to the PMR).

the evidence is irrefutable that—as Defendants have readily admitted since 2007 (*see infra*)—it substantially reduces the risk of auto theft.

116. Indeed, more than fifteen years ago, NHTSA—in making certain stylistic changes to FMVSS 114—offered guidance to manufacturers about the use of this technology, explaining how equipping their vehicles with an immobilizer complies with the requirements of the Safety Standard:



117. Thus, although not expressly mandated by NHTSA, it is hardly open for debate that immobilizers have become the most widely accepted device to stifle amateur auto thieves because this technology prevents the "forward self–mobility" of a vehicle if someone attempts to bypass the ignition lock, precisely as Section 5.1.1(b) of FMVSS 114 contemplates.

118. Indeed, beginning in the mid–1990s, a slew of petitions to NHTSA reflect that virtually every major auto manufacturer has been granted an exemption from the PMR by installing immobilizers as a standard feature on select vehicle lines, thereby significantly curbing auto theft in the United States.

119. As of August 30, 2021, the table below identifies each manufacturer's vehicle lines that have been granted an exemption from the PMR because they are equipped with standard

26

immobilizers and/or other antitheft measures that comply with FMVSS and are at least as effective as the PMR:

| Manufacturer | Subject lines |
|---|---|
| BMW | MINI, MINI Countryman (MPV), X1 (MPV), X1, X2 (MPV), X3, X4, X5 (MPV), Z4, 3 Series, 4 Series, 5 Series, 6 Series, 7 Series, 8 Series.[1] |
| CHRYSLER | 200, 300, Dodge Charger, Dodge Challenger, Dodge Dart, Dodge Journey, Fiat 500, Fiat 124 Spider, Jeep Cherokee, Jeep Compass, Jeep Grand Cherokee (MPV), Jeep Patriot, Jeep Wrangler/Wrangler JK,[2] Jeep Wrangler JL (new),[1] Town and Country MPV. |
| FORD MOTOR CO | C-Max, EcoSport, Edge, Escape, Explorer, Fiesta, Focus, Fusion, Lincoln MKC, Lincoln MKX, Lincoln Nautilus,[1] Mustang, Taurus. |
| GENERAL MOTORS | Buick LaCrosse/Regal, Buick Verano, Cadillac ATS, Cadillac CTS, Cadillac SRX, Cadillac XTS, Cadillac XT4,[1] Chevrolet Bolt, Chevrolet Camaro, Chevrolet Corvette, Chevrolet Cruze, Chevrolet Equinox, Chevrolet Impala/Monte Carlo, Chevrolet Malibu, Chevrolet Sonic, Chevrolet Spark, Chevrolet Volt, GMC Terrain. |
| HONDA | Accord, Acura MDX, Civic, CR–V, Passport,[1] Pilot. |
| HYUNDAI | Azera, Equus, Genesis G80,[1,3] IONIQ. |
| JAGUAR | F-Type, XE, XF, XJ, XK, Land Rover Discovery Sport, Land Rover F-Pace, Land Rover LR2, Land Rover Range Rover Evoque, Land Rover Velar.[1] |
| KIA | Niro, Stinger.[1] |
| MASERATI | Ghibli, Levante (SUV), Quattroporte. |
| MAZDA | 2, 3, 5, 6, CX–3, CX–5, CX–9, MX–5 Miata. |
| MERCEDES-BENZ | smart Line Chassis, smart USA fortwo, SL-Line Chassis (SL-Class) (the models within this line are): SL400/SL450, SL550, SL 63/AMG, SL 65/AMG, SLK-Line Chassis (SLK-Class/SLC-Class) (the models within this line are): SLK 250, SLK 300, SLK 350, SLK 55 AMG, SLC 300 AMG, SLC 43, S-Line Chassis (S/CL/S-Coupe Class/S-Class Cabriolet/Mercedes-Maybach) (the models within this line are): S400 Hybrid, S550, S600, S63 AMG, S65 AMG, Mercedes-Maybach S560, Mercedes-Maybach S650, CL550, CL600, CL63 AMG, CL65 AMG, NGCC Chassis Line (CLA/GLA/B-Class/A-Class) (the models within this line are): A220, B250e, CLA250, CLA45 AMG, GLA250, GLA45 AMG, C-Line Chassis (C-Class/CLK/GLK-Class/GLC-Class) (the models within this line are): C63 AMG, C240, C250, C300, C350, CLK 350, CLK 550, CLK 63AMG, GLK250, GLK350, E-Line Chassis (E-Class/CLS Class) (the models within this line are): E55, E63 AMG, E320 BLUETEC, E350 BLUETEC, E320/E320DT CDi, E350/E500/E550, E400 HYBRID, CLS400, CLS500/550, CLS55 AMG, CLS63 AMG. |

[3] *See* 61 FR 4729, February 7, 1996.

| Manufacturer | Subject lines |
|---|---|
| MITSUBISHI | Eclipse Cross, iMiEV, Lancer, Outlander, Outlander Sport, Mirage. |
| NISSAN | Altima, Juke, Leaf, Maxima, Murano, NV200 Taxi, Pathfinder, Quest, Rogue, Kicks, Sentra, Infiniti Q70, Infiniti Q50/60, Infiniti QX50,[1] Infiniti QX60. |
| PORSCHE | 911, Boxster/Cayman, Macan, Panamera. |
| SUBARU | Ascent,[1] Forester, Impreza, Legacy, Outback, WRX, XV Crosstrek/Crosstrek.[4] |
| TESLA | Model 3, Model S, Model X. |
| TOYOTA | Avalon,[1] Camry, Corolla, Highlander, Lexus ES, Lexus GS, Lexus LS, Lexus NX, Lexus RX, Prius, RAV4, Sienna. |
| VOLKSWAGEN | Atlas, Beetle, Eos, Jetta, Passat, Tiguan, Audi A3, Audi A4, Audi A4 Allroad MPV, Audi A6, Audi A8, Audi Q3, Audi Q5, Audi TT, Golf/Golf Sport wagen/eGolf/Alltrack. |
| VOLVO | S60. |

[1] Granted an exemption from the parts marking requirements beginning with MY 2019.
[2] Jeep Wrangler (2009–2019) nameplate changed to Jeep Wrangler JK, JK discontinued after MY 2018.
[3] Hyundai discontinued its parts marking exemption for the Genesis vehicle line beginning with the 2010 model year, line was reintroduced as the Genesis G80.
[4] Subaru XV Crosstrek nameplate changed to Crosstrek beginning with MY 2016.

*See* 86 Fed. Reg. 48,340, 48,342, Appx. A–I (Aug. 30, 2021), which is attached hereto as ***Exhibit I***.

120.     As this chart details, however, Kia and Hyundai have largely eschewed implementing immobilizers as standard technology in virtually all of their vehicles lines; save for the Hyundai Ioniq, Kia Niro, and (the recently–added) Kia Stinger that, on information and belief, are designed in a similar fashion, it appears that Hyundai only elected to make standard this immobilizer technology on its luxury vehicle lines (Azera, Equus, G80, and Genesis).[15]

_____
[15] As discussed below, in 2007 Kia also petitioned for an exemption from the PMR for its high–end Kia Amanti

121.   Of course, based on the immobilizer mandates of other countries in which Kia and Hyundai sell their vehicles (either directly or through affiliates), Defendants are acutely aware of the anti-theft benefits attendant to making immobilizers a standard feature on their vehicles.

122.   Indeed, on information and belief, Kia and Hyundai sell virtually identical vehicles to those comprising the Class Vehicles in these various countries, albeit equipped with standard immobilizer technology designed to prevent auto thieves from stealing the cars so easily.

123.   And as detailed below, (*see infra*, ¶¶ 194-212), in the few cases where Defendants have sought a petition for an exemption from the PMR to incorporate immobilizers as a standard feature in certain vehicles lines, they extoled the benefits of this technology and explained how it would dramatically reduce the risk of auto theft in the model line for which they sought a petition.

124.   Unfortunately, however, it appears that Kia and Hyundai avoided implementing this technology as a standard feature in the Class Vehicles as a cost-saving measure to improve their bottom line.

125.   Indeed, as early as 2004, NHTSA estimated that the cost to comply with the PMR was approximately $6.03 per vehicle (*see* Ex. C at 17,965, Sec. IV (Cost)), whereas, on information and belief, equipping the Class Vehicles with a standard immobilizer would have cost an additional $200-$400 per vehicle; a feature that, on information and belief, Defendants describe as a technology perk, offered as part of an upgrade package for which they charge their customers approximately $1,000-$1,500, albeit without ever describing the immense safety benefit these devices provide.

---

line, but, on information and belief, discontinued its production shortly thereafter. Thus, it no longer appears in NHTSA's appendix because it has not been manufactured for five years. (*See* Ex. I at 48,341 ("Each year the agency also amends the appendices to part 541 to remove vehicle lines that have not been manufactured for the United States market in over 5 years.").)

28

126. Further, on information and belief, ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████.

███████████████████████████████████████
█████████████████████████████████████

127. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████

128. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████

129. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████

130. ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

131. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

132. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

133. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████.

134. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████.

135. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████.

136. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████.

137.   ███████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████.

138.   ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████.

139.   ███████████████████████████████████

███████████████████████████████████████████████

████████████████████████.

140.   ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████.

141.   ███████████████████████████████████

███████████████████████████████████████████████

████████.

142.   ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

143.

144.

145.

146. ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████.

147. ██████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████.

148. ██████████████████████████████████████████
████████████████████████████████████████████████████

149. ██████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████.

████████████████████████████████████████████
████████████████████████████████████████████

150. ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████.

151. ██████████████████████████████████████████
██████████████████████████████.

33

152.    ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████.

153.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████.

154.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████

155.    Indeed, this is precisely why Defendants' professed solution to this crisis is to have

the MPD *hand out free steering wheel locks* to prevent future thefts of the Class Vehicles. ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████

156.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

34

157.

158.

159.

160.

161.

162.



### Thefts Of Kia And Hyundai Vehicles Surge In Milwaukee

165.    Given the ease with which the Class Vehicles can be stolen, the greater Milwaukee area has seen a "surge" in reported car thefts starting in the Fall of 2020, and at the time three particular makes accounted for nearly 60% of the thefts, two of which were Kias and Hyundais.[16]

166.    According to the MPD, 808 vehicles were reported stolen in the city within the first month of 2021, amounting to a 152% increase compared to the same timeframe last year.[17]

167.    The MPD has further explained that of the cars stolen, "Kia vehicles made in 2011 or newer" and "any Hyundai made in 2015 or later" are being targeted specifically, making up over

---

[16] *See* Tony Atkins, "Honda, Hyundai, Kias among Milwaukee's most stolen cars, police warn," TMJ4 WTMJ-TV MILWAUKEE, https://www.tmj4.com/news/local-news/honda-hyundai-kias-among-milwaukees-most-stolen-cars-police-warn (last updated Dec. 2, 2020, 6:07 PM); *see also* Winnie Dortch, "Most stolen cars in Milwaukee: Kia, Hyundai, and Honda models," CBS58 WDJT-MILWAUKEE, https://www.cbs58.com/news/most-stolen-cars-in-milwaukee-kia-hyundai-and-honda-models (Dec. 2, 2020, 4:20 PM).

[17] James E. Causey, "Motor vehicle thefts in Milwaukee are up 152%. Auto repair businesses say worst may be yet to come," MILWAUKEE JOURNAL SENTINEL, https://www.jsonline.com/story/news/solutions/2021/02/03/motor-vehicle-thefts-up-152-milwaukee-so-far-2021/4266701001/ (last updated Feb. 8, 2021, 3:53 PM).

60% of Milwaukee's car thefts in the first two months of 2021.[18] This is because, as one MPD Sergeant put it, Class Vehicles are "easy to steal."[19]

168.    As the year has gone on, the rate at which Class Vehicles have been stolen has increased exponentially. For example, as of March 8, 2021, there were 1,576 reported car thefts in Milwaukee, which equates to an average of twenty-three stolen vehicles per day.[20]

169.    By the end of March 2021, the number of car thefts for the year reached 2,100, and by this time the MPD identified the top five stolen models as Class Vehicles.[21]

170.    A month later, local news outlets began referring to Milwaukee's spike in car thefts as an "epidemic," and this was not mere hyperbole as the latest toll of stolen vehicles at the time amounted to 2,949 cars, 973 of which were Kias and 947 were Hyundais.[22]

171.    To combat this problem, the MPD began providing free steering wheel locks (commonly called "Clubs") to owners of Class Vehicles.[23]

---

[18] Rebecca Klopf, "MPD: Hyundai and Kia vehicles too easy to steal, leading to spike in car thefts," TMJ4 WTMJ-TV MILWAUKEE, https://www.tmj4.com/news/local-news/mpd-hyundai-and-kia-vehicles-too-easy-to-steal-leading-to-spike-in-car-thefts (last updated Feb. 3, 2021, 6:40 PM).

[19] Id.

[20] James E. Causey, "Car theft remains a pressing problem in Milwaukee. Here's what we learned at our recent Listen MKE Live event," MILWAUKEE JOURNAL SENTINEL, https://www.jsonline.com/story/news/solutions/2021/03/11/car-thefts-continue-plague-milwaukee-here-some-answers/6904729002/ (last updated Mar. 12, 2021, 8:51 AM).

[21] Bill Miston, "MPD says car thefts up nearly 150%; Bay View crime caught on cam," FOX6 NEWS MILWAUKEE, https://www.fox6now.com/news/milwaukee-car-thefts-bay-view-crime-surveillance (Mar. 31, 2021) ("The top five models stolen are Hyundai Sonata, Kia Optima, Hyundai Elantra, Kia Sportage, and Kia Forte. The majority of the Kia and Hyundai vehicles stolen are 2011-2020 model years"). *See also* FOX6 News Digital Team, "Vehicle thefts on Marquette campus increase; Hyundais and Kias targeted," FOX6 NEWS MILWAUKEE, https://www.fox6now.com/news/vehicle-thefts-on-marquette-campus-increase-hyundai-and-kia-targeted (May 4, 2021) (Marquette University police note "an increase in thefts of Hyundai and Kia models, often Hyundai Sonatas and Elantras, and Kia Souls and Sportages").

[22] Hannah Jewell, "Kia, Hyundai car thefts spike in Milwaukee: 'Epidemic'," FOX6 NEWS MILWAUKEE, https://www.fox6now.com/news/kia-hyundai-car-thefts-milwaukee (Apr. 30, 2021).

[23] Elliot Hughes, "Worried about your Kia or Hyundai getting stolen? Milwaukee police are handing out steering wheel locks," MILWAUKEE JOURNAL SENTINEL, https://www.jsonline.com/story/news/crime/2021/05/07/milwaukee-police-giving-away-steering-wheel-locks-kia-hyundai-owners/4987762001/ (last updated May 7, 2021, 10:08 AM). *See also* Mercedes Streeter, "So Many Hyundais And Kias Are Stolen In Milwaukee That Police Are Giving Out Steering Wheel Locks," JALOPNIK, https://jalopnik.com/so-many-hyundais-and-kias-are-stolen-in-milwaukee-that-1846859008 (May 10, 2021, 12:16 PM).

172.    Despite this measure, however, Milwaukee's "epidemic" raged on; by May 20, 2021, the new total of stolen vehicles came out to 3,524, bringing the city's daily average of car thefts up to twenty–five.[24]

173.    Indeed, by mid–June 2021, the increase in stolen vehicles for the year reached 200% compared to 2020,[25] and at that time the city was on track to surpass last year's record in July.[26]

174.    This uptick in car thefts is just one facet of the problem; the dilemma is compounded by the fact that in some instances the stolen vehicles are taken on high–speed chases and/or are used to commit other crimes, including the theft of more cars.[27]

175.    The method by which adolescents are stealing these Class Vehicles is spreading quickly; as the owner of an auto–repair shop in Milwaukee has explained, ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████[28]

176.    The cost to repair a window and steering column on a Class Vehicle is approximately $3,000 or more, and because the cars are often taken on joy rides resulting in further damage, the owner's costs to repair their vehicle may total as much as $10,000.[29]

---

[24] James E. Causey, "A thief swiped Dorothy Smith's car from in front of her Milwaukee home. An anonymous donor has made it right," MILWAUKEE JOURNAL SENTINEL, https://www.jsonline.com/story/opinion/2021/05/21/driven-by-good-will-anonymous-donor-pays-off-milwaukee-womans-stolen-car-debt/5130896001/ (May 21, 2021, 6:01 AM).

[25] Christian Robles, "Milwaukee has stepped up its response to reckless driving. With summer upon us, is it enough?" MILWAUKEE JOURNAL SENTINEL, https://www.jsonline.com/story/news/2021/06/10/3-months-7-000-citations-curb-milwaukees-reckless-driving/7599922002/ (June 10, 2021, 12:00 PM).

[26] Causey, note 24, *supra*.

[27] Causey, note 17, *supra*.

[28] Causey, note 17, *supra*. *See also* Klopf, note 18, *supra* (A Milwaukee resident whose video surveillance recorded his neighbor's Hyundai being stolen said, ████████████████████████████████████████ ███████████████████████; Miston, note 21, *supra* (One MPD Captain explained, ████████████ ████████████████████████████████████████████████████████

[29] Causey, note 17, *supra*.

177.     And because Class Vehicles are being stolen at such an alarming rate, Defendants' authorized dealers and various auto–repair shops have had difficulty acquiring the parts needed to repair them, as there is a national back–order of up to eight weeks in some cases.[30]

178.     Finally, repair shops have seen some of the same vehicles come through their doors, as there have been instances of a single car being stolen multiple times.[31]

179.     Nor does this account for the increased insurance premiums foisted upon the victims of these crimes, the other property that is stolen or damaged in the process, or the diminution in value of the Class Vehicles being targeted.

180.     But the cost of Milwaukee's "car crisis" goes beyond monetary harm to the victims, as the adolescents that steal Class Vehicles and engage in reckless driving often cause severe car accidents that have left several dead or severely injured.[32]

181.     Recognizing that the majority of stolen vehicles have been designed by Kia and Hyundai, two Milwaukee officials, Alderwoman Miele Coggs and Alderman Khalif Rainey, wrote joint letters to both companies, imploring them to "make fundamental changes to the mechanisms used to secure [their] vehicles" as Class Vehicles have accounted for "66% of those stolen in 2021" at the time. Attached hereto as ***Exhibits J–K*** are true and correct copies of these letters addressed to Kia and Hyundai respectively.

---

[30] *Id.*

[31] *Id.* (Owner of a local auto–repair shop explained, "[w]e have fixed a Kia that was stolen only to get it back because it was stolen again. That's how bad it is right now"). *See also* Mark Stevens, "Demand for anti-theft devices surging amid Milwaukee's stolen car crisis, CBS58 WDJT–MILWAUKEE, https://www.cbs58.com/news/demand-for-anti-theft-devices-surging-amid-milwaukee-stolen-car-crisis (June 16, 2021, 7:00 PM) (owner's Hyundai stolen three times).

[32] *See* "Teen driving stolen car killed in head-on crash, 5 others injured," WISN12 ABC, https://www.wisn.com/article/teen-car-theft-suspect-killed-in-head-on-crash-5-others-injured/36741640 (last updated June 16, 2021, 5:32 PM) (Sixteen year–old boy killed in a head-on collision when driving a stolen Kia Sportage on the night of June 15, 2021 during a high-speed chase. Also involved in the accident were two twelve year–old children in the stolen vehicle and three individuals, all under the age of twenty, in the other vehicle. All five individuals were injured, and two of their injuries were life–threatening).

182.    Alderman Rainey later commented that "Kia and Hyundai are directly responsible . . . for the drain on police and other city resources that have been sadly directed to deal with a rash of vehicle thefts and the havoc those thefts have brought to our city."[33] As Alderman Rainey aptly put it, "[i]t's time for these companies to fix the problem they created."[34]

183.    Alderwoman Coggs further elaborated that given the uptick in car thefts, "Kia and Hyundai owners have been under siege," a fact which is borne out by "[s]ocial media videos exposing car thieves or those who hunt them [which] make what our city is going through seem unreal."[35]

184.    With nowhere else to turn, owners of stolen Class Vehicles, their loved ones, and concerned citizens have resorted to social media to either locate a missing car or alert the owner to its location. A Facebook group entitled "Stolen Cars MKE" is rife with examples of Milwaukeeans attempting to return a Class Vehicle to its rightful owner:

---

[33] Caroline Reinwald, "Council members urge Kia, Hyundai to build better anti-theft systems," WISN12 ABC, https://www.wisn.com/article/mke-common-council-members-urge-kia-hyundai-to-build-better-anti-theft-systems/36745134 (last updated June 16, 2021, 10:30 PM).

[34] *Id.*

[35] *Id.*



**Stolen Cars MKE**

Marsha D Haywood
February 11 · 🌐

****FOUND****Thanks to the kind soul who notified me****

Hello this is a picture of my Mom's car, 4 Door RED KIA Sportage, Wisconsin License plate 825-ZCS that was STOLEN TODAY from the Eastside Downer Ave. If you happen to see the Trifling people who took it or see it being driven around Milwaukee call the Police & report it's whereabouts .. Thanks



**Stolen Cars MKE**

Demetria Noonie Taylor shared a post.
March 3 · 🌐

Resa Agee
March 3 · 🌐

My car was stolen 😫 Sonata Hyundai 2013 silver in color plate AFG9210



**Stolen Cars MKE**

Nicole Hightower
March 12 · 🌐

My friend's 2018 Kia Sportage, white - was stolen. License: ABB-9355 if anyone sees it



**Stolen Cars MKE**

Nicole Hightower shared a post.
March 20 · 🌐

2016 Kia Sedona
License: AAL-3661
Taken in West Allis, 60th and Lapham

Belongs to my parents. If you notice please message me...thanks!!



**Stolen Cars MKE**

Pretty Sadies
March 25 · 🌐

My red Kia was just stolen off 47th between Hope and Olive st



**Stolen Cars MKE**

AB Cortez
April 7 · 🌐

If anyone has seen my Pearl PLEASE call greenfield police department right away!!!! 414.761.5300. Someone stole a bunch of people's cars last night. I unfortunately was one of them. This is the only photo I have.
2017 White Hyundai Santa Fe Sport
Plates: AKY-5150 WILDE TOYOTA FRAMES
Last seen on Loomis & Layton road
Please please please share everyone!!!!!



**Stolen Cars MKE**

Rico Soto
May 7 · 🌐

Stole my kia this morning, lmk if you see anything!
License plate: AAG-6495

7:07 ✈                    ₁₁₁ 5G ▮ ▯

<                Ricardo's Post                ···

Ricardo Soto
Just now · 🌐

My Kia was stolen this morning, they broke a window, most likely passenger side.
License Plate: AAG-6495

SHARE FOR ME PLEASE!



**Stolen Cars MKE**

Demetria Noonie Taylor shared a post.
May 15 at 12:30 PM · 🌐

David Westmoreland
May 15 at 12:03 PM · 🌐

Anyone missing a car it's located on 19th Fairmount..
Update the owner has been notified









185. Owners of Class Vehicles' prayers have gone unanswered, however, as the number

of stolen cars continues to rise. As of June 17, 2021, for example, there were 4,367 cases of reported

motor vehicle theft in Milwaukee, and the upward trend shows no sign of abating.[36] In fact, that same day WISN Channel 12 reported that the number of Kias and Hyundais stolen in Milwaukee increased 2,500% from the same time last year.[37]

186. Both MPD and Milwaukee news stations have reached out to Kia and Hyundai to discuss a recall of Class Vehicles, but neither entity has substantively addressed these concerns.[38]

187. Yet given the aldermen's letters, Defendants are aware of the problem, as representatives of both Kia and Hyundai have stated that investigations are underway.[39]

188. As Alderwoman Coggs has pointed out, however, Defendants need to do more than just "investigate"; "[a]s the manufacturers of [the Class Vehicles]," Coggs went on, "[Defendants] owe it to their customers to fix the problems that help make these brands of vehicles easier to steal."[40]

189. But instead of addressing the problem, Kia and Hyundai have merely provided MPD with additional Clubs to distribute to owners of Class Vehicles.[41] Meanwhile, the number of auto thefts in Milwaukee continue to increase, as the city surpassed well–over 5,000 incidents of stolen vehicles by mid–July 2021.[42]

---

[36] Jim Piwowarczyk & Jessica McBride, "Milwaukee Aldermen Blame Car Makers for Skyrocketing Auto Thefts," WISCONSIN RIGHT NOW, https://www.wisconsinrightnow.com/2021/06/17/milwaukee-aldermen-blame-car/ (last visited June 18, 2021).

[37] "Thefts of Kia, Hyundai explode 2,500% in Milwaukee," WISN12 ABC, https://www.wisn.com/article/thefts-of-kia-hyundai-explode-2500-in-milwaukee/36756668 (last updated June 17, 2021, 6:09 PM).

[38] Jewell, note 22, *supra*.

[39] Benjamin Yount, "Milwaukee city council members blame car companies for spike in stolen cars," THE CENTER SQUARE CONTRIBUTOR WISCONSIN, https://www.thecentersquare.com/wisconsin/milwaukee-city-council-members-blame-car-companies-for-spike-in-stolen-cars/article_8a91118a-cf86-11eb-acc0-a377db7bb33a.html (June 17, 2021).

[40] *Id.*

[41] Jeramey Jannene, Two–Thirds of All Milwaukee Auto Thefts Are Kia and Hyundai Vehicles," URBAN MILWAUKEE, https://urbanmilwaukee.com/2021/07/24/two-thirds-of-all-milwaukee-auto-thefts-are-kia-and-hyundai-vehicles/ (July 24, 2021, 4:29 PM).

[42] *Id.* (5,144 stolen vehicles through July 11, 2021, with Kia and Hyundai each accounting for a third); *see also* Elliot Hughes, "Kia, Hyundai will make security feature standard on new vehicles and distribute free steering wheel locks after surge of thefts," MILWAUKEE JOURNAL SENTINEL, https://www.jsonline.com/story/news/crime/2021/07/19/kia-

44

190. That same month, Milwaukee news outlets also acknowledged two components of the Defect; namely, that ███████████████████████████████████████████ ████████ and the vehicles being targeted are those not equipped with an immobilizer.[43]

### Kia And Hyundai Concealed This Glaring Defect, While Simultaneously Touting The Safety, Reliability, And Security Of Their Vehicles.

191. Ostensibly recognizing the gravity of the situation Milwaukee faces, both Kia and Hyundai have claimed that all new model vehicles will be equipped with an immobilizer.[44]

192. Yet Defendants' proffered solution to combat the scourge of auto-thefts affecting the Class Vehicles rings hollow for thousands of consumers whose Kias and Hyundais containing the Defect remain in the stream of commerce; precisely why Alderman Bauman characterized the predicament as "a classic case of global companies having very little concern about public safety in the city of Milwaukee unless it impacts their pocket book."[45]

193. More troubling, however, is the fact that Defendants have known—*for decades*—that this very sort of problem was not only possible, but inevitable given the subpar measures they took to protect the Class Vehicles.

194. Indeed, not only have Defendants been obligated to sell virtually identical vehicles as those comprising the Class Vehicles with this safety benefit for decades—since 1998 in Europe, since 2001 in Australia, and since 2007 in Canada—but they've incorporated immobilizers as standard technology into select (higher-end) models for more than *fifteen years*; they simply failed to make it standard technology on their lower-cost brands as many of their competitors have done.

---

hyundai-handing-out-free-steering-wheel-locks-through-end-year/7963950002/ (last updated July 20, 2021, 11:20 AM) (5,400 stolen vehicles as of July 18, 2021, which is a 192% increase from the same time in 2020).

[43] Jannene, note 41, *supra*; *see also* Hughes, note 42, *supra*.

[44] *Id.*

[45] Jannene, note 41, *supra*.

45

195. For instance, in three petitions to NHTSA in 2007, Kia and Hyundai (through HATCI) sought exemptions from the PMR for the following three vehicle lines: (i) the Hyundai Azera, starting with the 2008 model year; (ii) the Hyundai Genesis, starting with the 2009 model year; and (iii) the Kia Amanti, starting with the 2009 model year. *See* 72 Fed. Reg. 39,661 (July 19, 2007) (the "Azera Petition"), which is attached hereto as ***Exhibit L***; 73 Fed. Reg. 4,304 (Jan. 24, 2008) (the "Genesis Petition"), which is attached hereto as ***Exhibit M***; and 75 Fed. Reg. 1,447 (Jan. 11, 2010) (the "Amanti Petition"), which is attached hereto as ***Exhibit N***.

196. Each of these vehicles represented Kia and Hyundai's foray into the luxury segment of the North American automobile market.

197. For instance, an October 4, 2005 press release[46] on the Hyundai Media Center's website explains that "[t]he Azera is every inch Hyundai's new flagship sedan, brimming with new thinking, creative solutions and an artful blend of style, sophistication, safety and performance."

198. Similarly, a December 3, 2007 Hyundai press release[47] describes what customers could expect from the Genesis, its "eagerly anticipated" luxury sports sedan: "the Hyundai Genesis redefines luxury by presenting a credible alternative to the premium automobile offerings from Germany, Japan and the United States."

199. Likewise, *Autoweek*, a popular website devoted to providing its readers with a wealth of information about the automotive industry, explained in a January 4, 2004 article[48] discussing the Amanti's debut: "The full–size Kia Amanti not only comes in at a dramatically higher price than

---

[46] Miles Johnson, "All–New 2006 Hyundai Azera: Hyundai's Premium Flagship Sedan," HYUNDAI MEDIA CENTER, https://www.hyundainews.com/en-us/releases/1044 (Oct. 4, 2005).

[47] Miles Johnson, "Genesis, Hyundai's New Beginning," HYUNDAI MEDIA CENTER, https://www.hyundainews.com/en-us/releases/570 (Dec. 3, 2007).

[48] "2004 Kia Amanti: Korea, Kia and its new little big car, the Amanti," AUTOWEEK, https://www.autoweek.com/news/a2084741/2004-kia-amanti-korea-kia-and-its-new-little-big-car-amanti/ (Jan. 4, 2004).

the average Kia, it brings with it a level of luxury foreign to a dealership base accustomed to servicing the entry-level and sub-prime markets."

200.    Each Petition "provided a description and diagram of the identity, design, and location of the components of the antitheft device" installed on the vehicles that included, amongst other features: "*a passive immobilizer* consisting of an EMS (engine control unit), SMARTRA (immobilizer unit), an antenna coil and a transponder." (*See* Azera Petition, Ex. L at 39,661; Genesis Petition, Ex. M at 4,304; and Amanti Petition, Ex. N at 1,448.)

201.    Because these vehicles were new to the American market, Defendants lacked specific data on the effectiveness of their immobilizer devices in deterring auto theft to justify an exemption from the PMR. (*See, e.g.*, Azera Petition, Ex. L at 39,661.)

202.    Nonetheless, Defendants successfully obtained an exemption for each vehicle line by providing conclusive data on the effectiveness of similar immobilizer technology used by other manufacturers. (*Id.*; *see also* Genesis Petition, Ex. M at 4,305; Amanti Petition, Ex. N at 1,448.)

203.    Indeed, Defendants explained that "the GM Pass-Key and Ford SecuriLock devices contain components that are functionally and operationally similar to [their antitheft] device." (*Id.*) Further, Defendants "stated that the *theft data from the National Crime Information Center* show a *clear reduction in vehicle thefts* after the introduction of the GM and Ford devices." (*Id.* (emphasis added).) Specifically, Defendants offered the following data points, which NHTSA reiterated verbatim in connection with granting each Petition:

> Hyundai *provided theft rate data* for the Chevrolet Camaro and Pontiac Firebird vehicle lines *showing a substantial reduction in theft rates* comparing the lines *between pre- and post-introduction of the Pass-Key device*. Hyundai *also provided "percent reduction" data for theft rates* between pre- and post-production years for the Ford Taurus and Mustang, and Oldsmobile Toronado and Riviera vehicle lines normalized to the three-year average of the Camaro and Firebird

47

pre-introduction data. [Defendants] stated that the ***data shows a dramatic reduction of theft rates due to the introduction of devices substantially similar to the Hyundai immobilizer device***. Specifically, the Taurus, Mustang, Riviera and Toronado vehicle lines ***showed a 63, 70, 80 and 58 percent theft rate reductions respectively, between pre- and post-introduction of immobilizer devices as standard equipment on these vehicle lines***.

(*Id.* (emphasis added).)

204.    Defendants' invocation of the success of GM's Pass–Key System—which originally went by the acronym VATS (Vehicle Anti–Theft System)—was common knowledge in the automotive industry when Defendants were submitting these Petitions in 2007. As an informative whitepaper, which was also authored in 2007 by Steve Young, explains:

**What is VATS?**

VATS (Vehicle Anti Theft System) was introduced by GM on the 1986 Corvette because the Corvette had become the number one target of car thieves. Corvette thefts dropped so impressively after VATS was implemented that GM expanded the system in 1988 to the Camaro, Firebird, and Cadillac Seville. Before long, VATS was standard equipment on all Cadillac vehicles and on many other Chevrolet, Pontiac, Buick, and Oldsmobile vehicles. As the system was added to more vehicles, GM began using the terms "PASSkey-1" and "PASSkey-2" as more descriptive names for the system. From the locksmith's point of view, there is no functional difference between VATS and PASSkey-1 or PASSkey-2, and most technicians still refer to the system simply as VATS.

A true and correct copy of the Young article, which is publicly available online, is attached hereto as ***Exhibit O***.

205.    Notably, the Young Article explains that GM *began using this VATS technology in 1986*, and references the same Chevrolet, Pontiac, Buick and Oldsmobile vehicle lines that were touted in Defendants' 2007 Petitions, meaning that the GM data on which Defendants relied in their 2007 Petitions was also years old. (*See* Ex. O at 1 ("The last VATS equipped vehicle sold was the Chevrolet Camaro and Pontiac Firebird which were both discontinued after the 2003 model year.").)

206.    Likewise, each Petition's reliance on the success Ford achieved in curbing auto theft through its use of immobilizers on the Mustang, ████████████████████████████████ ██████████████████████████████████████████████████:

48



207.    The Young Article and the Ford Petition also detail the decreased insurance costs associated with implementing this technology in the 1980s and 1990s, which was otherwise surcharged to the vehicle owners without it. (*See id.* (discounts of 10% to 25% for all immobilizer-installed Ford vehicles; Young Article, Ex. O at 2 ("The insurance companies went from charging a surcharge for owing a Corvette to offering a discount on the Corvette or any other vehicle that was equipped with the VATS system.").)

208.    Thus, not only were Defendants extoling the benefits of standard immobilizer technology in 2007—that is, *fifteen years* before the current auto-theft epidemic, which is now allegedly prompting them to make this equipment standard across all vehicle lines—but they did so in reliance on data that: (i) had been common knowledge in the automotive industry for another decade before they even submitted their Petitions; and ██████████████████████████
███████████████████████████████████████████████████████.

209.    Nor was Defendants' knowledge of, and reliance on, other manufacturers' attempts to curb auto theft through immobilizers limited to these 2007 Petitions. Indeed, in an additional

Petition for its Hyundai VI/Equus vehicle line dated September 11, 2009, HATCI "referenced and provided an April 2006 report by JP Research, Inc., which concluded that antitheft devices were consistently much more effective in reducing thefts compared to parts marking." Specifically, the "*report showed that of the 24 vehicles lines studied, those with antitheft devices were 70% more effective than parts marking in deterring theft.*" *See* 75 Fed. Reg. 6,253 (Feb. 8. 2010) (the "Equus Petition") (emphasis added), which is attached hereto as ***Exhibit Q***.

210.    To bolster the JP Research Report cited in the Equus Petition, HATCI also provided NHTSA with theft rate data from the NCIC on the following automobile makes and models: (i) the Lincoln Town Car, the Chrysler Town and Country, the Mazda MX-5 Miata, and Mazda Miata; and (ii) its own Hyundai Azera—all of which it used to support, and successfully obtain, an exemption from the PMR for its Equus vehicle line.

211.    But as with Defendants' previous Petitions, the Equus was billed as one of its luxury models. Thus, despite their knowledge of both the utility and ubiquity of this technology for more than fifteen years, Defendants avoided incorporating this safety measure as a standard feature into its less expensive—albeit, more widely disseminated—models. In other words, Defendants knowingly exposed a segment of its customer base with less means to more risk.

212.    The result of Defendants' decision to elevate profits over people is now obvious. Publicly available information from the National Insurance Crime Bureau ("NICB")—derived from the same NCIC data repository—shows the alarming uptick in the number of Class Vehicles stolen throughout the country.

213.    As it explains on its website, the NICB is "the nation's premier not-for-profit organization dedicated exclusively to fighting insurance fraud and crime." The NICB was formed in

1992 following a merger between the National Automobile Theft Bureau and the Insurance Crime Prevention Institute.[49]

214. For more than a decade, NICB has published an annual "Hot Wheels" Report that identifies: (i) the most stolen vehicles in the country; (ii) the most stolen vehicles in each state; and (iii) the most stolen new cars in the country by comparing the vehicle's model year (MY) to the calendar year (CY) in which the vehicle was stolen (e.g., the 2017 Hyundais stolen in 2017, the 2018 Kias stolen in 2018, etc.)

215. NICB's website generates these Hot Wheels reports by analyzing the data gleaned from the NCIC; a national crime database derived from information collected from various law enforcement agencies around the country. *See, e.g.*, Wis. Stat. § 342.31 (stating that "[e]ach sheriff and police department in the state shall immediately report to the department of justice each motor vehicle reported stolen or recovered within its jurisdiction").

216. On information and belief, NHTSA relies on the same information from NCIC to generate its auto-theft reports; data that NHTSA compiles and circulates to the automotive companies it regulates, including Defendants, and to which Defendants repeatedly cited in their 2007 Petitions for an exemption from the PMR to justify the implementation of immobilizers on select, luxury vehicle lines.

217. In the 2007 Hot Wheels Report[50] (the first publicly available online)—and in each ensuing year thereafter—NICB explained the importance of immobilizer technology in preventing auto theft:

---

[49] "About NICB – Who We Are," NICB, https://www.nicb.org/about-nicb (last visited Nov. 2, 2021).
[50] The 2007–2020 Reports are available on NICB's website: https://www.nicb.org/news/reports-statistics.

51

> **A Layered Approach to Protection:** To protect their investment, vehicle owners are urged to follow NICB's "layered approach" to auto theft prevention by employing simple, low-cost suggestions to make their vehicles less attractive to thieves. NICB's four layers of protection are:
>
> **Common Sense:** The cheapest form of defense is to simply employ the anti-theft devices that are standard on all vehicles: locks. Lock your car and take your keys.
>
> **Warning Device:** Having and using a visible or audible warning device is another item that can ensure that your car remains where you left it.
>
> **Immobilizing Device:** "Kill" switches, fuel cut-offs, and smart keys are among the devices which are high and low tech, but extremely effective. Generally speaking, if your car won't start, it won't get stolen.
>
> **Tracking Device:** Some systems use GPS to track your vehicle. Others use radio frequency technology and help law enforcement track and recover it quickly.

218. None of Defendants' vehicle lines were identified in the NICB's Reports from 2007 to 2012 as being prone to high risks of theft.

219. In the NICB's 2013 Report, however, the 2013 Hyundai Elantra—which, on information and belief, contains the Defect noted above—debuted as the No. 6 most stolen new car in the nation in 2013, with 541 vehicles being reported stolen.

220. Although none of Defendants' vehicles made the NICB's 2014 Report, this was an aberration. Indeed, the number of Defendants' vehicles containing the Defect saw a marked uptick in each year thereafter.

221. For example, in the NICB's 2015 Report, the 2015 Hyundai Sonata debuted as the No. 7 most stolen new vehicle in calendar year 2015. The 2013 Hyundai Sonata was identified as the tenth most stolen vehicle in Maryland and the 2015 Hyundai Elantra made the list as the third most stolen vehicle in Vermont.

222. In NICB's 2016 Report, Hyundai's 2016 Sonata and 2016 Elantra were identified as the No. 6 (887 vehicles) and No. 8 (832 vehicles) most stolen new cars in the country. On information and belief, both of these model lines contained the same Defect described herein, meaning that—if added together—Hyundai would top the list at 1,719 vehicles.

52

223. Various models of the Sonata—that, as noted above, contain the same Defect as the Class Vehicles—were also identified as high theft vehicles in various states:

- The 2011 Sonata was the eighth most stolen vehicle in Delaware;
- The 2016 Sonata was the eighth most stolen vehicle in Florida;
- The 2013 Sonata was the seventh most stolen vehicle in Maryland; and
- The 2014 Sonata was the ninth most stolen vehicle in Rhode Island.

224. This rash of new stolen Hyundais in 2016 coincided with Defendants' filing of two new Petitions for Exemption from the PMR on September 8, 2016 (Hyundai Ioniq) and January 22, 2017 (Kia Niro). *See* 82 Fed. Reg. 22,051 (May 11, 2017) (the "Ioniq Petition"), which is attached hereto as ***Exhibit R***; 82 Fed. Reg. 22,048 (May 11, 2017) (the "Niro Petition"), which is attached hereto as ***Exhibit S***.

225. Unlike Defendants' previous Petitions for exclusively luxury vehicles, however, they now sought to incorporate standard immobilizers into the Ioniq and Niro—two of their more cost-conscious brands that, on information and belief, compete in the hybrid vehicle market with the Toyota Prius, as *Car and Driver* reported.[51]

226. Similar to their Equus Petition, Defendants supported the basis for their exemption by relying on: (i) a JP Research Report determining that outfitting vehicles with immobilizers was 70% more effective than the PMR; and (ii) specific data from other vehicle manufacturers showing the utility in using this technology to curb auto thefts.

227. Meanwhile, the NICB's 2017 Report continued to show a dramatic increase in the theft of Hyundai vehicles; the 2017 Hyundai Elantra was the fourth most stolen new car in the

---

[51] Aaron Robinson, "Pennywiser: 2017 Hyundai Ioniq Hybrid Tested," CAR AND DRIVER, https://www.caranddriver.com/reviews/a15095670/2017-hyundai-ioniq-hybrid-full-test-review/ (Apr. 28, 2017).

country (929 vehicles) while the 2017 Sonata was the tenth most stolen new car (759 vehicles). And just like 2016, if the total number of thefts of the 2017 Sonata and Elantra are combined because, on information and belief, they contain the same Defect, then Hyundai would claim the number one most stolen new vehicle spot at 1,688 vehicles (by a wide margin).

228. The state-by-state comparison in NICB's 2017 Report also underscored this unsettling upward trend in thefts of Hyundais, that, on information and belief, contained the Defect noted above:

- The 2011 Sonata was the ninth most stolen vehicle in Connecticut;
- The 2013 Sonata and 2016 Elantra were fourth and sixth, respectively, on Delaware's most stolen cars list;
- The 2016 Sonata checked in at No. 6 on Washington D.C.'s most stolen cars list;
- The 2016 Sonata and 2017 Elantra were eighth and tenth, respectively, on Florida's most stolen cars list;
- The 2013 Elantra was the eighth most stolen car in Maine;
- The 2013 Sonata was the seventh most stolen car in Maryland;
- The 2017 Sonata was the eighth most stolen car in New York;
- The 2013 Sonata was the ninth most stolen car in North Carolina; and
- The 2013 Sonata was the eighth most stolen car in Virginia.

229. The trend continued next year. NICB's 2018 Report identifies the 2018 Hyundai Elantra as the sixth most stolen new vehicle in the country, with 775 vehicles stolen in the same year. Various states also identified Hyundais as the preferred choice of auto thieves:

- The 2011 Sonata and 2015 Elantra were seventh and ninth, respectively, on Washington D.C.'s most stolen cars list;
- The 2013 Sonata and 2017 Elantra were eighth and tenth on Florida's list;
- The 2013 Sonata and 2017 Accent were sixth and ninth, respectively, on Maine's list;
- The 2013 Sonata and 2018 Elantra were ninth and tenth, respectively, on Maryland's list;

54

- The 2018 Elantra was the tenth most stolen car in Nevada;
- The 2017 Sonata was the third most stolen car in New Mexico;
- The 2011 Sonata was the eighth most stolen car in North Carolina;
- The 2017 Sonata was the seventh most stolen car in Rhode Island; and
- The 2013 Sonata was the tenth most stolen car in Virginia.

230. The 2018 NICB Report also saw Kia make its debut; specifically, the 2015 Kia Optima was identified as the sixth most stolen car in New Mexico.

231. As noted above, however, given the ubiquity of the Defect across so many of Defendants' model lines—which, on information and belief, were designed by HATCI, their joint design center—Kia knew or should have known what was causing the marked uptick in thefts of these vehicles because they were outfitted with the same Defect.

232. Thefts of these vehicles containing the Defect then exploded in 2020.[52] Although the NICB's 2020 Report does not identify the most stolen 2020 model lines, the state-by-state analysis is alarming:

- The 2016/17 Hyundai Sonata and the 2015 Kia Optima checked in at No. 8 and No. 10, respectively, as the most stolen vehicles in Colorado;
- The 2015 Hyundai Sonata was the ninth most stolen vehicle in Connecticut;
- The 2012 Hyundai Sonata was the tenth most stolen vehicle in Delaware;
- The 2011 Hyundai Sonata was the sixth most stolen vehicle in Washington D.C., while the 2018 Hyundai Elantra registered as the eighth most stolen vehicle in the District;
- The 2011 Hyundai Sonata was the ninth most stolen vehicle in Florida;
- The 2013 Hyundai Sonata and 2017 Hyundai Elantra were seventh and ninth, respectively, on Maryland's list;
- The 2019 Hyundai Elantra was the tenth most stolen car in Massachusetts;
- The 2019 Kia Forte was the ninth most stolen car in New Hampshire;

---

[52] The 2019 NICB Report available online does not identify the most stolen new model vehicles or provide a state-by-state comparison like other years of the Report.

- The 2013 Hyundai Elantra, 2015 Hyundai Sonata, and 2015 Kia Optima finished at third, fifth, and seventh, respectively, as the most stolen cars in New Mexico;

- The 2019 Hyundai Elantra was the ninth most stolen car in Pennsylvania;

- The 2013 Hyundai Accent (No. 3), the 2019 Kia Rio, (No. 4), the 2019 Kia Soul (No. 5), the 2017 Hyundai Tucson (No. 7), and the 2017 Hyundai Elantra (No. 8) all finished in the top ten list of most stolen cars in Puerto Rico;

- The 2019 Hyundai Elantra was the seventh most stolen vehicle in Rhode Island;

- The 2013 Hyundai Elantra and 2013 Hyundai Sonata finished eighth and tenth, respectively, in Virginia's list; and

- Last but not least, the 2011 Hyundai Sonata placed seventh in Wisconsin's top ten list of most stolen vehicles.

233. Although the 2011 Hyundai Sonata was the only specific year and model of Defendants' vehicles to make Wisconsin's 2020 top ten list, a slew of other Class Vehicles were also being targeted, which prompted the MPD to begin "sounding the alarm" about this crisis in the Fall of 2020, as various media outlets reported. (*See* n.16, *supra*.)

234. Nor is this rash of stolen Class Vehicles a phenomenon unique to Milwaukee. Denver's local news was also reporting about this problem in December 2020, citing Denver's Police Commander to explain that Kias "are one of the top 10 stolen brands in Denver because they are easy to steal and easy to start."[53] Indeed, the Denver Police Department's statistical data painted an even more grim picture than the NICB's 2020 Hot Wheels Report, explaining that Hyundais and Kias were fifth and sixth, respectively, on its list of most stolen cars.[54]

235. As the NICB Reports reflect, however, this problem did not start in 2020. In fact, Denver media outlets began covering this troubling trend a year prior, explaining in December 2019 that "[p]olice are putting out a warning to Kia owners as they see a spike in the number of thefts

---

[53] Brian Maass, "'Oh No, This Can't Happen Again': Man Has 2 Kias Stolen In 1 Month," CBS4 DENVER, https://denver.cbslocal.com/2020/12/10/car-theft-kia-stolen-denver/ (Dec. 10, 2020, 11:59 PM).

[54] *Id.*

happening in the Denver metro."[55] Much like various news reports in Milwaukee, the Denver media began looking for answers by interviewing the owners of local autobody shops. As one such owner, who specializes in repairing stolen vehicles, explained: "These newer Kias are everywhere, and [criminals] know they're easy to steal, so they're a really hot commodity out there."[56]

236.    Of course, the ease with which the Class Vehicles can be stolen is not surprising to Defendants. As discussed above, as early as 2007, Defendants were extoling the benefits of immobilizers, citing case studies, reports, and crime statistics about the dramatic reduction in auto-theft through the implementation of this technology; an anti-theft device developed in the 1980s and which has been widely used by virtually every other automotive manufacturer for decades.

237.    Further, on information and belief, Defendants were actively or constructively aware of this uptick in the thefts of their vehicles, including the Class Vehicles, through scores of customer complaints—both directly and as relayed through their dealers—as well as through their ongoing monitoring of the very NCIC data, also relied on by NHTSA, that demonstrated this upward trend.

238.    Thus, not only were Defendants acutely aware of the number of their vehicles that get stolen throughout the United States but, on information and belief, they know *how* they are being stolen as well. As explained above and depicted in the photos of Plaintiffs' Class Vehicles below, the thieves' *modus operandi* is the same: ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

---

[55] Liz Gerlardi, "Denver police see spike in reports of stolen Kia vehicles," ABC DENVER 7, https://www.thedenverchannel.com/news/local-news/denver-police-see-spike-in-reports-of-stolen-kia-vehicles (Dec. 10, 2019, 8:38 PM).

[56] *Id.*

239. Defendants' actual and/or constructive knowledge regarding how these vehicles, including the Class Vehicles, were being stolen, was also apparent because they—through one or more affiliates—are responsible for furnishing replacement parts to dealerships and autobody shops around the country. It follows that, because the vehicles are being stolen in the same way as noted above, each repair made to a stolen vehicle requires a common nucleus of the same parts; parts that, on information and belief, were on backorder in the Milwaukee metropolitan area no later than December 2020.

240. Given the profound safety threat posed by auto theft in these situations—where cars can be stolen by juveniles with a penchant for joyriding, as NHTSA described *more than fifty years ago* when it promulgated FMVSS 114—one would think Defendants would have taken active steps to intervene and prevent this safety threat.

241. Indeed, not only were Defendants required to inform their dealers and implement an appropriate fix on the new cars being sold and leased, *see* 49 U.S.C. § 30116 (discussed *supra*), but the Safety Act specifies that Defendants[57] are required to notify their "owners, purchasers, and dealers," amongst others, when they: (i) "learn[ ] the vehicle or equipment contains a defect and decide[ ] in good faith that the defect is related to motor vehicle safety; or (ii) decide[ ] in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard prescribed under" the Safety Act. 49 U.S.C. § 30118(d).

---

[57] On information and belief, HMC and KMC have delegated responsibility for compliance with the Safety Act to HATCI, their authorized representative, as well as Kia and Hyundai, the American importers and distributors of their vehicles. Indeed, Kia and Hyundai both issued press releases in connection with resolving the Theta II Defective Engine Litigation, which indicates that *they*—not HMC and KMC—entered into an agreement to resolve class action litigation with owners of certain vehicles equipped with Theta II gasoline direct injection (GDI) engines. (*See* n.6, *supra*).

242. But Defendants did no such thing. Instead, they kept selling the Class Vehicles, flooding the Wisconsin market with more unsafe cars ripe for auto-theft. When the problem became too large to ignore, they then offered a token gesture to install immobilizers in all *new* vehicles, despite readily acknowledging the safety benefits they offer since as early as 2007.

243. As for the rest of their customers, however, Defendants will contend they're flat out of luck. As demonstrated below, Kia and Hyundai sought to disclaim in their respective warranties the very problems associated with the Class Vehicles in a transparent attempt to leave remediless the thousands of Wisconsinites affected by this crisis, which continues to grow by the day.

### Kia And Hyundai Have Denied Responsibility For This Crisis By Invoking Inapplicable And Unconscionable Warranty Disclaimers

244. As noted above, Defendants have touted their respective warranties as industry-leading in a conscious effort to promote the sale and lease of new Kias and Hyundais as well as the sale of their used vehicles—both of which redound to their pecuniary benefit.

245. For example, Kia's marketing material consistently advertises its advanced design features, which it stands behind through its "industry leading warranty." Kia's Warranty also expressly states that:

- "*The latest engineering techniques have been incorporated into the design and production of your Vehicle*[;]"
- "*It will arrange for an Authorized Kia dealer at locations of its choice to provide to the repair of your vehicle if it fails to function properly during normal use*[;] and
- "*All components of your Kia Vehicle are covered for 60 months/60,000 miles from the Date of First Service, whichever comes first.*"

(Ex. D at 3, 5-6.)

59

246. These are affirmations of fact that Kia warranted with respect to each Class Vehicle sold because they relate to the vehicles sold and describe that they will conform to the above-referenced descriptions. *See* Wis. Stat. §§ 402.313(1)(a)–(b).

247. As discussed below, these affirmations of fact are contained within the Kia Warranty furnished to each applicable named plaintiff and, on information and belief, cover every Kia Class Vehicle over the relevant period discussed herein.

248. Although Kia has ostensibly claimed that "all warranties on the vehicle will remain in full effect as stated in the Vehicle's Warranty and Consumer Information Manual," as discussed below, it has flatly rejected each attempt to invoke these warranties to effectuate a pre-suit resolution of this matter.

249. On information and belief, Kia's purported justification for shirking responsibility under the warranty is predicated on two disclaimers incorporated into this document; specifically, Kia's Warranty disclaims any "*Damage due to Factors Beyond the Manufacturer's Control*," such as "*[a]ccidents and incidents that damage [the] Kia vehicle including but not limited to collision, fire, theft, [and] riot.*" (*Id.* at 10 (emphasis added).) Kia's Warranty also purports to disclaim "*Manufacturer Design Choices*," explaining that "*[a] material is not defective or underperforming under [this] warranty because a better, stronger, more durable or more suitable material could have been used.*" (*Id.* at 11 (emphasis added).)

250. In the face of conflicting language in an express warranty, however, the Uniform Commercial Code is clear: "Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to s. 402.202 on parol or extrinsic evidence, *negation or*

60

*limitation is inoperative to the extent that such construction is unreasonable.*" Wis. Stat. § 402.316(1) (emphasis added).

251. Applied here, NHTSA explained that in promulgating FMVSS 114, ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

252. It follows that because Kia's Warranty covers damage to the vehicle when "it fails to function properly during normal use," its failure to equip its vehicles with an anti–theft system in conformance with FMVSS 114–████████████████████████████████████████████ ████████████████████████████—falls within the scope of the express warranty.

253. Consequently, the Kia Warranty's disclaimer for any damages resulting from theft of the Class Vehicles–which is directly attributable to Kia's failure to equip its cars with anti–theft measures compliant with FMVSS 114–renders this conflicting disclaimer a nullity.

254. Likewise, Kia cannot escape liability under its express warranty for its failure to equip the relevant Class Vehicles with decades–old technology that it repeatedly recognized–for also more than a decade–would substantially reduce the risk of auto theft through its "Manufacturer Design Choices" disclaimer.

255. Indeed, because this disclaimer conflicts with the first sentence of the Kia Warranty, which represents "*[t]he latest engineering techniques have been incorporated into the design and production of your Vehicle*[,]" the express warranty governs and the limitation is disregarded.

256. Hyundai's Warranty contains similar conflicting language and disclaimers that, on information and belief, it has and will continue to invoke to deny coverage for the problems with

61

the Class Vehicles. Specifically, Hyundai's Warranty describes the scope and extent of its coverage as follows:

- *These warranties apply to vehicles manufactured to United States–specifications which are distributed by Hyundai Motor America and registered and normally operated in the 50 United States and Washington D.C.*
- *Repair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama (HMMA), Kia Manufacturing Mexico (KMM), Kia Motors Manufacturing Georgia (KMMG) or Hyundai Motor America (HMA) that is found to be defective in material or workmanship under normal use and maintenance, except any item specifically referred to in the section "What is Not Covered."*
- *The warranty period is limited to 5 years from the date of original retail delivery or date of first use, or 60,000 miles, whichever occurs first.*

(Ex. F at 17–18 (emphasis added).)

257.    In its "What is Not Covered" section, Hyundai then disclaims coverage for, amongst other items: (i) "*[a]ny vehicle that has ever been declared a total loss*[;]" (ii) "*[d]amage or failure resulting directly or indirectly from*, amongst other situations, "*[m]isuse, abuse, accident, theft, water/flooding or fire*[;]" and (iii) "*[u]se of parts other than Hyundai Genuine Parts, or parts of nonequivalent quality and design.*" (*Id.* at 20 (emphasis added).)

258.    Applied here, Hyundai purports to extend its Warranty to "*vehicles manufactured to United States–specifications*[,]" (*id.* at 17 (emphasis added)), which encompasses FMVSS 114.

259.    Because that Safety Standard requires vehicles to be equipped with an anti-theft device that prevents "normal activation" of the vehicle ███████████████████████████, Hyundai's purported disclaimers fail or are otherwise unconscionable and cannot be enforced.

260.    Even assuming Kia and Hyundai were amenable to repairing the Class Vehicles, however, both warranties also contain repair-or-replacement clauses that would, in effect, "repair" the vehicles using the same defective parts, which does little to ameliorate this profound safety risk because the cars can be–and will be–stolen again.

62

261.     Indeed, as Defendants (through one or more affiliates) are responsible for supplying dealerships and autobody shops throughout the State with the parts needed to fix the Class Vehicles that have been stolen, they are acutely aware of the multiple occasions—like the experiences of Chaid and Lydia, discussed *infra*—wherein a stolen Class Vehicle has been repaired and then immediately stolen again.

262.     Consequently, any "repair or replacement" remedy contained within Defendants' warranties fails its essential purpose because it deprives Plaintiffs of the benefit of their bargain.

263.     Likewise, as discussed further below, Defendants' attempt in their respective warranties to limit their exposure by disclaiming incidental and consequential damages—which encompasses various categories of damages that Plaintiffs and the Class have suffered (*e.g.*, insurance premiums, rental car expenses, other stolen property, *etc.*)—also fails its essential purpose and is unconscionable under the circumstances. Thus, these remedy limitations are equally unenforceable under Wisconsin law.

### The Public Safety Threat Continues To Mushroom
### Since The Filing Of The Complaint

264.     Despite feigning concern for their customers and ostensibly needing time to "investigate" this problem, the reality is that Defendants have no intention to fix it.

265.     Meanwhile, the Kia Boyz continue to wreak havoc in metropolitan Milwaukee given the ease with which the Class Vehicles can be stolen; a problem that—as NHTSA ominously explained when it enacted FMVSS 114 more than fifty years ago—creates a marked public safety threat to anyone in the vicinity of those engaging in reckless joyriding.

266.     Indeed, various social media outlets have documented the consequences of Defendants' refusal to address the problems that their subpar engineering, which resulted in the Defect in the Class Vehicles has created.

267.     For example, the risks attendant to the Kia Boyz' theft of these vehicles has been chronicled in various videos posted by a Milwaukee–based Instagram account known as "@mixtapetrappers" (hereafter, "Mixtape").

268.     Take, for instance, the following video posted on September 11, 2021 on Mixtape's Instagram account that, on information and belief, was filmed outside of Bradley Tech High School in Walker's Point and features several stolen Kias and Hyundais drag racing on the sidewalk:



Available at: *https://www.instagram.com/p/CTrjrdgL-Zc/?utm_medium=copy_link*.[58]

269.     Nor is this video an unfortunate aberration. Mixtape's Instagram account contains a host of other videos, including an October 7, 2021 clip that, on information and belief, was filmed

---

[58] Last viewed on November 2, 2021.

outside the James Madison Academic Campus on Eighty–Third Street and Florist Avenue in Milwaukee, which also features a stolen Kia:



Available at: *https://www.instagram.com/p/CUvDdzEDFJ4/?utm_medium=copy_link*.[59]

270. Mixtape is not alone in chronicling on social media the havoc the Kia Boyz are causing around Milwaukee with a bevy of Class Vehicles at their disposal. Indeed, various Instagram accounts have posted shockingly similar videos that, on information and belief, depict juveniles recklessly joyriding in stolen vehicles around the city, all of which (or nearly all of which) feature the Defendants' Class Vehicles that they knowingly failed to equip with immobilizers:

- **@mixtapetrappersteens (5/31/21):** *https://www.instagram.com/p/CPOsriCDZzD/*
- **@414hypehousereloaded (7/02/21):** *https://www.instagram.com/p/CQ2bsjiD8rf/*
- **@mixtapetrappersteens (7/09/21):** *https://www.instagram.com/p/CRG7fE2g7g8/*
- **@414hypehousereloaded (7/19/21):** *https://www.instagram.com/p/CRhcv5HDMr8/*
- **@414hypehousereloaded (8/4/21):** *https://www.instagram.com/p/CSK4H2LgJIY/*
- **@414hypehousereloaded (8/11/21):** *https://www.instagram.com/p/CScSnGyAZTL/*

---

[59] Last viewed on November 2, 2021

- **@daedae_topspeed (8/18/21):** *https://www.instagram.com/tv/CSu5FpEA5iJ/*
- **@414hypehousereloaded (8/19/21):** *https://www.instagram.com/p/CSwsnhfAktd/*
- **@414hypehousereloaded (9/10/21):** *https://www.instagram.com/p/CTqCTgnAaJz/*
- **@414hypehousereloaded (9/10/21):** *https://www.instagram.com/p/CTqCaYTANaC/*
- **@mixtapetrappersteens (9/15/21):** *https://www.instagram.com/p/CT2PcmpAbpn/*
- **@414hypehousereloaded (10/20/21):** *https://www.instagram.com/p/CVRCcU5AkwT/*
- **@mixtapetrappers (10/25/21):** *https://www.instagram.com/reel/CVbyF1VjXb_/*
- **@mixtapetrappers (10/25/21):** *https://www.instagram.com/reel/CVdJgImDPHd/*
- **@414.hype.1k (10/29/21):** *https://www.instagram.com/p/CVnkH4jF9Bf/*

271.    The social media site "Tiktok" has also been a favorite avenue to post similar videos to those found on Instagram that, on information and belief, likewise feature the consequences of Defendants' failure to equip their vehicles with basic safety measures that other manufacturers have been using for decades:

- **@drewtofamous (4/10/21):** *https://www.tiktok.com/@drewtofamous/video/6949748811572736774*
- **@vlone478 (6/24/21):** *https://www.tiktok.com/@vlone478/video/6977530702795492614*
- **@414_keion (7/15/21):** *https://www.tiktok.com/@414_keion/video/6985357187044494598*
- **@mkegonewild (8/10/21):** *https://www.tiktok.com/@mkegonewild/video/6994946529387728134*
- **@kia.boyz (8/15/21):** *https://www.tiktok.com/@kia.boyz/video/6996874563288108294*
- **@longliveavee (8/22/21):** *https://www.tiktok.com/@longliveavee/video/6999133171342118150*
- **@tsbhunchoo414 (8/30/21):** *https://www.tiktok.com/@tsbhunchoo414/video/7002227863822880006*
- **@kiaboyz414 (9/2/21):** *https://www.tiktok.com/@kiaboyz414/video/7003375952306654469*
- **@longliveavee (9/3/21):** *https://www.tiktok.com/@longliveavee/video/7003634201140497670*
- **@kia.boyz (9/21/21):** *https://www.tiktok.com/@kia.boyz/video/7010247394784742662*
- **@jantwan_tolow (10/9/21):** *https://www.tiktok.com/@jantwan_tolow/video/7017136359345343749*
- **@tsbhunchoo414 (10/17/21):** *https://www.tiktok.com/@tsbhunchoo414/video/7020043122902289670*

272.    And while it appears no individuals were harmed or other property was damaged in the above-referenced videos, other social media posts—as well as the experiences of various Plaintiffs and the Class—establish that this the exception to the rule.

273.    Indeed, Mixtape posted another video to Instagram on October 19, 2021 that, on information and belief, features a stolen Hyundai smashing into an innocent bystander's cars across the street from a playground in Butterfly Park on Thirty–Eighth Street and West Meinecke Avenue:



Available at: *https://www.instagram.com/p/CVNhjg9D64B/?utm_medium=copy_link*.[60]

274.    Of course, the property damage pales in comparison to other reports of the harm flowing from the theft of the Class Vehicles. As detailed below, (*see* ¶¶ 368–76, *infra*), Chad's Kia Forte was stolen, involved in a shootout, and recovered at a hospital where, on information and belief, one of the passengers of the vehicle was shot and killed:

---

[60] Last viewed on November 2, 2021.

  

275. Regrettably, stories like those experienced by Chad are becoming all too common. Indeed, MPD just released footage of the sixteen-year-old who killed himself and injured others following a highspeed chase in a stolen Kia on June 15, 2021, which ended after he careened into oncoming traffic at an excessive speed and crashed head-on into another vehicle:



Available at: *https://www.wisn.com/article/dashcam-video-shows-fatal-crash-moments-after-police-cancel-pursuit/37955614?utm_campaign=snd-autopilot&fbclid=IwAR1-RK0bbrVixdJ9obJ_VTV-fNOrAd2b2ymF1jblxUOCsmLUW84TCIGfWhQ.*

276.     Nor has the tragedy flowing from this crisis been limited to the kids who are killing themselves in connection with stealing these cars. As recently as October 14, 2021, for example, a woman was run over and killed at the scene of a car–jacking when she attempted to stop two boys and two girls—ranging from thirteen to fifteen years old—from stealing a vehicle in the parking lot at the Holiday Inn Express in Wauwatosa, Wisconsin.[61]

277.     The latest news reports detail that the woman was run over by her own SUV when she attempted to stop a car theft.[62]

278.     As for what precipitated the tragic events that led to the victim's demise, an MPD dispatcher explained that the catalyst of the incident was one of Defendants' vehicles: "*Just prior to this call I did get a call at the Holiday Inn Express regarding two kids trying to steal a Hyundai.*" As the MPD later explained, "*the two calls were related.*"[63]

279.     All told, a staggering ***5,362 Class Vehicles***—Kias (2,697) and Hyundais (2,665)—have been stolen through the first three–quarters of 2021.[64]

280.     Extrapolating from this data, approximately 7,149 Class Vehicles will be stolen by years' end.

---

[61] "4 teens arrested in connection with hit & run that killed woman," WISN12 ABC, https://www.wisn.com/article/wauwatosa-teens-arrested-in-connection-with-hit-run-that-killed-woman/37976363 (last updated Oct. 15, 2021, 6:33 PM).

[62] *Id.*

[63] "Woman killed in Wauwatosa hit-and-run," WISN12 ABC, https://www.wisn.com/article/wauwatosa-woman-killed-in-hit-and-run/37963205 (last updated Oct. 15, 2021, 11:43 AM) (emphasis added).

[64] Tony Atkins, "Video: Man confronts thieves as they steal his car in Milwaukee," TMJ4 WTMJ-TV, https://www.tmj4.com/news/local-news/video-man-confronts-thieves-as-they-steal-his-car-in-milwaukee (last updated Oct. 5, 2021, 3:47 PM).

281.    Comparing this figure to the FBI's most-recent, 2019 statistics on auto-theft in Milwaukee,[65] this means that *__twice as many__* Kias and Hyundais will be stolen in 2021 (7,149 cars) than *__the total number of vehicles stolen__* in 2019 (3,450 cars)—*__combined__*.

282.    According to Defendants, however, there is no problem at all; as they see it, they can flood the market with dangerous, defective products and walk away from the crisis they created without consequence.

<u>FACTUAL ALLEGATIONS SPECIFIC TO THE NAMED PLAINTIFFS</u>

*Katie's Hyundai Sonata Is Stolen And Totaled In A Reckless Joyride*

283.    In December 2016, Katie began searching for a used car to buy and narrowed her search to either a Honda or a Hyundai.

284.    Katie researched numerous models of both vehicles and ultimately decided that she wanted to purchase a Hyundai Sonata because it was within her budget and was equipped with the features she liked.

285.    Through the course of her research, however, Katie did not come across the NICB's website, which explained the growing number of Hyundai vehicles, including multiple model years of the Sonata, that were being stolen across the country.

286.    On December 27, 2016, Katie purchased a used 2013 Hyundai Sonata GLS for $22,316.98 from Boucher Hyundai of Waukesha ("Boucher"), a Hyundai dealership located at 1583 East Moreland Boulevard, Waukesha, Wisconsin 53186.

287.    On information and believe, the component parts of Katie's vehicle comprising the Defect did not substantially change from the time the vehicle left Defendants' control to the day

---

[65] "Crime in the United States by Metropolitan Statistical Area, 2019," FBI, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-6 (last visited Nov. 3, 2021).

Katie acquired it, and Katie did not modify any of these component parts during her tenure as the vehicle's owner.

288.    Prior to her purchase, Boucher furnished Katie with a "Wisconsin Buyer's Guide" for the Sonata which did not identify any problems with the vehicle; specifically, under the Guide's "Electrical" Section—where the dealer was supposed to identify any "Starting / charging / ignition system problem"—the "No" box was checked.

289.    As noted above, however, by December 2016, Hyundai was actively and/or constructively aware of the Defect in the Class Vehicles, including the 2013 Sonata that Katie was about to purchase.

290.    Indeed, not only did Hyundai know, or should have known, about the safety risk associated with the way it designed this Sonata, but the NCIC crime data was showing an increasing trend in thefts associated with Kias and Hyundais; a trend that, on information and belief, was a direct byproduct of the Defect associated with the Class Vehicles, which made them so easy to steal.

291.    At no point prior to Katie's purchase of the Sonata, however, did Hyundai—either directly or through its authorized dealer—inform Katie of this information; indeed, Katie had no idea that if she purchased a push-button Hyundai and/or one outfitted with an immobilizer, this technology would have dramatically reduced the risk of her car being stolen.

292.    All these facts were material to Katie's decision to purchase the 2013 Sonata; had she been made aware of these facts, she would have purchased a different vehicle all together.

293.    Unaware of these facts, however, and in further reliance on the Wisconsin Buyer's Guide, which represented that there was no problem with the Sonata's ignition system, Katie purchased the vehicle from Boucher. Katie financed the purchase of her vehicle through Ally

71

Financial, Inc., and agreed to pay a monthly car payment of $277.53 until she satisfied the balance of the loan.

294.    In the ensuing years thereafter, neither Hyundai, its authorized dealership, nor any other Hyundai representative ever informed Katie about the Defect with her Sonata; although Katie received another recall notification, which prompted her to get the vehicle's engine repaired, she was never told about the increasing thefts of these vehicles that, on information and belief, was directly attributable to the Defect and of which Hyundai was acutely aware based on the NCIC crime data it was receiving, amongst other sources of information.

295.    Had Katie been informed of this fact, she could have disposed of the car much sooner rather than subsequently being forced to buy another vehicle after her car was stolen and totaled during a time in which skyrocketing inflation was forcing the cost of all goods, including used cars, to dramatically increase.

296.    After returning home from work at approximately 5:00 p.m. on May 12, 2021, Katie parked her vehicle in her rented parking space in a gated, surface parking lot called "Park Lane Lot" located on the corner of East Irving Place and North Prospect Avenue in Milwaukee's Lower East Side neighborhood.

297.    Katie then left for O'Hare Airport the following morning to attend a bachelorette party in Scottsdale, Arizona, leaving her vehicle in its designated parking spot over the weekend.

298.    Despite her vehicle being in a gated lot, however, it was stolen sometime between the night of May 13 and the morning of May 14, 2021.

299.    Katie's car turned up on Milwaukee's West Side at approximately 8:26 a.m., where the vehicle was in a reported accident on the corner of North Thirteenth Street and West Concordia

72

Avenue. As the exemplar photos below make plain, the accident was so severe that the vehicle rolled over and was totaled:

 

300.   At the time her Sonata was declared a total loss, the remaining balance left on the vehicle was $3,647.57.

301.   Katie then returned from Arizona on May 16, 2021, at which point she spent hours on the phone with the MPD and her insurance company the very next day, and subsequently went to the tow lot where her vehicle was being kept.

302.   Upon inspecting the vehicle, ███████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ According to the police officer who reported the accident, all four occupants were adolescents.

303.   On or about July 7, 2021, Katie purchased another used vehicle, a 2018 Subaru Crosstrek, placing $6,000.00 down. She has also incurred a number of other fees, including costs

associated with her license plate, new-registration costs to purchase the Subaru, and increased insurance premiums as a result of the incident.

### Stefanie's Kia Optima Is Hijacked Off A Public Street

304.     In January 2021, Stefanie purchased a 2012 Kia Optima from a family member.

305.     On information and belief, the component parts of Stefanie's vehicle comprising the Defect did not substantially change from the time the vehicle left Defendants' control to the day Stefanie acquired it, and Stefanie did not modify any of these component parts during her tenure as the vehicle's owner.

306.     On the evening of May 18, 2021, Stefanie spent the night with a friend at the Fortress Apartment complex located at 1726 North First Street in Milwaukee's Brewer's Hill neighborhood.

307.     Stefanie thus parked her car for the evening in front of the apartment building on the 1700 block of First Street at approximately 10:00 p.m.

308.     The following morning, Stefanie got up to commute to work at about 6:00 a.m., at which point she realized her car was no longer where she left it.

309.     Stefanie immediately called MPD's non-emergency number and was instructed to go to the Milwaukee County Courthouse to file a police report, which she did at about 7:30 a.m.

310.     A few hours later, MPD called Stefanie to relay that her vehicle had been stolen and recovered. Stefanie's vehicle was subsequently taken to a local impound lot.

311.     The vehicle was then towed to a local auto repair shop, where Stefanie was finally able to inspect the damage done to her vehicle.

312.     Similar to Katie's vehicle, ████████████████████████████████████████
████████████████████████████████████████

74

313.    The fact that Stefanie's car was stolen was confirmed by the Fortress Apartments' security footage, which revealed that two individuals who appeared to be about twelve years old broke into the car and drove off with it in less than a minute. The theft occurred sometime between 10:30 and 11:00 p.m. on May 18, 2021.

314.    As a result of the theft, Stefanie has been forced to pay a $250.00 insurance deductible and increased premiums. In July 2021, Stefanie also paid approximately $4,000.00 as a down payment to acquire a replacement vehicle, a 2016 Subaru Outback, as well as license–plate and registration fees, which she would not have otherwise done had her Optima not been stolen.

### Chaid's Hyundai Elantra Is Stolen Twice In Broad Daylight

315.    On June 21, 2019, Chaid leased a 2019 Hyundai Elantra from Boucher.

316.    Chaid was already familiar with the Hyundai brand, however, because he previously leased a 2013 Elantra followed by a 2016 Tuscon and was generally happy with both vehicles, so he decided to co–lease a 2019 Elantra when his partner's lease for a 2017 Elantra was set to expire.

317.    In connection with leasing his 2016 Tucson, which he also leased from Boucher, Chaid reviewed various pieces of marketing material, including a Hyundai Tuscon brochure that was the same or substantially similar to publicly available brochures online, which touted Hyundai's safety and design features:

- **2016 Tuscon:** "*This is how new gets to be improved* . . . And we're certain you'll want this: A CUV so concerned for your safety, it's able to help keep you in your lane, warn you when vehicles are in your blind spot, and automatically brake in an emergency. One thing we haven't changed? Our warranty. It's still America's Best."

- **2016 Tuscon:** "*Our latest thinking on how to prevent the unthinkable. You can see some of the all–new Tucson Limited's new LED headlights and LED Daytime Running Lights – or available High Intensity Discharge headlights with Dynamic Bending Light – enhance both safety and styling. But it's the features you can't see quite as easily – like more than half the 2016 Tuscon's body being forged from high–strength steel – that might be the most remarkable of all. The Tuscon driver is assisted by a host of innovations: Automatic Emergency Braking[ ] and a Lane Departure*

75

*Warning System[ ]. Blind Spot Detection with Lane Change Assist.[ ] Rear Cross –traffic Alert.[ ] Rear parking sensors[ ] and a standard rearview camera. It's a level of intelligence that helps make a safe driver an even safer one."*

- **2016 Tuscon**: *"Our commitment to Hyundai owners doesn't end with the transfer of keys. Wherever the road takes you, we've got your back with Hyundai Assurance, and umbrella of services and benefits that includes America's Best Warranty, 24/7 Roadside Assistance, innovative safety and car care features . . . and more."*

(Ex. G, ¶ 8 (emphasis added).)

318.    On information and belief, at the time Chaid leased his 2016 Tuscon, Hyundai was actively and/or constructively aware of the growing problem that its standard–key ignition vehicles that were not equipped with an immobilizer posed; indeed, NICB's crime data depicts the increasing number of thefts associated with various Hyundai models equipped with the same Defect.

319.    For multiple years—first with his 2013 Elantra, then with his 2016 Tucson—Chaid regularly visited the Boucher dealership to have his car serviced. During these visits to the dealership, Chaid was also exposed to Hyundai's various marketing materials, which likewise touted the safety and design of the company's vehicles.

320.    As noted above, Chaid also went back to Boucher to lease a new, 2019 Elantra. In settling in on a new Hyundai, Chaid also viewed a brochure for this vehicle, which was the same or substantially similar to the version publicly available online; one that—consistent with all the other marketing literature he saw through his multiple visits to the Boucher dealership—continued to tout all Hyundais, including the Elantra, as safe, well–designed vehicles:

- **2019 Elantra:** *"Elantra is self-assured, too. Advanced safety technologies like Forward Collision–Avoidance Assist and Rear Cross–Traffic Collision Warning are standard on all Elantra models except the base SE trim. All of this, together with America's Best Warranty, make it easy to see why the Brand Keys Customer Engagement Index[ ] ranked Hyundai No. 1 in customer loyalty – for the ninth consecutive year.[ ]"*

- **2019 Elantra**: *"**Above all, safety for all.** Over the past few years, there've been remarkable advances in the levels of safety technology available on new vehicles. At Hyundai, we're working hard to make the benefits of these innovative features available on more and more of our models.*

76

*After all, you shouldn't have to choose a top-of-the-line trim level to feel like you're safe and secure."*

- **2019 Elantra**: *"Our commitment to Hyundai owners doesn't end with the transfer of keys. Wherever the road takes you, we've got your back with Hyundai Assurance, and umbrella of services and benefits that includes America's Best Warranty, 24/7 Roadside Assistance, innovative safety and car care features . . . and more."*

(*Id.*, ¶ 11 (emphasis added).)

321. On information and belief, the marketing literature that Chaid reviewed over the course of leasing of multiple Hyundais, including the brochures for the specific vehicles he leased, originated from Hyundai's headquarters in California, which Hyundai provided to dealerships around the country, including Boucher, to disseminate to consumers like Chaid.

322. Aside from what he viewed at Boucher, Chaid was also exposed to Hyundai's online and televised marketing campaign regarding its vehicles' design, safety, and warranty program, which Hyundai broadcasts throughout the United States, including Wisconsin, that—in conjunction with his familiarity with the Hyundai brand—further informed Chaid's decision to lease a 2019 Elantra.

323. At no time prior to Chaid leasing his 2019 Elantra, however, did Hyundai—either directly or through authorized dealers—inform Chaid that if he obtained an Elantra with a push-button start, that, on information and belief, incorporates an immobilizer, this additional upgrade would provide an immense safety benefit by dramatically reducing the risk his car would be stolen.

324. As detailed herein, Hyundai withheld this information while simultaneously touting the safety and design features of its vehicles despite having actual and/or constructive knowledge of the Defect that made the Class Vehicles, including the 2019 Elantra Chaid was about to lease, so easy to steal. Indeed, the NICB crime data shows an increasing state-by-state trend in thefts of stolen Hyundais equipped with the same ignition system as Chaid's Elantra.

77

325. In fact, multiple model years of Chaid's Elantra appeared on NICB's various reports, which indicated that it was one of the most stolen new cars in the country; a fact that neither Hyundai—nor its authorized dealers—ever explained to Chaid prior to him leasing any Hyundai, including his 2019 Elantra.

326. Likewise, at no time prior to Chaid leasing his 2019 Elantra, did Hyundai—either directly or through its authorized dealers—inform him about (i) the safety concerns posed by the Defect; (ii) the increased likelihood that his Elantra would be stolen because of the Defect; (iii) the fact Hyundai would deny coverage for any damages flowing from the Defect as a result of the theft; or (iv) the increased insurance costs he would ultimately incur as a result of leasing an Elantra because it could be stolen so easily.

327. All these facts were material to Chaid's decision to lease a 2019 Elantra; had he been aware of these facts, he would have either upgraded to a Hyundai Elantra Limited, with a push-button start, or leased a different make of vehicle all together.

328. Absent this knowledge, and in reliance on Hyundai's contradictory marketing material, Chaid entered the lease agreement, through which he made a down payment in the amount of $5,909.36, with thirty-six monthly installments of $314.02 due thereafter for the remainder of the lease term ending on June 21, 2022.

329. On information and belief, the component parts of Chaid's vehicle comprising the Defect did not substantially change from the time the vehicle left Defendants' control to the day Chaid acquired it, and Chaid did not modify any of these component parts during his tenure as the vehicle's lessee.

78

330. In the two years Chaid leased his Elantra, he regularly got the vehicle serviced at the Boucher dealership, where no one ever informed him of the sharp uptick in thefts of Kia and Hyundais starting as early as the Fall of 2020.

331. On May 3, 2021, Chaid's partner drove the 2019 Elantra to work and parked the vehicle on the 100 block of North Jefferson Street in Milwaukee's Third Ward, where the vehicle was stolen sometime between 2:00 and 6:00 p.m. that day.

332. The vehicle was then found five days later on May 8, 2021 around North Forty-Seventh Street on Milwaukee's Northwest Side.

333. As an estimate from Chaid's insurance company reflects, the initial quote for the repairs was $4,336.59. This figure accounted for the car's ███████████ the damaged anti-lock brake system, and the lane keeping assist system, which had been torn out of the vehicle and necessitated the windshield being replaced.

334. Given the number of Hyundais being stolen, however, the repair shop could not obtain new parts for Chaid's Elantra because they were on backorder. Thus, the repair shop ultimately installed a used Elantra steering column and window because these were the only parts it could obtain.

335. Thus, the total repairs came to $3,294.47. Chaid ultimately picked up the "repaired" Elantra on June 11, 2021 at around 5:30 p.m.

336. The following day, Chaid drove the Hyundai to Metro Car Wash located at 1510 North Van Buren Street on Milwaukee's Lower East Side ("Metro") to get the vehicle cleaned and detailed. He left it parked on the 1500 block of Van Buren Street in front of Metro and in the shop's care to be picked up once the detail was complete.

79

337.    Around 7:30 p.m. that evening, however, a Metro employee called Chaid and informed him that his Hyundai was no longer where it had been parked and could not be found.

338.    Metro's owner then picked Chaid up at home and they drove back to Metro, so that Chaid could inspect the space where he parked his vehicle and view footage from the Metro surveillance camera facing the street parking space outside the shop.

339.    Upon seeing where his car was parked, Chaid noticed shattered glass all over the ground; he then watched the surveillance footage, which revealed that three males approached the car at 2:51 p.m., at which point ███████████████████████████████████ ████████████████ and drove off. Chaid's car was stolen in a matter of two and a half minutes.

340.    After seeing his car stolen again, Chaid filed a police report with MPD that evening.

341.    Around 11:00 p.m. on June 14, 2021, MPD called Chaid and informed him that his Hyundai was totaled in an accident earlier that day on Milwaukee's Northwest Side, this time around North Forty–Second Street.

342.    Chaid's Elantra was subsequently towed to a city lot where Chaid inspected it the following day. Aside from the damage done to the front of the vehicle, ██████████████████ █████████████████████████████████████████████

 

343.    Despite the vehicle being totaled, Chaid remained bound to make his monthly payments pursuant to the lease agreement. Chaid ultimately made two lease payments to Hyundai Motor Finance totaling $628.04, while his insurance company worked to finalize the paperwork and terminate his lease.

344.    In the interim, concerned about the other Hyundai vehicles owned and/or leased by his family members, Chaid reached out to the salesperson at Boucher on or about July 1, 2021 to better understand: (i) what other Hyundai models were affected; and (ii) whether Boucher was aware about these thefts occurring outside of Milwaukee.

345.    In response, the Boucher salesperson explained that while the news about the Defect in Defendants' vehicles had not yet spread to other cities, Chaid's mother-in-law, who resides in Chicago, should still get a club to be safe. The salesperson also explained that Hyundai would start installing standard immobilizers in its "September production run" of vehicles—further evincing its knowledge of the problem—and "crossed her fingers" that Hyundai would issue a recall:

346.   Thus, from May 3, 2021 to approximately September 6, 2021, Chaid's household was down to one vehicle. Chaid recently purchased a Subaru Outback, putting $6,000.00 down on this unanticipated purchase. In addition, Chaid lost out on the value of his down payment on the Elantra, which would have otherwise been amortized over the life of the lease.

347.   In an effort to resolve this dispute with Hyundai, Chaid attempted to initiate arbitration through BBB Auto Line as specified in Hyundai's Warranty. Chaid submitted an application to commence arbitration on August 6, 2021, which BBB Auto Line rejected on August 31, 2021, stating his claim was not arbitrable.

348.   Chaid also notified Hyundai that it was in breach of various warranties on September 23, 2021 and weeks thereafter informed Hyundai that he intended to vindicate his rights in a class action.

### Chad's Kia Forte Is Stolen And Involved In A Fatal Shooting

349.   On February 11, 2019, Chad leased a 2019 Kia Forte from Russ Darrow Ford, LLC d/b/a Russ Darrow Kia of Wauwatosa located at 1901 North Mayfair Road, Wauwatosa, WI 53226.

350.    Chad was already familiar with the Kia brand, however, because he previously owned a 2016 Kia Forte and was generally happy with the vehicle, so he decided to lease a 2019 Forte.

351.    In connection with purchasing his 2016 Kia Forte from an authorized Kia dealership in Wisconsin (Rosen Kia in Milwaukee), Chad reviewed various pieces of marketing material, including a Kia Forte brochure that was the same or substantially similar to publicly available brochures online, which touted Kia's safety and design features:

- **2016 Forte:** "*Technologically advanced features include available UVO eServices Infotainment System with voice-command navigation and a Rear-Camera Display to make driving more convenient than ever. Forte is also equipped with active and passive safety systems designed to help give you peace of mind every time you drive.*"

- **2016 Forte:** "***Advanced safety systems – because life is full of curves[.]*** *Forte features advanced safety systems designed to help give you peace of mind every time you drive. Each one is engineered to help you maintain control, even in harsh road conditions and in some emergency situations. These safety systems are designed to function automatically, leaving you free to focus on safe driving.*"

- **2016 Forte:** "***Delivering on a promise[.]*** *Kia is committed to producing world-class vehicles to suit most every driving need. This commitment has led to the development of stylish vehicles with an extraordinary combination of precision engineering, outstanding performance, innovative features, and advanced safety systems. Kia's dedication to quality and value has been widely recognized – one reason why Kia was named as a top 100 brand in Interbrand's 2014 Best Global Brands report.*"

(Ex. E, ¶ 6 (emphasis added).)

352.    On information and belief, at the time Chad purchased his 2016 Forte, Kia was actively and/or constructively aware of the growing problem that Defendants' standard-key ignition vehicles that were not equipped with an immobilizer posed; indeed, NICB's crime data depicts the increasing number of thefts associated with various Kia models equipped with the same Defect, of which Kia had knowledge vis-à-vis HATCI, the joint-design center it shared with Hyundai.

353.    Notwithstanding this growing problem, however, neither Kia nor its authorized dealer explained the safety benefits gained from this anti-theft device when Chad purchased his

2016 Forte, despite the fact that Defendants touted the safety benefits of this technology for no less than nine years beforehand in various Petitions for Exemption from the PMR.

354. Notably, although Chad did not appreciate it at the time, the 2016 Forte brochure identifies an "immobilizer" as an option on its "EX Premium Package" and "EM Premium Technology Package," but does not explain its utility or the safety benefits it provides. (*See id.*) In fact, the 2016 Forte brochure's section on "Restrain & Safety Systems" makes it appear that *all 2016 Forte models* (the LX, the EX, and the SX) come equipped with all the "safety systems" regardless of the trim package selected. (*See id.*)

355. Over the three years that Chad's owned his Kia Forte, he occasionally visited the Rosen dealership on South Twenty-Seventh Street in Milwaukee to have his car serviced. During these visits to the dealership, Chad was also exposed to Kia's various marketing materials, which likewise touted the safety and design of the company's vehicles.

356. As noted above, when Chad decided to lease a 2019 Forte, he went to another Kia authorized dealership (Russ Darrow Kia in Wauwatosa) to trade in his 2016 Forte and obtain a new model. In settling in on a new model Forte, Chad also viewed a brochure for the vehicle, which was the same or substantially similar to the version publicly available online; one that—consistent with all the other marketing literature he saw in the three years he owned his 2016 Forte—continued to tout all Kias, including the Forte, as safe, well-designed vehicles:

- **2019 Forte:** "*It's sporty, yet sensible. It says yes to advanced technology, and plenty of it. It's into sleek style, state-of-the-art connectivity, and space for everyone. And best of all, it's flat-out fun to drive. These are just a few great things to know about the all-new Kia Forte. Sound good so far? Read on, and we'll give you all the details.*"

- **2019 Forte:** "*Safety never takes a day off.*"

Case 2:21-cv-01146-PP   Filed 07/08/22   Page 84 of 168   Document 35

- **2019 Forte:** "*Advanced sensor systems, breakthroughs in materials and design that have led to strong body construction, and a range of active safety features are just a few of the ways Kia never stops working to help increase your protection.*"

(*Id.*, ¶ 9 (emphasis added).)

357.    Notably, unlike the 2016 Forte brochure, the 2019 Forte brochure makes no reference to an immobilizer system; although the 2019 Forte Brochure identifies a "Push–Button start/ Smart key" as an optional feature that, on information and belief, incorporates an immobilizer, it is advertised as a premium tech feature. (*See id.*) Nowhere did Kia explain—either directly or through its authorized dealer—that this "tech feature" provided an immense anti–theft (and concomitant safety) benefit.

358.    On information and belief, the marketing literature that Chad reviewed over the course of owning his 2016 Forte and subsequently leasing his 2019 Forte, including the brochures for these specific vehicles, originated from Kia's headquarters located in California, which Kia provided to dealerships around the country, including Rosen and Russ Darrow, to disseminate to consumers like Chad.

359.    Aside from what he viewed at the dealerships, Chad was also exposed to Kia's online and televised marketing campaign regarding its vehicles' design, safety, and warranty program, which Kia broadcast throughout the United States, including Wisconsin, that—in conjunction with his familiarity with the Kia brand through his ownership of the 2016 Forte—also informed Chad's decision to lease a 2019 Forte.

360.    At no time prior to Chad leasing his 2019 Forte, however, did Kia—either directly or through its authorized dealers—inform Chad that if he upgraded to a smart key that, on information and belief, incorporates an immobilizer, this premium "tech feature" would provide an immense safety benefit by dramatically reducing the risk of his car being stolen.

85

361. As detailed above, Kia withheld this information while simultaneously touting the safety and design features of its vehicles despite having actual and/or constructive knowledge of the Defect that made the Class Vehicles, including the 2019 Forte Chad was about to lease, so easy to steal. Indeed, the NICB crime data shows an increasing state-by-state trend in thefts of stolen Hyundais equipped with the same ignition system, of which Kia was aware given its relationship with HATCI, the joint design center it shared with Hyundai, its corporate cousin.

362. Likewise, at no time prior to Chad leasing his 2019 Forte, did Kia—either directly or through its authorized dealers—inform him about: (i) the safety concerns posed by the Defect; (ii) the increased likelihood that his Forte would be stolen because of the Defect; (iii) the fact Kia would deny coverage for any damages flowing from the Defect as a result of the theft; or (iv) the increased insurance costs he would ultimately incur as a result of leasing a Forte because it could be stolen so easily.

363. All these facts were material to Chad's decision to lease a 2019 Forte; had he been made aware of these facts, he would have either upgraded to a Kia with a smart-key or leased a different make of vehicle all together.

364. Absent being informed about these facts and relying on the contradictory marketing materials to which he had been exposed, Chad entered the lease agreement for his 2019 Forte, through which he made a down payment of $3,719.33, and further agreed to pay thirty-eight installments of $236.21 due on the thirteenth of each month for the duration of the lease term ending on April 11, 2022.

365. On information and belief, the component parts of Chad's vehicle comprising the Defect did not substantially change from the time the vehicle left Defendants' control to the day

86

Chad acquired it, and Chad did not modify any of these component parts during his tenure as the vehicle's lessee.

366. Over the ensuing two years that he was leasing his 2019 Forte, Chad also frequented the Russ Darrow dealership to have his car serviced at which point he was further exposed to Kia's marketing materials that conveyed the safety, reliability, and design features of the company's cars.

367. At no point during these two years, however, did Kia—either directly or through its authorized dealer—ever inform Chad of the safety risks posed by the Defect because his Forte was not equipped with an immobilizer or the dramatic increase in vehicle thefts—in Milwaukee and elsewhere—of which Kia was aware.

368. On April 20, 2021, Chad returned home from a doctor's appointment around 6:00 p.m., leaving his car parked on the 900 block of North Marshall Street in downtown Milwaukee, right outside his apartment building.

369. At approximately 7:00 a.m. the following morning, Chad received a voicemail from the MPD, informing him that his car was stolen and involved in a shooting the night before.

370. Chad then walked outside to confirm that the MPD had identified the correct vehicle and saw that his car was in fact gone. Chad also noticed shattered glass on the ground where he had last parked his Forte.

371. Around 2:00 p.m. that afternoon, Chad received another call from the MPD, at which point an officer provided Chad with further information regarding the theft of his Forte; specifically, the officer told Chad that the vehicle was stolen sometime between 11:00 p.m. and 2:00 a.m. before it was involved in a shooting.

372.     The officer then explained that after the shooting, Chad's Forte was recovered at St. Joseph's Hospital on the Northwest side of the city, where two people were found in the vehicle. Both individuals were shot, one of whom sustained life-threatening injuries. As for the Forte, it was taken to a local tow lot located on the 3800 block of West Lincoln Avenue.

373.     A few hours later, Chad went to the tow lot and learned that his car had been totaled. ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ On April 24, 2021, the vehicle was moved to another tow lot in Sussex, Wisconsin, where Chad saw it again. While at both lots, Chad photographed the resultant damage to his Forte, as evidenced by the photos depicted above (*see* ¶ 274, *supra*) and also set forth below:



374.     On information and belief, the shooting involving Chad's Forte occurred around 2:00 a.m. on the 3100 block of North Thirty-Fourth Street off West Burleigh Street and two fourteen year-old-girls were wounded as a result of the incident.[66]

---

[66] Tony Bettack, "Milwaukee Police investigate double shooting of two 14-year-old girls," 620 WTMJ,

375. On information and belief, these girls are the same individuals later found in Chad's car at St. Joseph's Hospital about a mile from where the shooting took place. As various media outlets reported, one of the girls passed away the following day due to her injuries.[67]

376. Apart from the havoc this particular theft caused on the community at large, Chad incurred damages as a result of the theft, as he was forced to pay a $500.00 deductible coupled with future increased premiums; an additional $114.00 in damages to his vehicle that his insurance did not cover; additional lease payments even after he was unable to use the vehicle; a $1,300.00 down payment on purchasing a new car; and other costs associated with the abrupt termination of his lease, including license and registration fees. Chad also lost a portion of his down-payment on his 2019 Forte, which would have otherwise been fully amortized over the lease term.

377. In an effort to resolve this dispute with Kia, Chad attempted to initiate arbitration through BBB Auto Line as specified in Kia's Warranty. Chad submitted an application to commence arbitration on August 9, 2021, which BBB Auto Line rejected on August 25, 2021, stating his claim was not arbitrable.

378. Chad also notified Kia that it was in breach of various warranties on September 23, 2021 and again attempted to reach a pre-suit resolution; a request that Kia subsequently rejected

https://wtmj.com/news/2021/04/21/milwaukee-police-investigate-double-shooting-of-two-14-year-old-girls/ (Apr. 21, 2021); *see also* "Two 14-year-old girls shot in Milwaukee," WISN12 ABC, https://www.wisn.com/article/two-14-year-old-girls-shot-in-milwaukee/36185533 (Apr. 21, 2021, 8:35 AM).

[67] CBS 58 Newsroom, "MCMEO: 14-year-old dies of injuries following shooting near 34th and Burleigh," CBS58 WDJT-MILWAUKEE, https://www.cbs58.com/news/mpd-two-14-year-old-girls-hurt-in-shooting-near-34th-and-burleigh (last updated Apr. 23, 2021, 10:57 PM); *see also* Drake Bentley & Elliot Hughes, "17-year-old boy shot and killed at Sherman Park; 14-year-old girl dies after Wednesday shooting," MILWAUKEE JOURNAL SENTINEL, https://www.jsonline.com/story/news/2021/04/22/man-18-killed-sherman-park-milwaukee-sheriffs-office-says/7343492002/ (last updated Apr. 23, 2021, 9:34 PM). For more information regarding the girl who passed away, see the following link: https://gunmemorial.org/2021/04/21/kimyra-brianna-hill.

Case 2:21-cv-01146-PP   Filed 07/08/22   Page 89 of 168   Document 35

on October 5, 2021, which prompted Chad to notify Kia of his intention to vindicate his rights through a class action.

## Amy Wakes Up One Morning And Her Kia Sportage Is Gone

379.    In January 2021, Amy began searching for a new car, the biggest purchase or her life to date. Amy began searching for vehicles and focused her search on a Kia SUV, in large part because multiple family members had recently purchased Kias.

380.    Apart from being exposed to Kia's televised marketing campaign, Amy also conducted research online, including Kia's website where she was exposed to various representations regarding the design, safety, and security of Kia's vehicles, which are the same or substantially similar to what Kia currently depicts on its website. (*See* Ex. E, ¶ 14.)

381.    Amy also visited various Kia authorized dealerships throughout the Milwaukee metropolitan area in January 2021, including Lupient Kia in Glendale, Russ Darrow Kia in Waukesha, and Russ Darrow Kia in Wauwatosa.

382.    In promoting their vehicles for sale, the dealerships also had various vehicle brochures, which were also available online, so that Amy could learn more about the vehicles in which she was interested, including the Sportage, Seltos, and Sorento. Each brochure contained the same message that was consistent with Kia's marketing information online, including on its website; namely, these materials lauded the design, safety, and industry-leading warranty accompanying every Kia vehicle. By way of example, the brochures Amy viewed stated:

- **2020 Sportage:** "*At Kia, the priority is always on improving all aspects of safety. Advanced sensor systems, strategically placed airbags, and breakthroughs in materials and design that have led to strong body construction are just a few of the ways we never stop working to increase your protection.*"
- **2020 Sportage:** "*It Helps Detect, Coordinate, And React to give you more peace of mind.*"
- **2020 Sportage:** "*Industry-Leading Warranty Program.*"

- **2021 Seltos:** "*The latest available advanced driver–assistance technologies and premium features to help keep you protected and connected.*"

- **2021 Seltos:** "*We never stop striving to bring the latest life–enhancing innovations in technology to our design process, and people like Sean Petterson are driven by the same mission.*"

- **2021 Seltos:** "*At Kia, we believe in the enduring quality of our vehicles. We believe in our materials, our workers, our engineers, and our designers. And to prove it, we stand by each vehicle we make with an industry leading powertrain warranty that lasts for 10 years.*"

- **2021 Sorento:** "***Industry–Leading Warranty Program.***"

- **2021 Sorento:** "*Strive to improve lives. We're constantly seeking innovative technologies to help keep our drivers safe, and people like M. Bernardine Dias are driven by a similar purpose.*"

(*Id.*, ¶¶ 10–11, 13 (emphasis added).)

383.     On information and belief, these materials originated from Kia's headquarters located in California, which Kia provides to its authorized dealers to disseminate to consumers like Amy.

384.     On January 25, 2021, Amy purchased a 2021 Kia Sportage from the Russ Darrow Kia dealership located in Wauwatosa, Wisconsin. At the time Amy purchased her vehicle, its assessed value was $31,420.00.

385.     Amy had narrowed down her search to either a Kia Seltos or a Kia Sportage; although the Seltos had a push–button ignition that she liked better, the dealership recommended the Sportage because the Seltos was recently redesigned, so the Sportage "had the kinks worked out."

386.     On information and belief, however, at the time Amy was purchasing her vehicle, both Kia and its Wisconsin authorized dealerships—including Russ Darrow—were aware of this rash of auto–thefts affecting the Class Vehicles, including Amy's Sportage that she was about to purchase.

387.     Indeed, on information and belief, while Amy was at Russ Darrow Kia to buy her Sportage, the dealership had numerous Class Vehicles that it was servicing, which had been stolen in the weeks and months before she decided to purchase a Kia.

91

388.    On information and belief, the Class Vehicles that Russ Darrow was servicing after they had been stolen all had the same Defect as Amy's Sportage and the parts needed to fix each vehicle were on backorder because of the number of thefts.

389.    Kia knew about this problem because it—through one or more affiliates—is responsible for supplying parts to its dealerships and autobody shops to fix any Kia that comes in for service.

390.    Further, Kia was actively or constructively aware of the increased number of thefts associated with its vehicles as well as Hyundai vehicles equipped with the same Defect because it monitors incidents of theft related to its vehicles through its review and analysis of the NCIC crime data on which NHTSA and the NICB also rely.

391.    Kia also had actual and/or constructive knowledge of this problem because its affiliate company, Kia Motor Finance, was actively working with the respective insurance companies of numerous auto theft victims who owned Kias and Hyundais when those vehicles were stolen and deemed a total loss. On information and belief, in those situations, Kia Motor Finance would be required to process paperwork to release a given victim from his or her remaining lease and/or financing obligations.

392.    Finally, Kia was also actively or constructively aware of the Defect with the Class Vehicles, including Amy's Sportage that she was about to purchase, because it was in contact with law enforcement about these problems.

393.    At no time prior to Amy purchasing the vehicle, however, did Kia—either directly or through its authorized dealers—inform Amy about: (i) the safety concerns posed by the Defect; (ii) the increased likelihood that her Sportage would be stolen because of the Defect; (iii) the fact Kia

92

would deny coverage for any damages flowing from the Defect as a result of the theft; or (iv) the increased insurance costs she would incur as a result of purchasing a Sportage because it could be stolen so easily.

394.     Further, although Kia's marketing materials touted the safety and design features of the Sportage and other Kia models that she viewed, not once did Kia—either directly or through its authorized dealers—inform Amy that she was about to purchase a vehicle that lacked standard technology like an immobilizer, which virtually all other manufacturers had installed to mitigate the risk of auto theft.

395.     Nor did Kia—either directly or through its authorized dealers—inform Amy that by purchasing a push-button Kia or purchasing an upgrade to ensure her Kia was equipped with an immobilizer, it would dramatically reduce the safety risk associated with her car being stolen.

396.     Although Kia's brochures mentioned its "smart key" option that, on information and belief, incorporates this immobilizer technology, these marketing materials list it as a "convenience" feature having nothing to do with vehicle safety. In fact, the brochures Amy saw stated nothing about an immobilizer and how that option would reduce the risk of theft.

397.     All these facts were material to Amy's decision to consummate the purchase of her Kia; had Amy been made aware of these facts, she would not have purchased the Sportage. Rather, she would have purchased the Seltos or purchased a different vehicle all together.

398.     Absent being informed about these facts and relying on the contradictory marketing materials to which she had been exposed, Amy executed the purchase contract, made a $7,500.00 down payment, and financed the remainder of the vehicle's purchase price through Kia Motor

Finance, agreeing to pay sixty monthly installments of $471.17, interest included, starting on March 11, 2021 until the outstanding balance of the loan was satisfied.

399.    On information and belief, the component parts of Amy's vehicle comprising the Defect did not substantially change from the time the vehicle left Defendants' control to the day Amy acquired it. Further, Amy did not modify or change any component parts of her Sportage from the day she purchased it until the day it was stolen, as discussed below.

400.    And from the day she purchased her Sportage to the day it was stolen, neither Kia nor its authorized dealership informed Amy about the dramatic increase in the theft of Class Vehicles to which she then experienced firsthand.

401.    On June 21, 2021, Amy spent the night with her fiancée at the Freshwater Plaza Apartments located at 1320 South First Street in the Walker's Point area of Milwaukee.

402.    Amy arrived at the apartment complex around 5:30 p.m., at which point she parked her car in the building's surface lot.

403.    When Amy left to commute to work the following morning at approximately 7:00 a.m., her car was nowhere to be found. The parking spot where Amy left her Kia was empty aside from shattered glass littering the ground.

404.    Amy immediately dialed MPD's non-emergency line and was instructed to commute to the nearest MPD station, District 2, about a mile and a half south from her then-current location. Because Amy was without a vehicle, she was forced to travel on foot. Amy arrived at District 2 at approximately 8:15 a.m. and filed a police report.

405.    Two days later, MPD called Amy and informed her that her car was recovered around 10:30 a.m. on June 22, 2021 outside of a home located on the 1700 block of South Twenty-Eighth

Street in Milwaukee's Burnham Park neighborhood. As Amy's police report reflects, ███████

███████████████████████████, the rear driver–side tire was flat, and the battery and rear

license plate were missing.

406. Amy's Kia was first towed to a local impound lot, but—at the behest of her insurance

company—was subsequently taken to an auto repair shop called Caliber Collision in Germantown,

Wisconsin for further inspection and repair.

407. Just like the other stolen vehicles described herein, ███████████████████████

████████████████████████████████████████████████████████

as evidenced by this exemplar photo taken at Caliber Collision:



408. The total repairs on Amy's vehicle were in excess of $5,000.00. Additionally, Amy's

car contained several stolen, unrecovered personal items, with an approximate value of $500-

$1,000.00, which was not covered by her auto insurance.

409. During the time she was without a vehicle, Amy's auto insurance company provided

her with a rental car, for which Amy had to pay $139.00 out of pocket. Amy also had to pay her

insurance deductible and a fee to replace her stolen license plate. On information and belief, Amy

will also be subjected to increased insurance premiums from the theft, both because she owns a Kia

and because of her frequent commutes throughout the Milwaukee metropolitan area.

95

410.    Approximately one month later, Amy received her "repaired" car back on July 16, 2021; on information and belief, the car was repaired with Kia authorized parts that Caliber Collision obtained from Kia—either directly or through one or more affiliates.

411.    Thus, even though Amy now has her car back, it was repaired by equipping it with the same defective parts that made her Sportage a prime target to be stolen in the first instance. Thus, Amy is effectively driving around metropolitan Milwaukee with a target on her vehicle, which leads to the palpable concern that her car could get stolen again.

412.    Apart from the stress and anxiety caused by knowing that her vehicle could be stolen at any time or—even worse—she could be harmed in the process of watching a carjacking unfold, Amy does not have the financial resources to simply get rid of her Sportage and purchase a new vehicle because the amount of the loan now exceeds the value of the vehicle.

413.    Even if she currently had the means to make up this difference, however, Amy has also suffered harm through the diminution in value of her Sportage because: (i) the market for a vehicle so easily prone to auto theft naturally reduces its value; and (ii) Amy's Sportage has already lost value because the theft is now associated with her Sportage's VIN, meaning that it will appear on any Carfax or Autocheck Report.

414.    In an effort to resolve this dispute with Kia, Amy attempted to initiate arbitration through BBB Auto Line as specified in Kia's Warranty. Amy submitted an application to commence arbitration on August 5, 2021, which BBB Auto Line rejected on August 26, 2021, stating her claim was not arbitrable.

96

415.     Amy then notified Kia of her desire to revoke acceptance of her Sportage on October

1, 2021; a request that Kia subsequently rejected on October 15, 2021, which prompted Amy to

notify Kia of her intention to vindicate her rights through a class action.

*Lydia's Club Does Nothing To Prevent Her*<br>*Kia Sportage Being Stolen A Second Time*

416.     On September 1, 2020, Lydia went to the Rosen Nissan dealership located at 5505

South Twenty–Seventh Street in Milwaukee to look at a 2020 Nissan Rogue, which she was thinking

of acquiring as a replacement for the vehicle she had at the time: a 2017 of the same model.

417.     The 2020 Rogue, however, was a bit out of Lydia's price range. Thus, the salesperson

assisting Lydia suggested she consider getting a Kia, a less expensive vehicle compared to a Nissan,

but with many of the same features.

418.     Specifically, the salesperson recommended a 2021 Kia Sportage, one of which was

on the dealership lot that day.

419.     Lydia and the salesperson then took the Sportage for a test drive, during which the

salesperson touted the vehicle's many features, including the vehicle's UVO link application: a

telematics system enabling one to synch a smartphone with the vehicle and operate a number of

features remotely from one's phone. According to the salesperson, the Sportage's attributes made it

a better choice than a Nissan.

420.     Impressed with the Sportage and the salesperson's representations, Lydia decided to

lease the vehicle and put a down payment of $500.00 before leaving the dealership.

421.     In connection with leasing the Sportage, the salesperson gave Lydia various pieces of

marketing material for her to review, including a Kia Sportage brochure that was the same or

97

substantially similar to publicly available brochures online touting Kia's safety and design features. (*Id.*, ¶ 10.)

422.   On information and belief, the marketing literature that Lydia reviewed, including the brochure for the Sportage, originated from Kia's headquarters located in California, which Kia provided to dealerships around the country, including Rosen, to disseminate to consumers like Lydia.

423.   Aside from this marketing material, Lydia also reviewed Kia's website and was exposed to the company's televised marketing campaign regarding its vehicles' design, safety, and warranty program, which Kia broadcast throughout the United States, including Wisconsin, that— in conjunction with the marketing material she was given—also informed her commitment to leasing a 2021 Kia Sportage.

424.   The next day, Lydia went to the Rosen Kia dealership, also located on Twenty-Seventh Street, and signed a lease agreement for the 2021 Sportage.

425.   On information and belief, at the time Lydia leased her 2021 Sportage, Kia was actively and/or constructively aware of the growing problem that its standard-key ignition vehicles that were not equipped with an immobilizer posed; indeed, NICB's crime data depicts the increasing number of Kia models equipped with the same Defect, of which Kia had knowledge vis-à-vis HATCI, the joint-design center it shared with Hyundai.

426.   Notwithstanding this growing problem, however, neither Kia nor its authorized dealer informed Lydia of the safety benefits gained from this anti-theft device when she leased her 2021 Sportage, despite the fact that Defendants touted the safety benefits of this technology for no less than thirteen years beforehand in various Petitions for Exemption from the PMR.

98

427. As detailed above, Kia withheld this information while simultaneously touting the safety and design features of its vehicles despite having actual and/or constructive knowledge of the Defect that made the Class vehicles, including Lydia's Sportage, so easy to steal. Indeed, the NICB crime data shows an increasing state-by-state trend in thefts of stolen Kias equipped with the same ignition system, of which Kia was aware given its relationship with HATCI and Hyundai, its corporate cousin.

428. Likewise, at no time prior to Lydia leasing her 2021 Sportage, did Kia—either directly or through its authorized dealers—inform her about: (i) the safety concerns posed by the Defect; (ii) the increased likelihood that her Sportage would be stolen because of the Defect; (iii) the fact that Kia would deny coverage for any damages flowing from the Defect as a result of the theft; or (iv) the increased insurance costs she would ultimately incur as a result of leasing a Sportage because it could be stolen so easily.

429. All these facts were material to Lydia's decision to lease a 2021 Sportage; had she been made aware of these facts, she would have either upgraded to a Kia with a push-start button or lease a different make of vehicle all together.

430. Absent being informed about these facts and relying on contradicting marketing materials to which she was exposed, Lydia entered the lease agreement, through which, in addition to her down payment, she agreed to pay thirty-five installments of $372.39 due on the second of each month for the duration of the lease term ending on September 2, 2023.

431. On information and belief, the component parts of Lydia's vehicle comprising the Defect did not substantially change from the time the vehicle left Defendants' control to the day

99

Lydia acquired it, and Lydia did not modify any of these component parts during her tenure as the vehicle's lessee.

432. In January or February of 2021, just weeks before her vehicle was stolen, Lydia returned to Rosen Kia to get an oil change. On information and belief, both Kia and its authorized dealers (including Rosen) were aware of the crisis unfolding in Milwaukee.

433. Indeed, on information and belief, Rosen was servicing vehicles that were stolen at the time Lydia made an appointment to have her oil changed.

434. Nonetheless, neither Kia nor its authorized dealer informed her of the car thefts plaguing Kia and Hyundai owners at that time.

435. On February 19, 2021, Lydia's vehicle was parked on the street outside her home located on the 4300 block of South Sixty–Third Street in Milwaukee's Capitol Heights neighborhood, from where she worked that day. At approximately 1:00 p.m., Lydia went for a walk during her break, at which point her vehicle was still parked outside.

436. At approximately 5:00 p.m. that day, Lydia finished working and intended to run an errand. When she walked outside, however, she realized her car was gone. All that Lydia saw was shattered glass on the pavement where her car used to be.

437. Lydia immediately filed a police report at MPD's District 7 located at 3626 West Fond Du Lac Avenue in Milwaukee. The vehicle was subsequently recovered three days later on the 2300 block of North Murray Avenue in the Murray Hill neighborhood of Milwaukee's East Side.

438. When the vehicle was recovered, MPD contacted Lydia and asked her to come to where it was found. ████████████████████████████████████████



439. The vehicle was then taken to the Milwaukee County tow lot on the 3800 block of West Lincoln Avenue. From there, Lydia had the vehicle repaired at Avenue Auto Service, located at 5231 South Pennsylvania Avenue in Cudahy, Wisconsin ("Avenue").

440. Lydia's Sportage underwent repairs for fifteen days from February 25 to March 12, 2021. These repairs amounted to $1,336.38, which was covered by her insurance except her $500.00 deductible.

441. In the following ten days, Lydia got the car detailed, but noticed that the window that was previously broken was not fixed correctly. Thus, she scheduled further repairs with Avenue for the week of March 22nd and made plans to acquire a rental car in the interim while her Sportage would be at the shop.

442.    It was around this time that Lydia learned that her Sportage, along with other Class Vehicles, were being targeted by thieves around Milwaukee. Thus, she purchased a Club from the Advanced Auto Parts located on the corner of West Appleton Avenue and North Seventy-Sixth Street in Milwaukee for approximately $60.00 to place on her car's steering wheel in an effort to prevent anyone from stealing it again.

443.    On March 21, 2021, the day before she was supposed to take her car back to Avenue to have the window repaired, Lydia came home at about 9:00 p.m. and parked her Sportage in her driveway, which is behind the home on West Marion Street. Before going inside, Lydia placed her new Club on the car's steering wheel and locked it in place. Lydia's car was last seen around midnight that evening, when her significant other took out the trash and noticed it was still parked in the driveway.

444.    The next morning at approximately 7:00 a.m., however, Lydia walked outside to take her car to Avenue for further repairs and it was nowhere in sight. Like the first time, all that Lydia saw in her car's stead was shattered glass littering the driveway.

445.    Just as she did before, Lydia filed a police report at District 7. MPD then found the vehicle on March 25, 2021 in an alley off the corner of Thirty-Third Street and West Meinecke Avenue about a block from Metcalfe Park. When the vehicle was recovered, there was no trace of the Club.

446.    When the car was found, Lydia again went to the site of recovery to view the damage done, which was similar to what occurred a month prior: ██████████████████████ ████████████████████████████████ there were dents on the hood and drivers side, as well as scratches on both sides of the vehicle.

102

447.	Lydia's Sportage was again taken to the same tow lot. From there, it was moved to the Caliber Collision in West Allis on March 26, 2021 for repair. These repairs were completed on April 19, 2021 and amounted to $8,079.89, which were also covered by her insurance, save the $500.00 deductible.

448.	As a result of both thefts, Lydia was forced to pay a $1,000.00 in insurance deductibles; two lease payments totaling $744.78 while her vehicle was being repaired; a portion of the rental car that her insurance did not cover, which totaled $223.17; and $60.00 for a useless Club.

449.	Not wanting to risk her Kia being stolen a third time, Lydia traded it in to lease a 2021 Nissan Sentra on April 24, 2021. Ultimately, however, because the value of her Sportage was significantly less than the remaining payments under her lease, Lydia was forced to incur additional costs of approximately $5,000–$6,000.00 to get out of this obligation, which was rolled into her new lease for the Sentra.

450.	In an effort to resolve her dispute with Kia, Lydia attempted to initiate arbitration through BBB Auto Line as specified in Kia's Warranty. Lydia submitted an application to commence arbitration on August 17, 2021, which BBB Auto Line rejected on August 25, 2021, stating her claim was not arbitrable.

451.	Lydia also notified Kia that it was in breach of various warranties on September 23, 2021 and again attempted to reach a pre–suit resolution; a request that Kia subsequently rejected on October 5, 2021, which prompted Lydia to notify Kia of her intention to vindicate her rights through a class action.

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

452.    Plaintiffs and the Class had no way of knowing about the Defect in their respective Class Vehicles because Defendants concealed it.

453.    Within the applicable period of limitations, certain Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence that Defendants were concealing the existence and nature of the Defect.

454.    Even in the event of preceding occurrences of theft—whether scattered here or clustered elsewhere throughout the country—an ordinary consumer, without sophisticated knowledge of mechanical systems and antitheft devices, would not and could not suspect that his or her vehicle that was stolen was, in fact, attributable to a pervasive Defect because Defendants withheld this information and pointed to their express warranties, which purport to disclaim liability for these damages.

455.    Indeed, it was not until thefts exploded in Milwaukee—all occurring the same way and spreading across various social media outlets—that Defendants' decades-long obfuscation of the Defect became transparent.

456.    All applicable statute of limitations have therefore been tolled by operation of the discovery rule.

### *Fraudulent Concealment Tolling*

457.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active campaign to fraudulently conceal the existence and nature of the Defect through the period relevant to this action.

458.     Instead of disclosing the Defect in the Class Vehicles and the palpable threat it poses to public safety, Defendants continued to falsely represent that its automobiles were safe, reliable, of high quality, and designed with the latest technological features to keep their drivers safe.

459.     In doing so, however, Defendants carefully sought to insulate themselves from liability through curated express warranties that–although advertised by Kia and Hyundai as industry–leading–purport to disclaim responsibility for both design defects and damages resulting from any theft; the most natural and foreseeable consequences flowing from the Defect, of which NHTSA first warned in 1968 in promulgating FMVSS 114.

460.     As the Defect is not readily observable and the average consumer is not technically savvy enough to understand, in isolation, why his or her vehicle may have been stolen, the increasing number of thefts of Defendants' vehicles was not fully appreciated by anyone except Defendants; that is, the only parties armed with the most data about this growing threat, which was beginning to cluster in specific areas around the United States, and the series of design flaws comprising the Defect, which has ultimately led to this crisis.

461.     Because Defendants were and remain under a constant, unflagging obligation to disclose to Plaintiffs and the Class the true character, quality, and nature of the Defect in the Class Vehicles, Defendants' active concealment of this fact tolls any applicable statute of limitations.

*Estoppel*

462.     The doctrine of equitable estoppel operates to bar a defendant guilty of fraudulent or inequitable conduct from asserting a given limitations period as a defense.

463. As noted above, Defendants were and remain under a constant, unflagging obligation to disclose to Plaintiffs and the Class the true character, quality, and nature of the Defect in the Class Vehicles.

464. Thus, Defendants' failure to adhere to this mandate amounts to an affirmative misrepresentation that—contrary to the true state of affairs—the Class Vehicles were safe and reliable, just as Defendants have advertised for years.

465. As a result, certain Plaintiffs and the members of the Class failed to commence an action within the statutory period relying on Defendants' fraudulent and/or inequitable conduct as noted above.

466. As NHTSA's records reflect, Defendants have had actual and/or constructive knowledge of the safety risk the Class Vehicles posed for no less than fifteen years; thus, their active, ongoing attempt to conceal the Defect started well before—and continued right through—any applicable limitations period.

467. This action is being brought on behalf of members of the Class who were affected by Defendants' misconduct and there has been no unreasonable delay in pursuing it.

## CLASS ACTION ALLEGATIONS

468. Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4), and 23(c)(5) of the Federal Rules of Civil Procedure (the "Rule 23") on behalf of themselves and the members of the following proposed Class and Subclasses as defined below:

- **The Class:** All persons or entities residing in Wisconsin who are current or former owners and/or lessees of a Class Vehicle, as that term is defined herein.
- **Ongoing User Subclass:** All persons or entities residing in Wisconsin who currently own or lease a Class Vehicle, as that term is defined herein.
- **Retail Buyer Subclass:** All persons residing in Wisconsin who meet the definition of "Retail Buyer" or "Lessee" as those terms are defined within the

106

MVDL, and who therefore have standing to assert a statutory claim under Wis. Stat. § 218.0163(2) in connection with the purchase and/or lease of a Class Vehicle.

- **Consumer Subclass:** All persons residing in Wisconsin who meet the definition of "Consumer" as that term is defined in Wis. Admin. Code ATCP § 127.01(2), and who therefore have standing to assert a claim under Wis. Stat. § 100.20(5) in connection with the purchase and/or lease of a Class Vehicle.

469. The following parties, however, are specifically excluded from the foregoing definitions of the Class and Subclasses (hereafter, the "Class" unless otherwise noted): Defendants; any of Defendants' parent companies, subsidiaries, affiliates, dealers, successors, assigns, officers, directors, legal representatives, employees, agents, family members, and/or co-conspirators; all persons or entities that purchased the Class Vehicles for resale; all governmental entities, as well as the judges, judicial officers, and associated court staff assigned to or working on this case, including the immediate family members of those judges, judicial officers, and associated court staff.

470. Subject to additional information that will be obtained through further investigation and discovery, Plaintiffs reserve the right to amend, redefine, and/or modify the foregoing definitions of the Class and Subclasses as needed to do substantial justice.

471. **Numerosity**: Members of the Class are so numerous that joinder of all members is impracticable pursuant to Rule 23(a)(1). The Class is composed of thousands of members dispersed throughout the state of Wisconsin, located in any county where Kia or Hyundai vehicles are sold. Although Plaintiffs do not know the exact number of Class members, which can only be ascertained through appropriate discovery, the Class is readily identifiable from information and records in Defendants' possession, custody, and control.

472. **Commonality**: There are questions of law or fact common to the Class pursuant to Rule 23(a)(2). Such legal or factual questions include but are not limited to:

107

i.   Whether Defendants designed, advertised, sold, and placed the Class Vehicles into the stream of commerce.

ii.  Whether the Class Vehicles were designed and sold with the Defect described above.

iii. Whether the Defect in the Class Vehicles is a safety and/or security defect that created a foreseeable risk of harm to Plaintiffs and the Class.

iv.  Whether the foreseeable risk of harm posed by the Defect in the Class Vehicles, which makes them incredibly easy to steal, could have been reduced or avoided by a reasonable alternative design.

v.   Whether Defendants' failure to implement a reasonable alternative design rendered the Class Vehicles unreasonably safe.

vi.  Whether the Defect rendered the Class Vehicles unreasonably dangerous to Plaintiffs and the Class.

vii. When and to what extent Defendants learned of the Defect in the Class Vehicles that makes them incredibly easy to steal.

viii. Whether the risk of harm to Plaintiffs and the Class outweighed any burden imposed on Defendants when they learned of the Defect in the Class Vehicles.

ix.  The determination that Defendants made concerning why the Class Vehicles were designed with the Defect versus other vehicle models in Defendants' product line.

x.   Whether Plaintiffs and the Class experienced out-of-pocket losses as a result of the Defect and, if so, how much.

xi.  Whether Defendants violated Wis. Stat. § 895.047(1) for their defective design of the Class Vehicles.

xii. Whether Kia and Hyundai violated the MVDL, Wis. Stat. §§ 218.0101 *et seq.*, in connection with marketing and selling the Class Vehicles to various Retail Buyers and Lessees.

xiii. Whether Defendants violated Wis. Stat. § 100.18 in connection with its advertisement and marketing campaign of the Class Vehicles.

xiv. Whether Kia and Hyundai violated Wis. Admin Code ATCP § 127.01 *et seq.*, and hence, Wis. Stat. § 100.20, in connection with its advertisement and marketing campaign of the Class Vehicles.

xv.  Whether Defendants violated their duty to warn Plaintiffs and the Class of the risk of harm stemming from the Defect following the sale of the Class Vehicles to Plaintiffs and Class.

xvi. Whether Kia and Hyundai breached their express warranties for their respective Class Vehicles.

108

xvii.   Whether Kia and Hyundai breached their implied warranty of merchantability tied to their respective Class Vehicles.

xviii.  Whether Kia and Hyundai violated the Magnuson–Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.*, as a result of any breach of their express and/or implied warranties.

xix.    Whether Kia and Hyundai's remedy limitations in their express warranties fail their essential purpose.

xx.     Whether Kia and Hyundai's warranties are unconscionable, in whole or in part, for disclaiming foreseeable liability and otherwise recoverable harm as a result of the Defect.

xxi.    Whether Defendants were unjustly enriched by Plaintiffs and the Class.

xxii.   Whether Amy and the Ongoing User Subclass are entitled to equitably rescind the purchase or lease of their Class Vehicles.

xxiii.  Whether Defendants conspired to commit statutory fraud in violation of Wis. Stat. §§ 895.446(1) & 943.20(1)(d).

xxiv.   Whether Plaintiffs and the Class are entitled to damages and/or other monetary relief and, if so, in what amount or form should it take.

473.   **Typicality**: Plaintiffs' claims are typical of the claims of the Class pursuant to Rule 23(a)(3) because all Class members are similarly affected by Defendants' conduct: indeed, Plaintiffs and the Class: (i) purchased or leased Class Vehicles manufactured and designed by Defendants that contain the Defect; (ii) have, are, or will suffer the same or similar monetary harm caused by the uptick in auto thefts as a result of the Defect in the Class Vehicles; and (iii) are residents of the state of Wisconsin where events described herein occurred, thus Plaintiffs and the Class' claims are subject to Wisconsin law and all Class members may enforce their rights against Defendants pursuant to the claims identified below.

474.   **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class pursuant to Rule 23(a)(4) because: (i) neither Plaintiffs nor their counsel have interests that conflict with the interest of the Class they represent, as all of them, as county residents, want to hold Defendants accountable for the Defect in the Class Vehicles making Milwaukee unsafe; (ii) Plaintiffs

109

are willing and able to vigorously litigate this action on behalf of the Class who, along with their counsel, have adequate resources to do so; and (iii) Plaintiffs' proposed class counsel has the qualifications, experience, and capabilities to handle the case as a class action.

475. Pursuant to Rule 23(b)(1), litigating this matter as a class action, as opposed to separate actions brought by individual Class members, alleviates the risk of: (i) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants; and/or (ii) adjudications of individual Class members' actions that may, as a practical matter, be dispositive of the interests of other Class members not parties to the individual adjudications, or substantially impair or impede their ability to protect their interests.

476. Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds that apply to the Class, thus rendering final injunctive relief, equitable relief, and/or a corresponding declaratory judgment with respect to the Class as a whole appropriate.

477. Pursuant to Rule 23(b)(3), the questions of law or fact common to the Class predominate over any questions affecting only individual Class members; thus, a class action is superior to other available methods of fairly and efficiently adjudicating this controversy.

478. Treatment of this controversy as a class action is therefore a superior means of effectuating its fair and efficient adjudication. Such treatment will permit a large number of similarly situated Class members to litigate their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. Rule 23 provides the Court with authority

and flexibility to maximize the benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, utilize the processes of Rule 23(c)(4) and/or (c)(5) to certify common questions of fact or law and to designate subclasses.

479.    Additionally, the amount of monetary damages at issue for each claim is such that the expenses of litigating Plaintiffs' and each Class member's claims individually would be cost prohibitive, so much so that proceeding individually would deny Plaintiffs and the Class members a viable remedy. Proceeding by way of class action is therefore the only fair, efficient, economical, and sensible way to vindicate the injuries that Plaintiffs and the Class members have sustained.

480.    Plaintiffs know of no difficulty, nor can they foresee any difficulty, that they may have in maintaining this class action that would preclude its maintenance as such.

481.    The undersigned counsel for Plaintiffs and the Class request that this Court appoint them to serve as Class counsel, first on an interim basis and then on a permanent basis, pursuant to Rule 23(g), as the undersigned counsel has: (i) done substantial work in identifying and investigating the claims brought in this action; (ii) experience handling complex litigation and the types of claims asserted in this action; (iii) knowledge of the applicable law; and (iv) sufficient resources to commit to the representation of the Class. Moreover, the undersigned counsel will fairly and adequately represent the interests of the Class. *See* Fed. R. Civ. P. 23(g)(1)(A) & (B).

### COUNT I: BREACH OF EXPRESS WARRANTY
### (Against Kia and Hyundai)

482.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

483.    Chaid, Chad, Amy, and Lydia (the "Warranty Plaintiffs" for purposes of Counts I–III) bring this claim on behalf of themselves and the Class.

484.     Kia and Hyundai designed, developed, manufactured, distributed, and sold the Class Vehicles into the stream of commerce with the intent that consumers like the Warranty Plaintiffs and members of the Class would purchase them as a means of transportation.

485.     Kia and Hyundai made express warranties to the ultimate purchasers and lessees of the Class Vehicles, including the Warranty Plaintiffs and members of the Class.

486.     As detailed above, Kia and Hyundai—in various marketing materials, including brochures distributed with their vehicles as well as other advertisements—made affirmations of fact and other promises in connection with the sale and/or lease of the Class Vehicles, which were woven into the fabric of the parties' agreement, therefore becoming part of the basis of the parties' bargain.

487.     Applied here, Kia and Hyundai made various affirmations of fact to the Warranty Plaintiffs regarding the safety and design features of their respective vehicles. (*See* ¶¶ 317, 320, 322, 351, 356, 359, 380, 382, 421, 423, *supra*.)

488.     These are actionable, express warranties about the safety and design of the Warranty Plaintiffs' respective Class Vehicles.

489.     Further, Kia and Hyundai each provided the Warranty Plaintiffs, as well as other members of the Class, with a "New Vehicle Limited Warranty" attendant to the sale or lease of their respective Class Vehicles; express warranties that are required to be made available to prospective consumers before consummating their transaction, *see* 16 C.F.R. § 702.3, and thus are also woven into the parties' agreement.

490.     Kia and Hyundai expressly warranted that the Class Vehicles were high quality, properly designed, in conformance with applicable federal standards, and at a minimum, would work properly.

491. The Warranty Plaintiffs and the Class relied on these express warranties in connection with purchasing and/or leasing their respective Class Vehicles.

492. But Kia and Hyundai breached these express warranties by selling and/or leasing Class Vehicles to the Warranty Plaintiffs and the Class that Defendants knew contained safety defects in their antitheft systems.

493. Kia and Hyundai's attempt to disclaim or otherwise limit both their liability under these express warranties and/or any remedies flowing therefrom vis-à-vis these consumers are unenforceable and unconscionable under the circumstances presented.

494. First, Wis. Stat. § 402.316 negates any disclaimer and/or modification of an express warranty in the face of inconsistent language that created the warranty in the first instance.

495. Second, Kia and Hyundai's attempt to disclaim responsibility for design defects and any damages flowing from the resultant theft of the Class Vehicles is void and unenforceable for the following reasons: (i) Defendants sold the Class Vehicles with a known Defect that violates both the letter and spirt of FMVSS 114 to which Kia and Hyundai's vehicles, including the Class Vehicles, are required to comply; (ii) despite their knowledge of this Defect, and the ever increasing safety risk they were presenting, Kia and Hyundai continued to sell the Class Vehicles without ever informing the Warranty Plaintiffs or the Class; and (iii) Kia and Hyundai cannot disclaim responsibility for a design defect that otherwise breaches the implied warranty of merchantability when the MMWA prohibits the disclaimer of these implied warranties.

496. On information and belief, however, Kia and Hyundai tailored their express warranty to their preferred distribution scheme—i.e., selling the Class Vehicles through authorized

113

dealers—in a calculated effort to insulate themselves from exposure by invoking an ostensible lack of privity between Kia/Hyundai, on the one hand, and Warranty Plaintiffs/the Class, on the other.

497. The MMWA prohibits a warrantor's ability to disclaim implied warranties, which can only be limited to the duration of an express warranty. As detailed herein, sufficient privity exists in this case to support implied warranty claims asserted by the Warranty Plaintiffs and the Class.

498. Should the Court rule otherwise, however, the Warranty Plaintiffs and the Class would be limited to asserting an express warrant claim, which would be limited by the purported disclaimers in Kia and Hyundai's respective written warranties. Such a scheme is unconscionable because it would allow Kia and Hyundai to evade the strictures imposed by the MMWA through a narrowly crafted express warranty used in conjunction with a distribution model that otherwise strips the Warranty Plaintiffs and the Class—the ultimate, end-users of the Class Vehicles—with remedies the MMWA otherwise contemplates. In effect, Kia and Hyundai get to decide whether they want to comply with a federal law, simply by choosing the manner in which they distribute their products and disclaiming in their written warranties the coverage that is otherwise available under an implied warranty.

499. The time limitations contained in Kia and Hyundai's respective warranty periods are also unconscionable and inadequate to protect the Warranty Plaintiffs and members of the Class.

500. Indeed, the manner in which Kia and Hyundai distribute their vehicles presents a variety of procedural and unconscionable elements whereby: (i) Kia and Hyundai offered the express warranties contained within their Warranties Booklets on a "tale-it-or-leave-it" basis; (ii) the Warranty Plaintiffs and the Class lacked a meaningful opportunity to negotiate or modify the terms of these warranties; (iii) a gross disparity of bargaining power existed between Kia/Hyundai and the

114

Class members; and (iv) Kia and Hyundai knew or should have known that the Class Vehicles contained the Defect at the time they were sold and leased, all while misrepresenting these vehicles as safe and secure. Accordingly, the warranties' limitations and exclusions therefore fail and are unenforceable pursuant to Wis. Stat. § 402.302(1).

501. As a direct and proximate result of the breach of these express warranties, the Warranty Plaintiffs and the Class have suffered damages, injury in fact, and ascertainable loss in an amount to be determined at trial, including but not limited to overpaying for the Class Vehicles, insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of their vehicles, the loss of use of their respective vehicles, costs associated with the replacement of the totaled Class Vehicles and/or the diminution in value of a stolen Class Vehicles that were not totaled.

502. Pursuant to Wis. Stat. § 402.719(2), the circumstances described herein caused Kia and Hyundai's exclusive or limited remedies to fail their essential purpose, such that the Warranty Plaintiffs and the Class may seek remedies as provided in Chapters 401 to 411 of the Wisconsin Statutes. Indeed, these warranties have denied the Warranty Plaintiffs and the Class the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever-present risk of them being stolen.

503. Further, Kia and Hyundai's exclusion and/or limitation of consequential damages in their New Vehicle Limited Warranties is unconscionable and void for the reasons stated above.

504. Accordingly, the Warranty Plaintiffs and the Class are entitled to damages flowing from Kia and Hyundai's breach of their express warranties, as well as all consequential and incidental damages resulting from this breach.

505. Prior to joining this lawsuit, the Warranty Plaintiffs notified Kia and Hyundai of the defective nature of the Class Vehicles and of Kia and Hyundai's breach of their express warranty within a reasonable time following the discovery of the Defect.

### COUNT II: BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Against Kia and Hyundai)

506. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

507. The Warranty Plaintiffs bring this claim on behalf of themselves and the Class.

508. As detailed herein, Kia and Hyundai designed, manufactured, distributed, and sold the Class Vehicles knowing that consumers such as the Warranty Plaintiffs would purchase these products from Kia and Hyundai's authorized dealers as a means of transportation.

509. As merchants of the Class Vehicles, Kia and Hyundai warranted to the Warranty Plaintiffs that the Class Vehicles were fit for the ordinary purpose for which they are used. *See* Wis. Stat. § 403.314(2)(c).

510. The Warranty Plaintiffs relied on this warranty to their detriment.

511. Indeed, the Class Vehicles, are not "merchantable" because they are not reasonably fit for the ordinary purpose for which they are sold, which is to provide *safe*, *reliable* transportation. Instead, the Class Vehicles pose a substantial safety hazard as the Defect renders them prone to being stolen, which makes them prime targets to be used as instrumentalities through which thieves engage in reckless driving or other criminal activity.

512. Sufficient privity of contract exists to assert this implied warranty claim.

513. Kia and Hyundai market and advertise the sale of their vehicles, including the Class Vehicles, in various media outlets across the United States, including to the Warranty Plaintiffs and the Class.

116

514.     A given consumer can go to Kia or Hyundai's website, obtain information about a vehicle in which he or she is interested; design a specific vehicle to meet his or her needs; obtain information about the value of his or her trade–in; request additional marketing materials; and obtain a quote for a vehicle in which he or she is interested. Kia and Hyundai provide this information, acting as a putative seller, and then send these consumers to one or more "authorized dealers" to assist in consummating a sale or lease

515.     On information and belief, Kia and Hyundai—in furtherance of their relationship with their respective dealers—each control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

516.     What is more, Kia and Hyundai advertise their authorized dealer network on their respective websites and task them with administering the promotional material and warranty information for new Class Vehicles to prospective consumers throughout the state.

517.     Relevant here, the Warranty Plaintiffs each purchased and/or leased their respective vehicles from the following "authorized dealers," with the understanding that these dealers were acting on behalf of Kia and Hyundai, respectively: Russ Darrow Kia of Wauwatosa (Chad and Amy); Rosen Kia (Lydia) and Boucher Hyundai of Waukesha (Chaid).

518. The sole and express purpose that each authorized Kia and Hyundai dealer has when it acquires the vehicles from Kia and Hyundai is to immediately re-sell them to the end-users.

519. Kia, Hyundai, and their respective dealers' acts thus create a justifiable belief on the part of the Warranty Plaintiffs that the dealers from which they purchased their vehicles were agents of Kia and/or Hyundai, which the Warranty Plaintiffs relied on to their detriment.

520. Consequently, each Kia and Hyundai dealership in Wisconsin—although incorporated and/or organized as a distinct entity—operates as the actual and/or apparent agent of the Defendant-manufacturers named herein, which satisfies the privity requirement.

521. As described above, the purchase and/or lease agreements between the Warranty Plaintiffs and their respective dealers were entered directly and primarily for Kia and Hyundai's benefit.

522. Likewise, any contract whereby Kia and Hyundai's authorized dealers acquire the Class Vehicles from Kia and Hyundai to resell to the end-user is also for the express benefit of Plaintiffs and the Class. On information and belief, Kia and Hyundai's authorized dealers make virtually no money on the actual sale or lease of new vehicles, including the Class Vehicles.

523. The Warranty Plaintiffs therefore have standing to assert implied warranty claims against Kia and Hyundai by virtue of their status as intended, third-party beneficiaries of these dealership sales agreements, which further satisfies the privity requirement. *See, e.g.*, *Sanchez–Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1234 (S.D. Fla. 2014) ("Literal privity can be finessed by a proxy: direct beneficiary or third-party beneficiary status.") (quoting *In re Masonite Corp. Hardboard Siding*, 21 F. Supp. 2d 593, 599 (E.D. La. 1998) (collecting cases).[68]

---

[68] *Accord Mosqueda v. Am. Honda Motor Co., Inc.*, 443 F. Supp. 3d 1115, 1128 (C.D. Cal. 2020) (noting "the clear

118

524.     Additionally, the Magnuson–Moss Warranty Act ("MMWA") specifies that when a manufacturer offers a written warranty, it may limit the duration of an implied warranty to the duration of an express warranty, *but it cannot* disclaim implied warranties all together. *See* 15 U.S.C. § 2308(a) ("No supplier may disclaim or modify . . . any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer Product. . . .").

525.     If the MMWA prohibits a manufacturer that offers an express warranty from disclaiming implied warranties, it follows that a manufacturer cannot avoid this prohibition by offering an express warranty that disclaims coverage that would otherwise fall within the ambit of an implied warranty it cannot disclaim simply by selecting a distribution model that allows it to skirt implied warranties by claiming an ostensible lack of privity.

526.     The purchase and/or lease agreements the authorized dealers provided to the Warranty Plaintiffs and members of the Class furnished the underlying consideration to Kia and Hyundai for their express warranties; privity thus exists between Kia and Hyundai on the one hand, and the Warranty Plaintiffs and the Class on the other by virtue of the express warranties provided through these purchase and/or lease agreements.

527.     Moreover, imposing a rigid privity requirement in this case would permit Kia and Hyundai to escape both the letter and spirit of the MMWA through their preferred distribution

---

weight of authority [which] compels a conclusion that where plaintiffs successfully plead third–party beneficiary status, they successfully plead a breach of implied warranty claim") (collecting cases); *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 845 (S.D. Ohio 2012) ("Where an automobile manufacturer, through its authorized dealer, issues to a purchaser of one of its new automobiles from the dealer a warranty as part of the sale, certainly an implied warranty of merchantability is in effect despite the lack of actual privity.")

scheme; one in which the only parties in strict privity that can assert an implied warranty claim are the Kia and Hyundai dealers who would never need to assert the claim in the first instance.

528.    Consequently, any rigid application of a state law privity requirement would violate the Supremacy Clause and be preempted. *See* U.S. Const. art. VI ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

529.    As a direct and proximate result of the breach of these express warranties, the Warranty Plaintiffs and the Class have suffered damages, injury in fact, and ascertainable loss in an amount to be determined at trial, including but not limited to overpaying for the Class Vehicles, insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of their vehicles, the loss of use of their respective vehicles, costs associated with the replacement of the totaled Class Vehicles and/or the diminution in value of the stolen Class Vehicles that was were totaled.

530.    Pursuant to Wis. Stat. § 402.719(2), the circumstances described herein caused Kia and Hyundai's exclusive or limited remedy to fail its essential purpose, such that the Warranty Plaintiffs and the Class may seek remedies as provided in Chapters 401 to 411 of the Wisconsin Statutes. Indeed, these warranties have denied the Warranty Plaintiffs and the Class the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever-present risk of them being stolen.

531.    Further, Kia and Hyundai's exclusion and/or limitation of consequential damages in their New Vehicle Limited Warranties is unconscionable and void for the reasons stated above.

120

532.    Accordingly, the Warranty Plaintiffs and the Class are entitled to damages flowing from Kia and Hyundai's breach of their implied warranties, as well as all consequential and incidental damages resulting from this breach.

533.    Prior to joining this lawsuit, the Warranty Plaintiffs notified Kia and Hyundai of the defective nature of the Class Vehicles and of Kia and Hyundai's breach of the implied warranty of merchantability within a reasonable time following the discovery of the Defect.

### COUNT III: VIOLATION OF MAGNUSON MOSS WARRANTY ACT, 15 U.S.C. §§ 2301 *ET SEQ.*
### (Against Kia and Hyundai)

534.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

535.    The Warranty Plaintiffs bring this claim on behalf of themselves and the Class.

536.    In 1975, Congress enacted the MMWA, 15 U.S.C. §§ 2301 *et seq.*, to address the widespread misuse of merchants' express warranties and to protect consumers from deceptive warranty practices. To that end, the MMWA imposes civil liability on any "warrantor" for failing to comply with any obligation under a written or corresponding implied warranty. *Id.* § 2310(d)(1).

537.    The Class Vehicles are "consumer products" as defined in 15 U.S.C. § 2301(1).

538.    The Warranty Plaintiffs and members of the Class are "consumers" as defined in 15 U.S.C. § 2301(3).

539.    Kia and Hyundai are "suppliers" and "warrantors" as those terms are defined in 15 U.S.C. § 2301(4) & (5), respectively.

540.    In connection with the sale and/or lease of the Class Vehicles, Kia and Hyundai supplied the Warranty Plaintiffs and the Class with "written warranties" as that term is defined in 15 U.S.C. § 2301(6).

121

541.    15 U.S.C. § 2310(d)(1) provides that "a consumer who is damaged by the failure of the supplier, warrantor, or service contractor to comply with any obligation under [the MMWA], or a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any state."

542.    As detailed above, Kia and Hyundai expressly warranted that the Class Vehicles were high quality, properly designed, in conformance with applicable federal standards, and at a minimum, would work properly.

543.    But Kia and Hyundai breached these express warranties because the Defect at issue was present in the Class Vehicles at the time of sale and/or lease, Kia and Hyundai knew that Defect was present at the time of sale and/or lease and that these antitheft systems failed to comply with FMVSS 114, and Kia and Hyundai did not disclose or repair the Defect prior to each sale or lease of the Class Vehicles.

544.    Kia and Hyundai also breached these express warranties (and continue to do so) because they wrongfully, uniformly, and repeatedly refuse to cover the Defect under their respective warranties, thus forcing Warranty Plaintiff and the Class to pay for any repairs attendant to the theft of the Class Vehicles and/or outfit their vehicles with sufficient antitheft measures that Kia and Hyundai were required to install in the first instance.

545.    Even if Kia and Hyundai covered these repairs under their express warranties, however, the remedy therein would fail its essential purpose because they would merely replace defective parts with equally defective parts containing the same Defect. As such, these warranties have denied the Warranty Plaintiffs and the Class the benefit of their respective bargains, which

presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever-present risk of them being stolen.

546. Further, as detailed herein, the additional disclaimers and/or limitations incorporated into Kia and Hyundai's respective warranties—including but not limited to the warranties' durational limits and limitations on incidental and consequential damages—are unconscionable as a matter of law. (*See* ¶¶ 499-504, *supra*.)

547. Indeed, at the time Kia and Hyundai issued written warranties for the Class Vehicles, they knew and had notice that these automobiles failed to comply with FMVSS 114 and otherwise presented a significant safety risk. Their continued misrepresentations and omissions regarding the Class Vehicles, as well as their failure to abide by their own written and implied warranties, are "[u]nfair methods of competition in or affecting commerce, and [are] unfair or deceptive acts or practices in or affecting commerce." Accordingly, Kia and Hyundai's behavior also is unlawful under 15 U.S.C. §§ 2310(b), 45(a)(1).

548. Warranty Plaintiffs used their respective Class Vehicles in a manner consistent with their intended use and performed every duty required of them under the terms of the warranty, except as may have been excused or prevented by Kia and Hyundai's conduct or by operation of law in light of their unconscionable conduct as described herein.

549. Warranty Plaintiffs and the Class seek to recover damages resulting directly from Kia and Hyundai's breach of their written and implied warranties, as well as their deceitful and unlawful conduct, including but not limited to overpaying for the Class Vehicles, insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of their vehicles, the loss of use of their respective vehicles, costs associated with the

123

replacement of the totaled Class Vehicles and/or the diminution in value of a stolen Class Vehicle that was not totaled.

550.    The MMWA also permits "other legal and equitable" relief. 15 U.S.C. § 2310(d)(1). Accordingly, Warranty Plaintiffs seek reformation of Kia and Hyundai's respective written warranties to comport with their obligations under the MMWA and with consumers' reasonable expectations. Further, Warranty Plaintiffs seek to enjoin Kia and Hyundai from acting unlawfully as further alleged, including discouraging them and other consumers to seek all available remedies.

551.    Finally, the MMWA also provides for an award of costs and expenses, including attorneys' fees, to prevailing consumers in the Court's discretion. 15 U.S.C. § 2310(d)(2). Warranty Plaintiffs intend to seek such an award as prevailing consumers at the conclusion of this case.

552.    Prior to joining this action, the Warranty Plaintiffs satisfied all jurisdictional prerequisites to bring this MMWA class action.

553.    Specifically, in August 2020, they each sought to avail themselves to Kia and Hyundai's dispute resolution procedure set forth in Kia and Hyundai's respective written warranties by filing a claim with BBB Auto Line. 15 U.S.C. § 2310(3)(C)(ii). Ultimately, however, BBB Auto Line rejected the Warranty Plaintiffs' attempt to avail themselves of this ADR mechanism, of which Kia and Hyundai were aware. *See* 16 C.F.R. § 703.5(b) ("Upon notification of a dispute, [BBB Auto Line] shall immediately inform both the warrantor and the consumer of receipt of the dispute.")

554.    Warranty Plaintiffs then furnished copies of their respective rejection letters to Kia and Hyundai and again requested these defendants to entertain a pre-suit resolution. Kia rejected these overtures outright; Hyundai ignored Chaid's request for thirty days, only to feign ignorance about the problem and re-request the same information that Chaid submitted to BBB Auto Line

in August, which violated its obligations under the MMWA. 16 C.F.R. § 703.2(d) ("The warrantor shall proceed fairly and expeditiously to attempt to resolve all disputes submitted directly to the warrantor."). Thus, the Warranty Plaintiffs informed Kia and Hyundai that they intended to vindicate their rights in a class action as the MMWA requires.

## COUNT IV: CONTRACTUAL/EQUITABLE RESCISSION
### (Against Kia and Hyundai)

555.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

556.    Amy brings this claim individually and on behalf of the Ongoing User Subclass.

557.    The MMWA permits Amy and other members of the Ongoing User Subclass to seek "other legal and equitable" relief as needed to do substantial justice. 15 U.S.C. § 2310(d)(1).

558.    As detailed herein, Amy purchased a 2021 Kia Sportage from an authorized Kia dealership in January 2021.

559.    Her 2021 Sportage, like so many other Class Vehicles, contains a Defect, which leaves it more prone to being stolen, as the sheer number of stolen Kias and Hyundais equipped with the same Defect—both in Wisconsin and throughout the country—demonstrates.

560.    As detailed above, Kia and Hyundai's failure to remedy this Defect breaches various express and implied warranties, which are cognizable under state law and the MMWA.

561.    Even if Kia and Hyundai were willing to remedy this Defect, however, their repair or replacement remedy would entail replacement of the defective parts with the same defective parts. Indeed, like so many other Class Vehicles, Amy's Sportage was stolen and "repaired" using the same Kia parts that do nothing to mitigate the possibility that her automobile will be stolen again.

125

562.     Under the Uniform Commercial Code, a buyer may revoke acceptance of goods once the defect is discovered "and before any substantial change in condition of the goods which is not caused by their own defects."  Wis. Stat. § 402.608(2).

563.     Amy sought to do precisely that, notifying Kia of her request to revoke acceptance of her Sportage on October 1, 2021 after her request to arbitrate this dispute through BBB Auto Line, in conformance with Kia's Warranty, was rejected.

564.     Although Amy purchased her Sportage through a Kia authorized dealer, Amy directed her letter to Kia because the law contemplates that it is ultimately responsible for the Defect. *See*, *e.g.*, *id.* § 218.0171 (explaining that new car buyers and lessees should direct their request for a refund to the manufacturer directly, not the dealer); *cf. id.* § 218.0128 (obligating manufacturers to indemnify dealers in connection with product defect claims).[69]

565.     Ultimately, however, Kia rejected Amy's revocation of acceptance of her vehicle, thus prompting this claim for rescission.

566.     As Amy explained in her October 1st letter to Kia, although she will attempt to limit her use of the Sportage, she needs to use the vehicle out of necessity and will continue to make payments to Kia's affiliate, HCA, under protest.

567.     Indeed, the 2021 Sportage is her only vehicle, which she needs for transportation and because it is upside down, she does not currently have the means to simply dispose of it.

568.     Although Amy promptly gave notice of her claim, which is generally a prerequisite under the Uniform Commercial Code to revoke acceptance, class wide relief for the ongoing users

---

[69] Because Amy's 2021 Sportage was not out of service for more than thirty days, she could not simply avail herself of the procedures in Wisconsin's Lemon Law to tender back the vehicle to Kia. Regardless, the point is that it is ultimately the manufacturer's responsibility to address this problem.

126

of Kia and Hyundai's vehicles is nonetheless appropriate given their bad faith conduct, as detailed herein. Specifically, Kia and Hyundai's fraudulent concealment of the Defect in the Class Vehicles—while simultaneously marketing and selling them as safe and durable, which they continue to do—equitably estops them from invoking this notice requirement vis-à-vis the absent members of the Class.

569.     Blackletter principals of equity likewise permit rescission under the circumstances presented in this case. *See, e.g., CMFG Life Ins. Co. v. RBS Securities Inc.*, No. 12-cv-037-wmc, 2013 WL 4483068, *1, *4 (W.D. Wis. Aug. 19, 2013) ("Under Wisconsin principles of equity, a party induced to enter into a contract by the other party's misrepresentation may unilaterally rescind the contract if three essential elements are shown: (1) a misrepresentation of fact; (2) that was material or fraudulent; (3) upon which the recipient justifiably relied.") (collecting cases).

570.     As detailed above, in January 2021 when Amy purchased her new Sportage, the MPD was already "sounding the alarm" about the rash of auto thefts affecting the Class Vehicles.

571.     For more than a decade prior to Amy consummating this purchase, however, Kia and Hyundai were actively and/or constructively aware of the Defect in the Class Vehicles; their failure to comply with the letter and spirit of FMVSS 114; and the inherent safety risks presented by the deficient antitheft systems with which they nonetheless equipped these automobiles.

572.     What is more, even if one ignores their decades of knowledge about this safety issue, Kia and Hyundai were acutely aware of this problem at the time Amy purchased her Sportage in January 2021. Indeed, on information and belief, Russ Darrow—the authorized Kia dealership from which Amy bought her car—was simultaneously repairing dozens of stolen Kias while continuing to market and sell their cars off the lot.

127

573.    Kia was acutely aware of this crisis because it was, on information and belief, supplying the same replacement parts to its authorized dealers—either directly or through one or more affiliates designated as Fictitious Defendants herein—to fix these stolen Class Vehicles.

574.    On information and belief, however, Kia and Hyundai instructed their authorized dealers to stay silent and continue selling the cars off their lot, despite the fact that these dealers—who tethered their financial livelihoods to the Kia and Hyundai brand—were praying amongst themselves that Kia and Hyundai would fix the Defect.

575.    Indeed, the Safety Act *required* Kia and Hyundai to take these steps once they knew of this problem and before their authorized dealers could sell or lease these new Class Vehicles, including Amy's 2021 Sportage. 49 U.S.C. § 30116.

576.    Thus, setting aside that these vehicles should not have even been sold, *see id.*, this means that, at an absolute minimum, Kia was obligated to disclose this information to Amy—and other members of the Ongoing User Subclass—so they could make an informed purchasing decision. (*See, e.g.*, ¶¶ 608–632, *infra*, which is incorporated herein by reference.) The same holds true with Hyundai whose new Class Vehicles are equipped with the same Defect that, on information and belief, was designed by HATCI. (*See id.*)

577.    Kia and Hyundai's omission of this material information—coupled with the affirmative misrepresentations in their marketing materials touting the safety and design of the Class Vehicles, including Amy's Sportage—amount to misrepresentations of fact.

578.    Indeed, for decades Kia and Hyundai had special knowledge about this information, which neither Amy nor the Class possessed. And by January 2021, it cannot be credibly disputed that Defendants knew precisely how the crisis described herein was unfolding (the Defect) yet

128

concealed this information from Amy and the Ongoing User Subclass while misrepresenting the Class Vehicles' safety and efficacy.

579. After a thorough investigation, the publicly available information to date reveals that Kia and Hyundai's omissions and misrepresentations were fraudulent. At an absolute minimum, however, they were material.

580. Indeed, Amy and the members of the Ongoing User Subclass each purchased and/or leased their vehicles believing they were equipped with reasonable safety measures and none of them—or any prospective consumer for that matter—would have purchased or leased their respective vehicles had they known they could be stolen in a matter of minutes (by a teenager with a screwdriver, no less).

581. Further, Amy and other members of the Ongoing User Subclass justifiably relied on these material misstatements and omissions to their detriment; Amy, like so many other unwitting members of the Class, are now saddled with a Class Vehicle that is continuously at risk of being stolen, thereby compromising her safety as well as those placed in harm's way whenever this occurs.

582. Accordingly, under the Uniform Commercial Code and settled principles of equity, Amy and the members of the Ongoing User Subclass are entitled to rescind their respective purchase and/or lease agreements with Kia and Hyundai—the parties ultimately responsible for this crisis

## COUNT V: UNJUST ENRICHMENT
### (Against All Defendants)

583. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

584. Plaintiffs bring this claim on behalf of themselves and the Class.

585. This claim is pleaded in the alternative to any contract-based claims asserted by the Warranty Plaintiffs noted above. *See* Fed. R. Civ. P. 8(d)(2). Further, Plaintiffs and the Class can

129

maintain a claim for unjust enrichment where, as here, Kia and Hyundai contend that their warranties do not cover damages stemming from the Defect.[70]

586.   Chaid, Chad, Amy, Lydia bought and/or leased their vehicles new, directly from a Kia or Hyundai dealership.

587.   Every year, Kia and Hyundai make millions of dollars in revenue selling and leasing new vehicles through their respective dealer networks across the United States.

588.   On information and belief, no consumer is permitted to buy a car directly from Kia and Hyundai, but the proceeds flow through various dealers and/or related companies (e.g., their finance companies) back to Kia and Hyundai as noted above.

589.   Accordingly, the purchase and lease of new Kias and Hyundais confers a direct monetary benefit on each of these entities; this is how these companies make their revenue.

590.   As used car buyers, Stefanie and Katie also conferred an immense benefit on Kia and Hyundai. Indeed, on information and belief, as long as these vehicles are on the road and remain in the stream of commerce, Kia and Hyundai—either directly, or through one or more affiliate companies named as Fictitious Defendants herein—profit off the replacement parts to service these vehicles.

591.   Further, as more used Kias and Hyundais stay in the stream of commerce, it promotes each Defendant's brand awareness, of which they have been particularly keen to advertise.

---

[70] *See, e.g., In re FCA US LLC Monostable Elec. Gearshift Litig.*, 446 F. Supp. 3d 218, 228–29 (E.D. Mich. 2020) (permitting plaintiff to plead unjust enrichment in the alternative where there was a dispute over whether defendant's warranty covered the alleged defect); *Tershakovec v. Ford Motor Co.*, No. 17–21087–CIV–MORENO, 2018 WL 3405245, at *13–14 (S.D. Fla. July 12, 2018), (same); *Lilly v. Ford Motor Co.*, No. 00 C 7372, 2002 WL 84603, at *6 (N.D. Ill. Jan. 22, 2002) (same).

130

592.    Indeed, Kia and Hyundai directly leverage the ongoing use and utility derived from their used vehicles, including the Class Vehicles, staying in the stream of commerce; for no less than a decade, Kia and Hyundai have touted their vehicles as not only reliable and durable, but also as having lower depreciation rates and ownership costs over their useful lives.[71]

593.    Kia and Hyundai tout these benefits for one (monetary) reason: to promote the sale and lease of their new cars, which naturally redounds to their pecuniary benefit.

594.    On information and belief, HATCI also obtained a benefit on behalf of Plaintiffs purchase/lease of Kia and Hyundai vehicles, as the *sine qua non* of HATCI's business is designing the very vehicles then marketed, sold, and placed in the stream of commerce by Kia and Hyundai. On information and belief, HATCI generates millions in revenue, albeit indirectly, from the sale of these vehicles.

595.    Accordingly, Plaintiffs and the Class conferred a benefit upon Defendants, whether directly, indirectly, or through one or more affiliate entities named as Fictitious Defendants herein.

596.    Defendants' corporate structure and distribution network also means that they each had knowledge and appreciated the benefits conferred upon them through the sale of the Class Vehicles to Plaintiffs and members of the Class.

597.    Indeed, they know who buys or leases new vehicles, as they are often financed through HCA doing business as Kia Motor Finance or Hyundai Motor Finance.

598.    Additionally, federal law mandates that Kia and Hyundai maintain records of first-time purchasers of Class Vehicles, *see* 49 U.S.C. § 30117(b), and remain able to identify the owners

---

[71] *See* James Bell & James Hope, "Kia Sweeps IntelliChoice CPO Awards," KIA MEDIA, https://www.kiamedia.com/us/en/media/pressreleases/15857/kia-sweeps-intellichoice-cpo-awards (Dec. 19, 2019); *see also* Trainor, note 8, *supra*.

of their used cars, including the owners of certain Class Vehicles, to comply with recall notification procedures under applicable law. *See id.* § 30119(d)(1)(A).

599. Applied here, Defendants acknowledged and appreciated the benefits conferred upon them by Chaid, Chad, Amy, and Lydia because they either financed their vehicles through HCA or are first time purchasers for whom Defendants maintain certain records from their authorized dealers.

600. Further, Defendants acknowledged and appreciated the benefits conferred upon them by Stefanie, Katie, and other used car owners in the Class because they are required to identify these car owners to comply with certain mandates under federal law.

601. For over a decade, Defendants have represented to the consuming public that the Class Vehicles are safe, reliable, and durable despite their actual and/or constructive knowledge of the Defect. As detailed herein, not only did they fail to equip the Class Vehicles with basic anti–theft measures despite acknowledging their utility for more than a decade, but the deficient measures they did equip on the Class Vehicles do not even comply with FMVSS 114.

602. As a result, unsuspecting consumers, like Plaintiffs and the Class, bought these vehicles for more than they were worth and have been forced to pay other costs, while Defendants concealed the defects, thereby earning more profit.

603. What is more, Defendants have continued to design, market, and sell these Class Vehicles despite the shocking uptick in theft data described above, which gave them actual or constructive knowledge that the Class Vehicles were unsafe and susceptible to theft.

604. And with thousands of Class Vehicles on the road, Defendants have further benefited by foisting the cost they would otherwise bear by proactively implementing a procedure to

redress this harm—through a voluntary recall or otherwise—on Plaintiffs, the Class, and the community at large.

605.    Under these circumstances, it would be unjust to allow Defendants to accept and retain the benefits identified herein without paying Plaintiffs and the Class them for their value

### COUNT VI: STATUTORY FRAUD IN VIOLATION OF WIS. STAT. §§ 895.446 & 943.20(1)(d)
### (Against All Defendants)

606.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

607.    Plaintiffs bring this claim on behalf of themselves and the Class.

608.    It is axiomatic that as manufacturers, importers, and/or distributors of their respective vehicles, Kia and Hyundai—both individually and/or through one or for Fictitious Defendants—have a duty to design and sell reasonably safe products.

609.    Part and parcel of this obligation is the duty to provide consumers with sufficient information about the safety of these vehicles, so that they can make an informed purchasing and/or leasing decision. Nor is this duty eliminated once the transaction is consummated; indeed, state statutes, federal statutes, and the common law impose on Kia and Hyundai an unflagging obligation to inform consumers about safety issues with a given vehicle (or vehicle lines) once Defendants become aware of a problem.

610.    Indeed, as the parties with superior knowledge about the manufacturing and design of the Class Vehicles—including problems that arise once these vehicles enter the stream of commerce—ordinary consumers, including Plaintiffs and the Class, are necessarily reliant on Defendants to keep them abreast of any safety-related issues about the vehicles Defendants sell given this asymmetry of information.

133

611.    Indeed, consistent with this reality, the Safety Act obligates manufacturers and distributors to either repurchase or repair any new vehicle in a dealer's possession before it is sold or leased to an end user if "it is decided [that the vehicle] contains a defect related to motor vehicle safety or does not comply with applicable motor vehicle safety standards prescribed under" the Safety Act. 49 U.S.C. § 30116.

612.    Likewise, the Safety Act also imposes on Defendants (*see* n.57, *supra*) the obligation to notify their "owners, purchasers, and dealers," amongst others, when they: (i) "learn[ ] the vehicle or equipment contains a defect and decide[ ] in good faith that the defect is related to motor vehicle safety; or (ii) decide[ ] in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard prescribed under" the Safety Act. 49 U.S.C. § 30118(d).

613.    Apart from these federally prescribed duties, the MVDL prohibits any "licensee," which includes Kia and Hyundai, from, amongst other misconduct: (i) willfully defrauding any retail buyer or lessee; (ii) engaging in fraudulent sales, consumer leases, or any other transaction; and (iii) making any "fraudulent misrepresentation, circumvention or concealment through whatsoever subterfuge or device of the material particulars" related to the retail purchase or lease of their vehicles. *See* Wis. Stat. §§ 218.0116(c), (dm), (e).

614.    A seller's obligation to inform a consumer about material issues related to his or her contemplated purchase of a product—like an unreasonable safety risk—is also deeply rooted in the common law. Indeed, the Wisconsin Supreme Court has held that a duty to disclose arises when: (i) the fact is material to the transaction; (ii) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (iii) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be

expected to discover it; and (iv) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact." *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 20, 283 Wis.2d 555, 699 N.W.2d 205.

615. The Restatement of Torts, on which Wisconsin courts repeatedly turn for guidance, has also embraced a seller's duty to disclose in the following situations:

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts, § 551.

616. Thus, when a duty to disclose arises, a seller's failure to disclose (or to make full disclosure) is actionable; a conclusion that, as the Wisconsin Court of Appeals recently explained, applies with equal force to indirect misrepresentations. *See Pagoudis v. Keidl*, 2021 WI App 56, ¶ 27, 399 Wis. 2d 75, 963 N.W.2d 803 (noting that "under some circumstances, a seller may be liable to a third party for *indirect misrepresentations* causing pecuniary loss") (emphasis in original) (citing Restatement (Second) of Torts, § 533).

617. Applied here, pursuant to FMVSS 114, Defendants were required to outfit their vehicles with safety measures to curb specific cases of auto theft through technology ████

135

██████████████████████████████████████████████████████████

████████████████████████████ .

618.    Defendants have been aware of the benefits of this technology for more than a decade. Indeed, since no later than 2007, in various Petitions for exemption from the PMR—albeit, only for a discrete subset of their luxury model lines—Defendants extoled the benefits of immobilizer technology as a way to substantially reduce or eliminate easy cases of auto theft.

619.    However, despite the utility and ubiquity of this technology—as evidenced by the litany of automotive manufacturers that have equipped immobilizers as a standard feature and obtained an exemption from the PMR because of it (*see* ¶ 119, *supra*)—Defendants failed to incorporate this technology as a standard feature into virtually every other vehicle line except for its high-end models, including the vehicles owned by Plaintiffs and the Class.

620.    █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

621.    In the years subsequent to this change, thefts of Kias and Hyundais saw a marked uptick around the country, ultimately culminating in the very auto theft "epidemic" plaguing metropolitan Milwaukee.

622.    For instance, no later than 2013, the Hyundai Elantra was the sixth most stolen new vehicle in America. And as the NICB's Hot Wheels Reports reveal, the thefts of Defendants vehicles, including the Class Vehicles, has increased dramatically since that time.

136

623.    Defendants were actually or constructively aware of the Defect present in the Class Vehicle that was making them such an easy target for thieves; knowledge of which they learned from a variety of sources, including, on information and belief: (i) NCIC crime data; (ii) their interaction with, and study of, what other manufacturers were doing to reduce auto theft; (iii) their interaction with NHTSA and law enforcement; (iv) reports from various media outlets; (v) their interaction, through one or more affiliates (e.g., their respective financing arms), with the insurance companies of the victims of these auto thefts; and (vi) the increase in component parts that they, through one or more affiliates, were supplying to authorized dealers and autobody shops around the country that were tasked with fixing stolen vehicles once they were recovered.

624.    Despite the wealth of data demonstrating this growing safety risk, however, Defendants did nothing to ameliorate this problem. They never informed the current owners, including Plaintiffs and the Class, of the safety risk their vehicles posed; they continued to sell and lease the Class Vehicles without ever informing prospective customers of the heightened safety risk posed by purchasing a standard keyed ignition vehicle without an immobilizer; and until recently, they never modified the design of these vehicles to account for this Defect, such as by making immobilizer technology standard across all vehicle lines.

625.    Quite the opposite, actually: Kia and Hyundai—through a variety of marketing campaigns disseminated in various media (on their website, in vehicle brochures, on television, and through various press releases, to name a few)—consistently touted the safety, reliability, and durability of their vehicles that Kia and Hyundai owners would come to enjoy in the years following their purchase or lease.

626.    HATCI was actively complicit in this activity, and despite being aware of the increased thefts of the Class Vehicles it designed, it continued to approve of a design that contained the Defect, thereby exposing Defendants' customers to an unreasonable risk of harm.

627.    Given the duties noted above, it follows that each time a new or used Kia or Hyundai was sold, Defendants were representing to prospective customers—both directly and indirectly—that these Kia or Hyundais, including the Class Vehicles, were safe.

628.    Indeed, Plaintiffs each purchased and/or leased their vehicles believing they were equipped with reasonable safety measures and none of them—or any prospective consumer for that matter—would have purchased or leased their respective vehicles had they known they could be stolen in a matter of minutes (by a teenager with a screwdriver, no less).

629.    In other words, the ease with which the Class Vehicles could be stolen—including the vehicles that Plaintiffs bought and/or leased—was a fact so "basic to the transaction" that Defendants were obligated to disclose it; Defendants' failure to do so thus amounts to an affirmative representation that—consistent with their marketing literature—Kias and Hyundais were safe, reliable vehicles with technology on par with what other manufacturers were doing to prevent such easy cases of auto theft.

630.    As detailed herein, at the time Defendants made these representations to each Plaintiff, as well as those to the Class, Defendants knew they were false or they made them recklessly, without caring whether they were true or false.

631.    Defendants made these representations—both directly and indirectly—to deceive and defraud Plaintiffs and the Class; their intent can be readily gleaned from their NHTSA Petitions, in which they recognized years before selling each of the Class Vehicles that immobilizers would prevent

138

the very safety risk posed by the absence of this equipment; a problem that was further exacerbated ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.

632. Further, each Plaintiff, as well as each Class member, was misled by Defendants' failure to disclose this information, especially when coupled with Kia and Hyundai's marketing materials to the contrary, which touted the safety and design of the Class Vehicles.

633. Plaintiffs and the Class members relied on the absence of this information to their detriment, mistakenly believing—as a direct result of Defendants' fraudulent conduct—that their respective vehicles had basic theft protection mechanisms, which were otherwise commonplace in the industry and employed by virtually all author manufacturers, including—on information and belief—all of Defendants' competitors.

634. As a result of this fraudulent scheme, Plaintiffs and the Class paid money for their respective Class Vehicles, which ultimately redounded to Defendants' pecuniary benefit.

635. Regarding Chad, Chaid, Amy, and Lydia—the buyers and lessees of new Class Vehicles—Defendants benefited because, on information and belief, Kia and Hyundai received the proceeds from each sale, either directly or indirectly, through the floorplan financing relationship that its authorized dealers maintain with Kia/Hyundai and HCA, which serves as the financing arm for these dealerships.

636. Likewise, HATCI indirectly benefited from these sales because, on information and belief, it is funded by, and/or receives proceeds from, the sale and lease of new vehicles to maintain its operations as the American design center for Kia and Hyundai's respective vehicle lines.

637. Regarding Stefanie, Katie, and other buyers of used Class Vehicles, Defendants also financially benefited from this fraudulent scheme. Indeed, they each paid money to buy a Class Vehicle, which provided immense financial benefits to Defendants.

638. First, Kia and Hyundai—either directly or through one or more affiliate companies named as Fictitious Defendants herein—profit off the replacement parts to service for these used Class Vehicles; the longer these autos stay in the stream of commerce, the more money Kia and Hyundai make.

639. Thus, each time Stefanie, Katie, or any member of the Class who owns a used Kia or Hyundai had his or her vehicle serviced, they paid money for parts that, on information and belief, ultimately made its way back to Defendants.

640. Second, Defendants directly leveraged the ongoing use and utility derived from their used vehicles, including the Class Vehicles, that stay in the stream of commerce; for no less than a decade, Kia and Hyundai have touted their vehicles' as not only reliable and durable, but as also being more valuable assets given the ostensibly lower depreciation rates and ownership costs over their useful lives.

641. Kia and Hyundai's purpose in advertising this information was not only to increase their brand awareness but promote the sale of their new vehicles; in turn, this allowed them to, on information and belief, charge more for their new vehicles because these assets ostensibly held their value better than those of Defendants' competitors.

642. Further, apart from the proceeds they indirectly derived from the sale of used Class Vehicles, Kia and Hyundai made misrepresentations to the original purchasers of these automobiles, as described above. Indeed, on information and belief, when these cars were originally sold, the

140

brochures accompanying the sale of Stefanie and Katie's new vehicles—a 2012 Kia Optima and 2013 Hyundai Sonata, respectively—both touted the safety and design of each vehicle, while never mentioning the possibility of adding an immobilizer as an upgrade to protect against auto-theft.

643. Even after each vehicle was sold, however, Defendants failed to disclose the Defect to each vehicle's then-current owner, even though thefts of the Hyundai Sonata (in particular, the 2013 model year) were markedly increasing throughout the country.

644. On information and belief, as the 2012 Kia Optima is equipped with the same standard key ignition system as the Sonata, the Elantra, and Hyundai's other model lines, the increase in thefts put all Defendants on actual and/or constructive notice of this problem across all their vehicle lines equipped with the same Defect.

645. Nonetheless, Defendants remained silent and failed to address the problem, thereby keeping these unsafe vehicles in the stream of commerce and ultimately foisting this liability on Stefanie, Katie, and other similarly situated members of the Class.

646. As a result, Defendants conspired to violate Wis. Stat. § 943.20, which vests Plaintiffs and the Class with a claim under Wis. Stat. § 895.446 because they "suffered damage or loss by reason of this intentional conduct."

647. Plaintiffs and the Class have been damaged as a result of this fraudulent scheme in an amount to be determined at trial. Specifically, they have suffered significant damages including but not limited to overpaying for the Class Vehicles, insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of their vehicles, the loss of use of their respective vehicles, costs associated with the replacement of the totaled Class Vehicles and/or the diminution in value of a stolen Class Vehicle that was not totaled.

141

648.     In accordance with Wis. Stat. § 895.446, Plaintiffs and the Class also seek exemplary damages, attorneys' fees, and all costs of the investigation and litigation that were reasonably incurred as a result of Defendants' misconduct.

### COUNT VII: STATUTORY VIOLATION OF WIS. STAT. § 100.18
### (Against All Defendants)

649.     Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

650.     Chaid, Chad, Amy and Lydia (hereafter, the "DATCP Plaintiffs" for purposes of this Count) bring this claim on behalf of themselves and the Class.

651.     Section 100.18 of the Wisconsin Statutes ("Section 100.18") prohibits a company from making false, deceptive, or misleading advertisements to the public, which are designed to sell the company's products. The statute states in pertinent part that:

> [N]o person, firm, corporation or association, . . . with intent to sell, distribute, increase the consumption of or in any wise dispose of any . . . merchandise . . . or anything offered by such person, firm, corporation or association, . . . directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any . . . merchandise, . . . shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, . . . an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such . . . merchandise, . . . or to the terms or conditions thereof, which . . . contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Wis. Stat. § 100.18(1).

652.     In promoting the Class Vehicles to the public, Kia and Hyundai engaged in a multi-year, multi-faceted, advertising campaign—through their websites, social media outlets, television commercials, and vehicle brochures, to name a few—to the DATCP Plaintiffs and other members of the Class, through which Kia and Hyundai touted the safety and design of the Class Vehicles;

142

repeated proclamations about their respective automobiles, which they also claimed to stand behind pursuant to their self-professed, industry-leading warranties.

653. On information and belief, HATCI, as Kia and Hyundai's joint-design center, directly or indirectly assisted in these promotional efforts, including as it specifically relates to the representations made about the design and technological features with which the Class Vehicles were equipped.

654. On information and belief, Defendants' advertising and marketing materials originated from Defendants' respective headquarters in California and Michigan, which were then disseminated to consumers throughout the United States, including in Wisconsin to the DATCP Plaintiffs and other members of the Class.

655. For example, Kia and Hyundai's vehicle brochures are distributed to their authorized dealerships located throughout Wisconsin, which are then used to promote the sale and lease of the Class Vehicles to the DATCP Plaintiffs and other members of the Class.

656. Likewise, Kia and Hyundai's consumer-facing websites are viewable with a click of a button to any prospective purchaser and/or lessee; consumers who are then directed by Kia and Hyundai to a specific authorized dealer to buy or lease the vehicle of their choice.

657. Pursuant to this marketing campaign, prospective consumers interested in a Kia or Hyundai—including the DATCP Plaintiffs and members of the Class—are led to believe that Defendants place an emphasis on their customers' safety through well-designed vehicles equipped with advanced technological features and backed up by an unparalleled product warranty. As detailed above and in the corresponding exhibits, Defendants have maintained a consistent refrain about these issues, with statements such as:

- "*Advanced sensor systems, breakthroughs in materials and design that have led to strong body construction, and a range of active safety features are just a few of the ways Kia never stops working to help increase your protection.*" (Ex. E, ¶ 9.)

- "*Safety never takes a day off.*" (*Id.*)

- "*At Kia, the priority is always on improving all aspects of safety.*" (*Id.* ¶ 10.)

- "*We never stop striving to bring the latest life–enhancing innovations in technology to our design process, and people like Sean Patterson are driven by the same mission.*" (*Id.* ¶ 11.)

- "*Above all, safety for all. Over the past few years, there've been remarkable advances in the levels of safety technology available on new vehicles. At Hyundai, we're working hard to make the benefits of these innovative features available on more or more of our models. After all, you shouldn't have to choose a top–of–the–line trim to feel like you're safe and secure.*" (Ex. G, ¶ 11.)

- "*Make the safe move. Nothing's more important to you than the safety of your family. And that's the priority of the Palisade, too. With Hyundai SmartSense, Palisade comes equipped with an array of innovative safety technologies that help protect you from every angle – whether you're negotiating frantic freeways, or urban jungles or winding ribbons of a mountain road.*" (*Id.* ¶ 13.)

- "*Working towards one goal–a Hyundai made to keep you safe.*" (*Id.* ¶ 14.)

- "*We care about drivers, so we build technology and programs that put them first, always.*" (*Id.*)

- "*More than giving you added peace of mind, this [Hyundai] warranty supports our commitment to provide vehicles of high quality, dependability and reliability.*" (*Id.*)

658.    As detailed above, however, notwithstanding these representations, Defendants failed to equip the vast majority of their vehicles, including the Class Vehicles, with an immobilizer; a ubiquitous antitheft device that has been: (i) utilized by the automotive industry for decades; (ii) required to be installed since 1998 in other jurisdictions where Defendants sell their vehicles; (iii) embraced by NHTSA as an effective deterrent against auto theft since as early as 1997; and even lauded by Defendants themselves—*more than fifteen years ago*—as an incredibly beneficial method to curb the palpable safety threat that auto theft poses.

659.    When these irrefutable facts are juxtaposed against the exemplar advertisements above—and there are many, many more—it becomes clear that Defendants' marketing materials touting the safety and technological features of the Class Vehicles are not merely deceptive and misleading—they are categorically and measurably false.

144

660. What is more, Defendants have had actual and/or constructive knowledge about this powder keg they created—namely, failing to equip the Class Vehicles with immobilizers that their competitors began successfully using to curb auto theft in 1986 ███████████████████ ████████████████████████████████████████████████████ ████—for more than twenty years.

661. Accordingly, the DATCP Plaintiffs and members of the Class, who have been exposed to Defendants' ongoing, deceptive advertising campaign, have suffered monetary loss redressable under Section 100.18.

662. Neither the DATCP Plaintiffs, nor members of the Class, nor any reasonable consumer, would have consummated the sale or lease of the Class Vehicles had Defendants been honest brokers and explained the truth; specifically, that despite these marketing materials touting the Class Vehicles' safety and design, they contained an easily redressable Defect—employed by their competitors since the 1980s and required to be installed as standard technology in other jurisdictions in which Defendants sell their cars since as early as 1999—that subjected these consumers to an ever-present risk of auto theft.

663. As such, the facts make plain that Defendants conspired to violate Section 100.18 by disseminating to the public—including the DATCP Plaintiffs and the Class—false, deceptive, and misleading advertising materials about the purported safety and design of the Class Vehicles.

664. Accordingly, the DATCP Plaintiffs and the Class—as members of the public to whom these false, deceptive, and misleading advertisements were directed—have suffered monetary damage that is recoverable under Section 100.18(1) in an amount to be determined at trial.

665.   Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

666.   Chaid, Chad, Amy, and Lydia (hereafter, the "Consumer Plaintiffs" for purposes of this Count) bring this claim themselves and on behalf of the Consumer Subclass.

667.   Section 100.20 of the Wisconsin Statutes ("Section 100.20") prohibits individuals and entities from engaging in unfair trade practices. Wis. Stat. § 100.20(1).

668.   To that end, Section 100.20 authorizes Wisconsin's Department of Agriculture, Trade and Consumer Protection ("DATCP") to "issue general orders forbidding methods of competition in business or trade practices in business which are determined by the [DATCP] to be unfair." *Id.* § 100.20(2)(a).

669.   The statute vests any person who suffers pecuniary loss stemming from a violation of "any order issued under [Section 100.20]" with a cause of action to sue for damages in a court of competent jurisdiction. *Id.* § 100.20(5).

670.   Relevant here, Chapter ATCP 127 of Wisconsin's Administrative Code ("ATCP 127") specifies the conduct to which a "seller" of "consumer goods and services" must adhere when making face-to-face solicitations with customers. *See* Wis. Admin. Code ATCP §§ 127.01 *et seq.*

671.   ATCP 127 defines "seller" expansively; the term encompasses Kia and Hyundai because they are engaged in the business of selling, offering to sell, and/or promoting the sale of consumer goods or services to consumers. *Id.* § 127.01(21).

146

672. Kia and Hyundai promote the sale of the Class Vehicles by disseminating brochures and other advertising materials to their authorized dealers throughout the United States, including those located in the state of Wisconsin.

673. The Consumer Plaintiffs are "consumer[s]" as the term is defined in ATCP 127 because they are individuals to whom Kia and Hyundai advertised, offered to sell, sold, and/or promoted the sale of consumer goods or services. *Id.* § 127.01(2).

674. Likewise, the Class Vehicles Kia and Hyundai promoted to the Consumer Plaintiffs and various members of the Consumer Subclass fall within the ambit of "consumer goods and services," because they are goods used for personal, family, or household purposes. *Id.* § 127.01(3).

675. ATCP 127 was adopted under the authority of Section 100.20(2) and is enforceable through a private right of action pursuant to Section 100.20(5). Thus, the Consumer Plaintiffs may enforce the mandates of ATCP 127 by way of a Section 100.20(5) claim on behalf of themselves and members of the Consumer Subclass.

676. As "sellers" of the Class Vehicles, Kia and Hyundai were required to "disclose" to the Consumer Plaintiffs the following information, in writing, before they entered into a purchase contract[72] for their respective Class Vehicles: "all material terms and conditions affecting the sale, receipt, or use of the consumer goods or services, including credit terms if any." *Id.* § 127.64(1)(c).

677. ATCP 127 defines "disclose" as a term of art, which obligates Kia and Hyundai, as sellers, "to make a clear and conspicuous statement which is reasonably designed to be noticed and readily understood by the consumer." *Id.* § 127.01(10).

---

[72] ATCP 127 defines "purchase contract" as "an agreement to purchase consumer goods or services, regardless of whether that agreement is subject to a later right of cancellation. Wis. Admin. Code ATCP § 127.01(18). Because ATCP 127 defines a "purchase" as the act of buying or leasing consumer goods or services, the administrative scheme applies to members of the Class who either bought or leased a Class Vehicle. *See id.* § 127.01(17).

147

678.    Similarly, ATCP 127 prohibits Kia and Hyundai from engaging in the following misconduct when making a "face-to-face solicitation" (discussed *infra*): (i) failing to disclose material costs payable by the consumer; (ii) misrepresenting the nature, quantity, material characteristics, performance, or efficacy of the goods or services offered or promoted; (iii) failing to disclose material restrictions, limitations, or conditions on the purchase, receipt, use, or return of goods of services offered or promoted; (iv) misrepresenting the material terms of their warranty policies; and (v) making any false, deceptive, or misleading representations to consumers. *Id.* §§ 127.72(4)-(7), (15).

679.    ATCP 127 defines a "face-to-face solicitation" as a solicitation that "a seller makes in a face-to-face encounter with a consumer," including "[p]urchase contracts and other dealings that result from a face-to-face solicitation." *Id.* § 127.60.

680.    A "solicitation" is then defined more broadly as "a communication received by a consumer at a place other than the seller's regular place of business, in which a seller offers or promotes the sale of consumer goods or services to a consumer, or which is part of a seller's plan or scheme to sell consumer goods or services to a consumer." *Id.* § 127.01(22).

681.    Applied here, Kia and Hyundai make face-to-face solicitations anytime a consumer buys or leases a Class Vehicle at an authorized Kia or Hyundai dealership because there is a face-to-face encounter that takes place outside of Kia and Hyundai's respective places of business, whereby Kia and Hyundai, as sellers, promote the sale or lease of Class Vehicles through the brochures and/or other advertising materials their authorized dealers provide the consumer on Kia and Hyundai's behalf.

682. Applied here, Kia and Hyundai disseminated brochures and/or other advertising materials promoting the sale or lease of Class Vehicles to their authorized dealers across the United States, including those located in the state of Wisconsin.

683. As explained above, these dealers then distributed Kia and Hyundai's brochures and/or other advertising materials to the Consumer Plaintiffs and members of the Consumer Subclass at the dealerships in connection with purchasing or leasing a Class Vehicle.

684. As explained above, the Class Vehicles contain the Defect, rendering them easy to steal and therefore highly susceptible to theft, which has sparked an "epidemic" of car theft throughout the greater-Milwaukee area.

685. Before the Consumer Plaintiffs and the members of the Consumer Subclass entered their respective purchase contracts, however, Kia and Hyundai failed to conspicuously disclose in writing all material terms and conditions affecting their use of the Class Vehicles; specifically, at no point did Kia and Hyundai inform the Consumer Plaintiffs or members of the Consumer Subclass that the Class Vehicles were designed with the Defect, which made them so vulnerable to theft.

686. Kia and Hyundai's failure to disclose this information violated ATCP 127.64(1)(c) because the Defect constitutes a "material terms and conditions affecting the sale, receipt, or use" of the Class Vehicles. Indeed, not only is this information material to any prospective purchaser or lessee, but as a result of the Defect, the Consumer Plaintiffs and the Consumer Subclass have been (and will continue to be) deprived of the use of the Class Vehicles whenever they are stolen.

687. Additionally, Kia and Hyundai violated several provisions of ATCP 127.72, because they (i) failed to disclose material costs for which the Consumer Plaintiffs would ultimately be responsible when the Class Vehicles would be stolen; (ii) misrepresented the nature, material

149

characteristics, performance, or efficacy of the Class Vehicles as it relates to products' safety and security; (iii) failed to disclose material restrictions, limitations, or conditions on the use of the Class Vehicles they promoted; (iv) misrepresented the material terms of their warranty policy, which Kia and Hyundai now claim does not cover damages stemming from the Class Vehicles defective design; and (v) made false, deceptive, or misleading representations to the Consumer Plaintiffs and the Consumer Subclass as described in Count II, *supra*.

688. As a result of Kia and Hyundai's myriad violations of ATCP 127, the Consumer Plaintiffs and the Consumer Subclass have suffered pecuniary loss, including but not limited to overpaying for the Class Vehicles, insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of their vehicles, the loss of use of their respective vehicles, costs associated with the replacement of the totaled Class Vehicles and/or the diminution in value of a stolen Class Vehicle that was not totaled.

689. Accordingly, the Consumer Plaintiffs and the Consumer Subclass bring this claim for Kia and Hyundai's myriad violations of ATCP through their authority under Wis. Stat. § 100.20 and seek recovery for the losses suffered—in addition to the other remedies set forth under this statute, including exemplary damages and attorneys' fees—in an amount to be determined at trial.

### COUNT IX: STATUTORY VIOLATIONS OF WIS. STAT. § 218.0116
### (Against Kia and Hyundai)

690. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

691. Katie, Chaid, Chad, Amy, and Lydia (together, the "Retail Plaintiffs" for purposes of this Count) bring this claim themselves and on behalf of the Retail Buyer Subclass.

692. Chapter 218 of the Wisconsin Statutes, Wis. Stat. §§ 218.0101 *et seq.*, regulates the conduct of various participants in the motor vehicle industry, including Kia and Hyundai.

693.     Indeed, Section 218.0114 of the Wisconsin Statutes requires both Kia and Hyundai to be licensed under Chapter 218 to sell their respective vehicles in Wisconsin through various authorized dealers:

> **(2)** *No manufacturer, importer, or distributor may engage in business as a manufacturer, importer or distributor in this state without a license therefor as provided in ss. 218.0101 to 218.0163.*
>
> **(2m)** No manufacturers', distributors' or importers' vehicles shall be sold in this state unless either the manufacturer on direct dealerships of domestic vehicles, the importer of foreign manufactured vehicles on direct dealerships or the distributor on indirect dealerships of either domestic or foreign vehicles are licensed under ss. 218.0101 to 218.0163. *The obtaining of a license* under ss. 218.0101 to 218.0163 shall conclusively establish that a manufacturer, distributor or importer is doing business in this state and *shall subject the licensee to all provisions of the Wisconsin statutes regulating manufacturers, importers and distributors*.

Wis. Stat. §§ 218.0114(2)–(2m) (emphasis added).

694.     On information and belief, Kia and Hyundai have maintained their respective licenses as either manufacturers, distributors, and/or importers pursuant to Section 218.0114 since at least 2010, and likely much earlier.

695.     As licensees under Chapter 218, Kia and Hyundai are thus subject to "all provisions of the Wisconsin statutes regulating manufacturers, importers and distributors," including but not limited to when the Retail Plaintiffs and those members of the Class leased and/or purchased their respective vehicles, including the Class Vehicles. Wis. Stat. § 218.0114.

696.     Relevant here, Chapter 218 vests certain consumers with a civil cause of action against a licensee that engages in conduct proscribed by the statutory scheme:

> *Any retail buyer, lessee or prospective lessee suffering pecuniary loss because of a violation by a licensee* of s. 218.0116(1) . . . (bm), (c), (cm), . . ., (dm), (e), . . . [and] (f) . . . *may recover damages for the loss in any court of competent jurisdiction together with costs, including reasonable attorney fees.*

Wis. Stat. § 218.0163(2) (emphasis added).

151

697. The enumerated acts of malfeasance that give rise to a retail buyer or lessee's statutory claim against a licensee—and which independently serve as grounds to suspend or revoke an offending party's license—include situations where a licensee:

> (bm) Willfully fails to comply with any provision of ss. 218.0101 to 218.0163 or any rule or regulation promulgated under Chapter 218 implementing regulations;
>
> (c) Willfully defrauds any retail buyer, lessee or prospective lessee to the buyer's, lessee's or prospective lessee's damage;
>
> (cm) Willfully fails to perform any written agreement with any retail buyer, lessee or prospective lessee;
>
> (dm) Makes a fraudulent sale, consumer lease, prelease agreement, transaction or repossession;
>
> (e) Makes a fraudulent misrepresentation, circumvention or concealment through whatsoever subterfuge or device of any of the material particulars or the nature thereof required hereunder to be stated or furnished to the retail buyer, lessee or prospective lessee; and
>
> (f) Engages in any unconscionable practice relating to the licensed business activity.

Wis. Stat. §§ 218.0116

698. Each Retail Plaintiff is either a "retail buyer" or "lessee" as those terms are defined in the MVDL. *See* Wis. Stat. § 218.0101(16) (defining "Lessee"); *see also id.* § 218.0101(31) (defining "Retail Buyer").

699. As set forth in Plaintiffs' statutory fraud claim, Kia and Hyundai engaged in a multi-year pattern of fraudulent conduct whereby—through various affirmative misrepresentations and fraudulent omissions—they defrauded Plaintiffs and members of the Class. (*See* Count IV, *supra*.)

700. As such, Kia and Hyundai's pattern of fraudulent conduct is independently actionable under Wis. Stat. § 218.0163(2) because: (i) each Retail Plaintiff falls within the scope of those protected under the MVDL; and (ii) Defendants' fraudulent conduct violates subsections (c), (dm), and (e) of Wis. Stat. 218.0116.

152

701.     Likewise, Kia and Hyundai have "willfully fail[ed]" to honor their written warranties with Chad, Chaid, Amy, and Lydia—the "Warranty Plaintiffs" as defined above—as well as other members of the Class, as more fully described in Count I (Express Warranty). Accordingly, Kia and Hyundai's willful failure to do so is also actionable under Wis. Stat. § 218.0163(2) because it violates Wis. Stat. § 218.0116(cm).

702.     Finally, when Kia and Hyundai's actions are viewed holistically, they knew or should have known about the Defect in the Class Vehicles for decades; despite this actual or constructive knowledge they continued to market and sell the Class Vehicles (even to this day) knowing that they present a massive safety threat to the Retail Plaintiffs, other members or the Class, as well as the community at large; and yet they have steadfastly refused to take ownership and redress this crisis while masquerading as model corporate citizens.

703.     As licensees under the MVDL, Kia and Hyundai have knowingly peddled unsafe vehicles into the stream of commerce and now seek to disclaim liability for crisis they created. As substantively detailed herein, this pattern of behavior is unconscionable under the circumstances, which is likewise actionable under Wis. Stat. § 218.0163(2) by operation of Wis. Stat. § 218.0116(f).

704.     The Retail Plaintiffs, as well as members of the Class, have suffered pecuniary loss as a result of Kia and Hyundai's violation of these MVDL provisions, including but not limited to paying insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of their vehicles, the loss of use of their respective vehicles, costs associated with the replacement of the totaled Class Vehicles and/or the diminution in value of a stolen Class Vehicle that was not totaled.

705. Accordingly, Kia and Hyundai, as licensees under the MVDL, are therefore liable to the Retail Plaintiffs and the Class in an amount to be determined at trial.

## COUNT X: STATUTORY VIOLATION OF WIS. STAT. § 895.047 (DESIGN DEFECT)
### (Against All Defendants)

706. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

707. Plaintiffs bring this claim themselves and on behalf of the Class.

708. In codifying Section 895.047(1) of the Wisconsin Statutes ("Section 895.047"), the Wisconsin legislature created a statutory claim to hold manufacturers responsible for damages caused by a defective product based on a claim of strict liability. *See id.* § 895.047(1).

709. Under Section 895.047(1), a manufacturer is liable for a design flaw in its product if the plaintiff proves by a preponderance of the evidence that: (i) the product is defective in design, meaning the foreseeable risks of harm posed by the product could have been reduced or avoided had the manufacturer adopted a reasonable alternative design, the omission of which renders the product unsafe; (ii) the defective condition rendered the product unreasonably dangerous to persons or property; (iii) the defective condition existed at the time the product left the manufacturer's control; (iv) the product reached the user or consumer without the condition in which it was sold being substantially changed; and (v) the defective condition caused the claimant's damages. *Id.*

710. Section 895.047 also permits a claimant to maintain a cause of action against sellers and distributors of the product if the manufacturer is liable under the rubric prescribed above and any one of the following applies: (i) the claimant proves by a preponderance of the evidence that the seller or distributor has contractually assumed one of the manufacturer's duties to manufacture, design, or provide warnings or instructions with respect to the product; (ii) the claimant can prove by a preponderance of the evidence that neither the manufacturer nor its insurer is subject of service

154

of process within this state; or (iii) the claimant would be unable to enforce a judgment against the manufacturer or its insurer. *Id.* § 895.047(2)(a).

711.    Applied here, the Defect in the Class Vehicles renders them defective in design because it makes the Class Vehicles easy to steal, which creates a foreseeable risk of harm; easy–to–steal cars entice more crime, thereby putting Plaintiffs and the Class in harms' way.

712.    As discussed in detail above, this foreseeable risk could have been reduced or avoided had Defendants adopted a reasonable alternative design for the Class Vehicles, the absence of which made the Class Vehicles prime targets for theft.

713.    For starters, ████████████████████████████████████████████ ████████████████████████████████████████. On information and belief, this increased protection could have been implemented on the Class Vehicles at minimal cost.

714.    Further, Defendants were aware of how effective immobilizers are in reducing the risk of auto theft because: (i) this technology is implemented as a standard feature in Defendants' vehicles sold in foreign markets; and (ii) Defendants' have petitioned the NHTSA to exempt certain (typically more expensive) models in their lineup from the PMR by installing the very safety measure absent in the Class Vehicles.

715.    The touted effectiveness of this immobilizer technology versus simply complying with the PMR—the former being 70% more effective than the latter, according to HATCI—coupled with the fact that virtually all of Defendants' competitors have equipped their vehicles with immobilizers, underscores that this technology is a reasonable alternative design that could have been implemented in the Class Vehicles to protect Plaintiffs and the Class.

155

716.    Regardless, even without equipping the Class Vehicles with an immobilizer, Defendants could have adopted a host of other reasonable alternative designs to make the Class Vehicles less susceptible to theft, the need for which was amplified only more so by the subpar alarm system.

717.    For instance, Defendants could have equipped the Class Vehicles ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████Thus, they are an eminently reasonable design alternative that could have been incorporated with one or more additional antitheft measures described herein to prevent the Class Vehicles from being stolen so easily.

718.    More importantly, however, Defendants should have ██████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████

719.    ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████.

720.    ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████

156

721. On information and belief, however, unlike other manufacturers, ███████ ███████████████████████████████████████████████████████ █████████████████████████████████████████

722. ███████████████████████████████████████████████████ ████████████████████████████████████████████.

723. As discussed above, Defendants had at their disposal numerous, alternative reasonable designs ████████████████████████████████████████████. Indeed, the "Kia Boyz" are not called the "Toyota Boyz" or the "Chevy Boyz" or the "Nissan Boyz" for good reason; namely, because unlike Defendants, ██████████████████████ ████████████████████████████████████████.

724. In fact, Defendants knew or should have known that ██████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████

725. ███████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████.

726. Accordingly, the Defect rendered the Class Vehicles unreasonably dangerous to Plaintiffs, the Class, and the community at large because these vehicles are being stolen so easily and then used in furtherance of other crimes.

727. Not only has this deprived Plaintiffs and the Class of safe, reliable transportation, but the ease with which these cars are being stolen has resulted in severe injuries, death, and a substantial drain on community resources.

728. The Defect existed at the time the Class Vehicles left Defendants' control, and the Class Vehicles reached each Plaintiffs in the same condition without changing; the only logical conclusion given the sheer number of Class Vehicles that have been stolen in the exact same way.

729. As the Defect involves the design of the Class Vehicles' ignition system coupled with the absence of other antitheft measures noted above, the Defect is not something that would ever be apparent to unsuspecting consumers, such as Plaintiffs and the Class.

730. In fact, Defendants repeatedly advertised the Class Vehicles as safe, while concealing or otherwise failing to disclose that these "safe" vehicles lacked basic antitheft measures that have been embraced by NHTSA, other automotive manufacturers, and Defendants themselves (albeit, in limited instances) for decades.

731. Plaintiffs and the Class never modified the Class Vehicles at any point while they owned them, except perhaps to have installed the same defective replacement parts once their vehicles were stolen. Thus, the Defect existed at the time each Class Vehicle was stolen.

732. The Defect has proximately caused Plaintiffs and the Class significant damages, including but not limited to insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of their vehicles, the loss of use of

158

their respective vehicles, costs associated with the replacement of the totaled Class Vehicles and/or the diminution in value of a stolen Class Vehicle that was not totaled.

733. Nor does this account for collateral damage to other, innocent victims' property that was damaged in connection with the thefts of the Class Vehicles; a natural consequence to a rash of auto thefts wherein the primary perpetrators are juveniles with a penchant for joyriding.

734. Additionally, because Defendants and/or their corporate affiliates are liable for the Defect under Section 895.047(1), Plaintiffs and the Class can maintain a cause of action against Defendants in their capacities as sellers and/or distributors of the Class Vehicles pursuant to Section 895.047(2).

735. On information and belief, and as detailed herein: (i) as sellers and/or distributors, Defendants contractually assumed the same duties regarding the design of the Class Vehicles as the Class Vehicles' manufacturers; (ii) one or more of the Class Vehicles' manufacturers or their insurers may be foreign entities who are not subject to service of process in the state; and/or (iii) Plaintiffs and the Class cannot enforce a judgment against the manufacturers or their insurers.

736. Each day, Plaintiffs and the Class face ongoing exposure to severe risk of personal injury and further property damage as a result of this Defect, which has transformed metropolitan Milwaukee into a game of *Grand Theft Auto*. Defendants are therefore liable for the resulting injuries sustained in an amount to be determined at trial.

### COUNT XI: POST–SALE FAILURE TO WARN
### (Against All Defendants)

737. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

738. Plaintiffs bring this claim on behalf of themselves and the Class.

739.    Wisconsin law imposes an obligation on automotive companies to design reasonably safe and secure vehicles.

740.    This duty does not end when the car leaves the company's factory, however; rather, it extends to require these companies to warn the owners of their vehicles when the company learns about risks associated with the vehicle that can pose substantial harm to persons or property.

741.    Indeed, automotive recalls are commonplace in the industry–whether voluntarily implemented by the manufacturer, ordered by the appropriate agency, or otherwise.

742.    On information and belief, this is one of many reasons why vehicles are assigned a unique VIN; specifically, these VINs allow automotive companies to keep track of a large number of vehicles throughout the country, so that recall notices can be issued if necessary.

743.    On information and belief, all major automotive companies, including Defendants, maintain a database to readily identify, and effectively communicate with, as many of their vehicle owners as possible to alert them of serious problems with their vehicles, so these owners can promptly take action to address and/or mitigate any risks of which they would otherwise be unaware.

744.    Applied here, Defendants are acutely aware of the Defect in their vehicles that has caused an outlandish spike in Kia/Hyundai auto thefts in the area.

745.    Defendants have known about this issue for decades given: (i) the design specifications imposed by other countries in which they sell their products; and (ii) Defendants' acknowledgment of how to better design their vehicles to avoid being a theft risk, as evidence by their multiple (fifteen–year–old) Petitions to NHTSA for an exemption from the PMR.

746.    Further, data compiled by the NCIC, on which Defendants relied to obtain various petitions for exemption from the PMR and which is also cataloged by the NICB in its annual Hot

Wheels Reports, shows the marked increase in thefts of Defendants' vehicles of which they were acutely aware.

747. At a minimum, however, Defendants have been aware of this problem for approximately one year when the incredible uptick in Kia/Hyundai thefts began.

748. On information and belief, Defendants receive data and maintain their own database concerning the number of thefts of their respective vehicles, which is reported to them by various municipalities.

749. On information and belief, Defendants are also involved in the manufacture and distribution of component parts for their vehicles, such that they receive information (and appropriately monitor situations) where the same or similar replacement parts are being ordered at such an alarming rate that it is causing a significant backlog in the supply chain.

750. Applied here, Defendants have thus known for months if not years about the Defect in the Class Vehicles that—given the very nature of auto-theft—can pose a substantial risk of harm to Plaintiffs and the Class.

751. Further, the nature of the Defect is not readily apparent to a consumer unless: (i) that person's vehicle is stolen and the mechanic explains how; or (ii) the person has recently begun paying attention to the local news.

752. Defendants had the information, opportunity, and infrastructure to warn their vehicle owners about the Defect in the Class Vehicles, so the Class could have taken steps to ameliorate the problem. Defendants neglected to do so, however.

753. As the above-referenced articles make clear, the alarming increase in thefts, injuries, and deaths proximately caused by the ease with which the Class Vehicles can be stolen means the

risk of harm dramatically outweighed any burden on Defendants to furnish a warning to Plaintiffs and the Class.

754.    Defendants nonetheless failed to do so, despite the risk of harm to which Plaintiffs and the Class were (and continue to be) exposed.

755.    Because the Defendants did not act reasonably under the circumstances, they violated their post-sale duty to warn Plaintiffs and the Class about the Defect in the Class Vehicles.

756.    As such, Defendants' post-sale failure to warn caused Plaintiffs and the Class significant damages, including but not limited to overpaying for the Class Vehicles, insurance deductibles to get the stolen Class Vehicles repaired, the cost to replace other property stolen in connection with the thefts of their vehicles, the loss of use of their respective vehicles, costs associated with the replacement of the totaled Class Vehicles and/or the diminution in value of a stolen Class Vehicle that was not totaled.

757.    Nor does this account for collateral damage to other, innocent victims' property that was damaged in connection with the thefts of the Class Vehicles; a natural consequence to a rash of auto thefts wherein the primary perpetrators are juveniles with a penchant for joyriding.

758.    Thus, apart from their ongoing failure to warn, which continues to expose Plaintiffs and the Class to severe risk of personal injury and further property damage, Defendants are liable to Plaintiffs and the Class for injuries sustained as a result of this public safety crisis, which has been brought to bear by the Defect in the Class Vehicles coupled with Defendants' post-sale failure to warn about it.

## COUNT XII: DECLARATORY & INJUNCTIVE RELIEF PURSUANT TO 28 U.S.C. §§ 2201 *ET SEQ.*
### (Against All Defendants)

759.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

162

760. Plaintiffs bring this claim on behalf of themselves and the Class.

761. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, this Court may enter a judgment declaring the rights and legal relations of the parties, and grant necessary relief pursuant to the judgment.

762. This Court also has authority to restrain tortious actions and violations of criminal statutes to prevent further harm.

763. Further, the Wisconsin Constitution guarantees to every person a remedy for all injuries or wrongs that the person may receive in the person's property or character:

> *Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws.*

Wis. Const. Art. I, § 9 (emphasis added).

764. As the Wisconsin Supreme Court has explained, the "court, like every other branch of the government must face the constitutional guaranty of a certain remedy in the laws to redress every wrong 'completely and without denial.' It is a creature of the constitution and its most important function is to vitalize its guarantees." *Lutheran Trifoldighed Congregation. of Neenah v. St. Paul's Evangelical Lutheran Congregation of Neenah*, 159 Wis. 56, 150 N.W. 190, 192 (1914).

765. Applied here, there is little dispute that society imposes a duty on all vehicle manufacturers to design reasonably safe and secure vehicles, which is breached each time a defective or dangerous product is sold.

766. As the sheer number of Kia and Hyundai auto thefts demonstrates, however, Defendants have failed to meet this duty; the Defect present in the Class Vehicles is so pervasive

and so dangerous that middle-schoolers can steal these cars in under a minute, only to terrorize the city on a reckless joyride.

767. Plaintiffs, other owners of the Class Vehicles, and their fellow Milwaukee residents are therefore subject to an endemic auto-theft spree that only Defendants can remedy. As their conduct has evinced to date, however, Defendants have no such intention of doing so. Accordingly, the Court must invoke its authority under the Declaratory Judgments Act and the Wisconsin Constitution to craft a suitable remedy.

768. As detailed herein, Defendants have engaged in a multi-year pattern of false, deceptive, and misleading advertising while concealing the Defect in the Class Vehicles, which has culminated in the public safety crisis taking hold of metropolitan Milwaukee.

769. Accordingly, the Court must issue injunctive relief to enjoin Defendants from their direct or indirect participation in the ongoing sales of the Class Vehicles, which they can control vis-à-vis their respective authorized dealers; from conducting business through the unlawful, unfair, misleading, or deceptive business acts or practices, and other violations of law described in this Complaint; and require them to implement necessary measures to remedy these unconscionable business practices.

770. Legal remedies alone cannot adequately address the substantial likelihood of future harm Plaintiffs and the Class will sustain if these practices continue.

771. True, Plaintiffs are no longer "deceived" by Defendants business practices, as residents of Milwaukee County, they each face the risk of future imminent harm if Defendants are permitted to continue to sell the Class Vehicles in this jurisdiction and/or they fail to implement

an appropriate program to recall and/or buyback the Class Vehicles already in the stream of commerce.

772.    The hardship that Plaintiffs and the Class will suffer if the Court does not issue an injunction exceeds the hardship Defendants will experience if the Court issues an injunction, as Plaintiffs and the Class continue to face the threat of personal injuries and unsafe roadways as this rash of thefts rages on.

773.    Further, the cost to Defendants for complying with an injunction is relatively minimal. In effect, the injunction decrees what they are obligated to do already; specifically, stop selling defective vehicles that should not be sold anyway.

774.    Additionally, Plaintiffs anticipate that—at least with respect to Plaintiffs Stefanie and Marvin and Katie Wargin (hereafter, the "Used Car" buyers)—Defendants will seek to weaponize the economic loss doctrine ("ELD") to contend that because neither of them suffered personal injuries on account of their respective Class Vehicles being stolen, they and other used car buyers are foreclosed from proceeding in tort and/or seeking injunctive relief to curb the ongoing threat of future, imminent harm.

775.    As Defendants are aware, however, unlike the Warranty Plaintiffs who purchased and/or leased new Class Vehicles from Kia and Hyundai's authorized dealers, these used car buyers are even further removed from Defendants to claim privity of contract. Thus, absent abrogating the privity requirement altogether, they are foreclosed from asserting an otherwise cognizable claim for breach of the implied warranty of merchantability.

776.    Likewise, absent a finding that the disclaimers and limitations in Kia and Hyundai's respective express warranties are void as unconscionable, these used car buyers are foreclosed from

asserting an express warranty claim because Defendants sought to disclaim design defects and damages resulting from theft in each warranty.

777. Finally, given the age of these used car buyers' Class Vehicles, including those of certain members of the Class, an express warranty claim would be barred in any event by the applicable statute of limitations unless these limitations period is tolled as a result of Defendants' conduct.

778. All told, the upshot is that Defendants will tout the illusory nature of the used car buyer's ostensible "bargained–for" contract remedies, while attempting to escape liability *in toto* for this class of individuals despite the unquestionable Defect afflicting the Class Vehicles that are, quietly literally, putting all Plaintiffs and their fellow Milwaukee residents in harm's way.

779. The ELD is a judicially created remedies principle designed to preserve the distinction between contract and tort; it generally operates to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contractual relationship.

780. What the ELD is not designed to do, however, is grant safe harbor to manufacturers of inherently dangerous and defective products, which have created a public safety crisis.

781. Indeed, weaponizing the ELD in this fashion would violate this Court's solemn obligation to "completely and without denial, promptly and without delay" fashion a remedy to fix this crisis for the thousands of people who purchased a used Kia or Hyundai with an expired warranty, albeit nonetheless believing they were safe and reliable vehicles—just as Kia and Hyundai have advertised.

782. Milwaukee is under siege and people have already died because of the ease with which the Class Vehicles can be stolen. It follows that the used car buyers, as equal victims of this auto-theft scourge, have a constitutional right to a remedy.

783. Accordingly, Plaintiffs, on behalf of themselves those similarly situated, hereby request the Court to invoke its authority, declare the Class Vehicles defective, and decree a suitable remedy.

**WHEREFORE**, Plaintiffs respectfully request the following relief, as allowed pursuant to the above-referenced facts, the applicable caselaw, and the governing statutes:

**(A)** That the Court determine that this action may be maintained as a class action and certify it as such under Rules 23(b)(2), 23(b)(3), and/or 23(c)(4) of the Federal Rules of Civil Procedure, or alternatively certify all issues, claims, and/or subclasses that are appropriately certified under Rule 23(c)(4) and Rule 23(c)(5);

**(B)** That the Court appoint Plaintiffs as class representatives and the undersigned counsel as class counsel as well as pre-certification interim counsel;

**(C)** That the Court order appropriate injunctive and/or declaratory relief, including, without limitation, an order that: (1) enjoins Defendants from continuing to misrepresent and conceal material information about the Defect and from conducting business in an unfair, deceptive, and unconscionable manner as set forth herein, including their ongoing encouragement and approval of the sale of the Class Vehicles; and (2) requires Defendants to repair, recall, and/or replace the Class Vehicles or, at a minimum, to provide Plaintiffs and the Class with appropriate curative notice regarding the existence and cause of the Defect;

**(D)** That the Court order Defendants to disgorge all monies, revenues, and profits they wrongfully obtained as a result of their acts and practices alleged in this Amended Complaint;

**(E)** That the Court award Plaintiffs and the Class compensatory, restitutionary, and/or statutory damages, including but not limited to the purchase and/or lease price of the Class Vehicles;

**(F)** That the Court award Plaintiffs and the Class punitive and/or exemplary damages in accordance with applicable law;

**(G)** That the Court award Plaintiffs and the Class costs and attorneys' fees incurred in connection with prosecuting this action; and

**(H)** That the Court award any other relief it deems just and equitable under the circumstances, including but not limited to rescission of any applicable purchase and/or lease contracts for the Class Vehicles.

*PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE*

Dated this 4th day of November, 2021.

BARTON LEGAL S.C.

*/s/ Electronically Signed By James B. Barton*
James B. Barton
Email: *jbb@bartonlegalsc.com*
Joshua S. Greenberg
Email: *jsg@bartonlegalsc.com*
313 North Plankinton Ave., Ste. 207
Milwaukee, WI 53203
T: (414) 877–0690
F: (414) 877–3039

*Attorneys for Plaintiffs, Stefanie Marvin, Katherine Wargin, Chaid Przybelski, Chad Just, Amy Flasch, Lydia Davis and the Proposed Class*

168